# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# AT NASHVILLE

| | |
|---|---|
| ABEDE DASILVA, § § *Plaintiff*, § § v. § § JEFFREY L. REINKING, § § *Defendant*. § | Case No. _____ JURY DEMANDED |

## COMPLAINT

## INTRODUCTION

1. Akilah DaSilva was a beloved son, brother, and budding musician who was pursuing a promising career in computer engineering at Middle Tennessee State University. He loved his family, photography, writing poetry, and directing music videos. *See* **Exhibit 1.** On April 22, 2018, Travis Reinking gunned him down with an AR-15 style rifle that had been returned to him by his father, Jeffrey Reinking, despite Mr. Reinking's actual knowledge that his son was mentally unstable and posed a severe risk of harm to himself and others.

2. As a result of Jeffrey Reinking's gross negligence, Akilah DaSilva was brutally and senselessly murdered. Akilah's older brother, Abede DaSilva—who narrowly avoided being killed by Travis Reinking himself—held Akilah while he bled out, screaming in pain, and ultimately watched him die.

3. This lawsuit seeks to hold Jeffrey Reinking accountable for the severe emotional distress that he caused Abede DaSilva through his unconscionable conduct.

-1-

## I. PARTIES

4. Plaintiff Abede DaSilva is the brother of Akilah DaSilva, who was murdered by Travis Reinking on April 22, 2018. Abede DaSilva is a citizen of Davidson County, Tennessee.

5. Defendant Jeffrey Reinking is the father of Travis Reinking, who brutally murdered the Plaintiff's brother with a Bushmaster XM-15 rifle that his father returned to him after his right to own a firearm was formally revoked. Jeffrey Reinking is a citizen of Tazewell County, Illinois. He may be served at his personal residence in Morton, Tazewell County, Illinois.

## II. JURISDICTION, AUTHORITY AND VENUE

6. This Court has jurisdiction over this diversity action pursuant to 28 U.S.C. § 1332.

7. As a diversity action, this Court has authority to adjudicate the Plaintiff's claims pursuant to Tennessee common law and Tenn. Code Ann. § 29-11-107(b)(1).

8. As the jurisdiction in which a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

## III. FACTUAL ALLEGATIONS

9. On three occasions in 2016 and 2017, Defendant Jeffrey Reinking took possession of multiple firearms owned by his son, Travis Reinking.

10. On all three occasions, Jeffrey Reinking returned those firearms to Travis Reinking despite actual knowledge that his son was mentally unstable and a danger to others.

11. In July 2017, Travis Reinking was arrested by the United States Secret Service at the White House in Washington, D.C. The following month, after being contacted by the FBI, the Sheriff's Office in Tazewell County, Illinois, visited Travis Reinking at J&J Cranes, Inc.—a business owned by Defendant Jeffrey Reinking—for the purpose of dispossessing him of his firearms and his right to possess firearms.

12. In August 2017, the Tazewell County Sheriff's Office formally revoked Travis Reinking's Firearm Owners Identification (FOID) card. Under Illinois law, the effect of the revocation was to prevent Travis Reinking from lawfully possessing firearms.

13. In August 2017, and at all times thereafter, Jeffrey Reinking had actual knowledge that Travis Reinking's FOID card had been revoked by law enforcement and that his son could no longer legally possess firearms as a result.

14. On or about August 24, 2017, Jeffrey Reinking asked the Tazewell County Sheriff's Office for permission to take possession of the firearms and ammunition that Travis Reinking had become legally obligated to surrender.

15. On or about August 24, 2017, Jeffrey Reinking did in fact take possession of the firearms and ammunition that Travis Reinking had become legally obligated to surrender. At the time that he took possession of the firearms, Jeffrey Reinking knew that Travis Reinking was "having problems."

16. As a condition of taking possession of Travis Reinking's firearms and ammunition, the Tazewell County Sheriff's Office required Jeffrey Reinking to agree that he would not return the firearms and ammunition to Travis Reinking.

17. Thereafter, Jeffrey Reinking did in fact agree that he would not return the firearms and ammunition to Travis Reinking or allow him to access them.

18. As a result of this agreement, and only because of it, the Tazewell County

Sheriff's Office permitted Jeffrey Reinking to take possession of four of Travis Reinking's firearms, including a Bushmaster XM-15 semi-automatic rifle. Jeffrey Reinking understood from the Sheriff's Office that he could possess the weapons himself, but that he had an obligation "to make sure that they didn't go back in the possession of his son."

19. At the time that he took possession of Travis Reinking's firearms, Jeffrey Reinking knew that Travis Reinking could not legally possess firearms and that it was illegal to facilitate Travis Reinking's possession of any firearm.

20. Even so, prior to April 22, 2018, Jeffrey Reinking returned and entrusted the Bushmaster XM-15 rifle, a 9-millimeter handgun, a .22-caliber rifle, and a Remington 710 rifle to Travis Reinking anyway.

21. It was at least the third time that Jeffrey Reinking had taken possession of his son's firearms since 2016, only to return them despite actual knowledge that Travis Reinking was a dangerous and mentally unstable threat to himself and others. Because Travis Reinking used the Bushmaster XM-15 rifle that his father returned to him to commit a deadly mass shooting on April 22, 2018 at the Antioch Waffle House located at 3571 Murfreesboro Pike in Nashville, Tennessee, it would ultimately be the last.

22. Akilah DaSilva was one of the innocent people that Travis Reinking murdered at the Antioch Waffle House.

23. The Plaintiff, Abede DaSilva—Akilah DaSilva's older brother—watched Akilah die of massive blood loss after narrowly avoiding death himself.

24. Abede held his dying brother while he bled out and screamed in pain on the floor of the Antioch Waffle House, and he ultimately watched his brother die at Vanderbilt Hospital.

25. Witnessing Akilah DaSilva's murder and narrowly avoiding death himself

caused the Plaintiff to suffer serious and severe emotional injury that is supported by scientific proof.

26. Losing his brother, best friend, work partner, and someone in whom he confided—and watching that person die in front of him—left a void in Abede's life that he will never be able to fill. Abede misses his brother dearly, and a part of him is now gone forever.

27. Travis Reinking shot at the Plaintiff and other Waffle House patrons and murdered Akilah DaSilva using the Bushmaster XM-15 rifle that the Defendant returned to him after Travis Reinking's right to possess firearms had been formally revoked.

28. The Bushmaster XM-15 rifle is a military-style weapon designed to inflict devastating and fatal damage. It fires ammunition at approximately 3,260 feet per second and can discharge up to 45 rounds per minute.

29. One of the rounds that Travis Reinking fired at Akilah DaSilva hit him in the right shoulder. The force of the round inflicted a fatal wound that caused Akilah DaSilva to die from massive blood loss at Vanderbilt Hospital, a Level 1 Trauma Center. The Plaintiff was with Akilah DaSilva both when he was shot and when he died.

30. At the time that Jeffrey Reinking returned the Bushmaster XM-15 rifle to Travis Reinking, Mr. Reinking knew or should have known that the Bushmaster XM-15 rifle was a deadly weapon that was specifically designed to kill multiple people swiftly and with maximum efficiency and lethality.

31. At the time that Jeffrey Reinking returned the Bushmaster XM-15 rifle to Travis Reinking, Mr. Reinking knew or should have known that AR-15 style rifles had been used to inflict massive fatal casualties during multiple recent mass shootings, including those that took place at Sandy Hook Elementary School in Newtown,

-5-

Case 3:18-cv-00640   Document 1   Filed 07/12/18   Page 5 of 13 PageID #: 5

Connecticut; the Pulse nightclub in Orlando, Florida; Stoneman Douglas High School in Parkland, Florida; and dozens of other locations.

32. Jeffrey Reinking returned the Bushmaster XM-15 rifle to Travis Reinking despite actual knowledge that Travis Reinking was mentally unstable, had a history of mental instability, and was a danger to himself and others.

33. At the time that Jeffrey Reinking returned the Bushmaster XM-15 rifle to Travis Reinking, Mr. Reinking was aware that Travis Reinking planned to take and possess the rifle in Nashville, Tennessee, and that his doing so constituted a real and severe danger to all individuals in Nashville, Tennessee, with whom Travis Reinking came into contact.

34. Jeffrey Reinking transferred the rifle into Travis Reinking's possession with the actual knowledge and intent that the rifle be introduced into and possessed in the State of Tennessee and the city of Nashville by an individual whom he knew to be dangerous and mentally unstable.

35. At the time that Jeffrey Reinking returned the Bushmaster XM-15 rifle to Travis Reinking, Jeffrey Reinking was aware that in July 2017, his son was arrested by the United States Secret Service after he crossed into a restricted area near the White House and demanded an audience with President Trump.

36. Travis Reinking specifically stated that he wanted to speak to the President, proclaimed that he was a sovereign citizen, and insisted that he had "a right to inspect the grounds." Thereafter, Travis Reinking removed his tie, balled it into his fist, and walked past the White House's security barriers, proclaiming: "Do what you need to do. Arrest me if you have to."

37. At the time that Jeffrey Reinking returned the Bushmaster XM-15 rifle to

Travis Reinking, Jeffrey Reinking was aware that as a result of the incident, the FBI requested that Illinois State Police revoke Travis Reinking's FOID card. Nonetheless, and despite his actual knowledge that Travis Reinking was legally prohibited from possessing firearms, Jeffrey Reinking returned the firearms to Travis Reinking as a matter of his own personal convenience because he wanted to move out of the state.

38. At the time that Jeffrey Reinking returned the Bushmaster XM-15 rifle to Travis Reinking, Jeffrey Reinking was also aware that in June of 2017, Travis Reinking had jumped into a Tremont Park District Pool wearing a pink woman's house coat and begun swimming in his underwear. After Travis Reinking was told to get out of the pool, he began to yell at the lifeguards and then "showed his genitals saying he was a man."

39. Following this incident, a Tazewell County law enforcement officer called Jeffrey Reinking and advised him that "he might want to lock the guns back up until Travis gets mental help," and Jeffrey Reinking stated he would do so.

40. At the time that Jeffrey Reinking returned the Bushmaster XM-15 rifle to Travis Reinking, Jeffrey Reinking was similarly aware that in or about May 2016, Travis Reinking was suicidal and had threatened to take his own life.

41. In or about May 2016, Jeffrey Reinking specifically communicated to police that Travis Reinking was armed, unstable, and a danger to himself.

42. In or about May 2016, Jeffrey Reinking knew that police wanted Travis Reinking to check into a hospital for a mental health evaluation, and that Travis Reinking became hostile afterward.

43. In or about May 2016, the Tazewell County Sheriff's Office responded to a CVS parking lot in Morton, Illinois, because Travis Reinking reported that Taylor Swift was stalking him.

-7-

Case 3:18-cv-00640 Document 1 Filed 07/12/18 Page 7 of 13 PageID #: 7

44. At the time that Jeffrey Reinking returned the Bushmaster XM-15 rifle to Travis Reinking, Jeffrey Reinking knew or should have known that Taylor Swift was not stalking his son.

45. At the time that Jeffrey Reinking returned the Bushmaster XM-15 rifle to Travis Reinking, Jeffrey Reinking knew or should have known that Taylor Swift was a citizen of Nashville, Davidson County, Tennessee.

46. At the time that Jeffrey Reinking returned the Bushmaster XM-15 rifle to Travis Reinking, Jeffrey Reinking was aware of several additional incidents that did not involve police but similarly confirmed that Travis Reinking was mentally unstable.

47. At the time that Jeffrey Reinking returned the Bushmaster XM-15 rifle to Travis Reinking, Jeffrey Reinking had been personally advised by his son's former employer that the employer was concerned about Travis Reinking's mental health.

48. At the time that Jeffrey Reinking returned the Bushmaster XM-15 rifle to Travis Reinking, Jeffrey Reinking was aware that in or about June 2017, Travis Reinking had threatened one of Jeffrey Reinking's employees and screamed profanity at him while wielding a rifle.

49. At the time that Jeffrey Reinking returned the Bushmaster XM-15 rifle to Travis Reinking, Jeffrey Reinking was aware that his daughter—Travis Reinking's sister—had been advised by police to keep weapons away from Travis Reinking.

50. At the time that Jeffrey Reinking returned the Bushmaster XM-15 rifle to Travis Reinking, Jeffrey Reinking knew that his son had moved or planned to move to Tennessee.

51. Jeffrey Reinking returned the Bushmaster XM-15 rifle to Travis Reinking in an effort to circumvent the law and with the specific intention that Travis Reinking

possess the firearm in Tennessee.

52. On April 23, 2018, following an extended manhunt, Travis Reinking was arrested for murdering Akilah DaSilva and three other innocent victims at the Waffle House in Antioch.

53. Upon information or belief, after Travis Reinking became domiciled in Tennessee, Jeffrey Reinking deliberately reached out to this jurisdiction for the purpose of helping Travis Reinking secure employment in Davidson County, Tennessee.

54. Upon information or belief, since the time of Travis Reinking's arrest, Jeffrey Reinking has been in contact with Travis Reinking and has reached out to and made additional contacts with him and other individuals within the jurisdiction.

## IV.  CAUSES OF ACTION

### 1.  Negligent Infliction of Emotional Distress

55. The Plaintiff incorporates and realleges the foregoing allegations as if fully set forth herein.

56. By returning the Bushmaster XM-15 rifle to Travis Reinking and entrusting him with it despite actual knowledge that Travis Reinking was mentally unstable, Defendant Jeffrey Reinking acted unreasonably and failed to use ordinary or reasonable care under the circumstances.

57. By returning the Bushmaster XM-15 rifle to Travis Reinking and entrusting him with it despite actual knowledge that Travis Reinking's right to carry firearms had been revoked, Defendant Jeffrey Reinking acted unreasonably and failed to use ordinary or reasonable care under the circumstances.

58. By returning the Bushmaster XM-15 rifle to Travis Reinking and entrusting

him with it despite actual knowledge that that Travis Reinking posed a threat to himself and others, Defendant Jeffrey Reinking acted unreasonably and failed to use ordinary or reasonable care under the circumstances.

59. Under the circumstances, it was not only foreseeable that Travis Reinking would use the firearms entrusted to him by Jeffrey Reinking to commit an act of violence against others, but that very likelihood had been communicated to Jeffrey Reinking, who both understood and acknowledged it.

60. Jeffrey Reinking nevertheless took express and deliberate actions to frustrate and undo the efforts of law enforcement to disarm his mentally deranged and dangerous son because doing so would promote his own personal convenience.

61. At all times relevant to this Complaint, Jeffrey Reinking had a legal duty not to entrust Travis Reinking with firearms. He also gratuitously accepted and acknowledged that duty by expressly agreeing to the same in exchange for receiving Travis Reinking's firearms from law enforcement.

62. At the time that Jeffrey Reinking returned the Bushmaster XM-15 rifle to Travis Reinking, Jeffrey Reinking knew or should have known that entrusting Travis Reinking with a Bushmaster XM-15 rifle created a severe and unreasonable risk of harm to others.

63. Given Travis Reinking's long history of mental illness and the fact that his right to carry firearms had been revoked following a recent arrest due to his erratic behavior, mental instability, and law enforcement's concern that he was a threat to himself and others, the harm that Jeffrey Reinking caused would have been foreseeable to any reasonable person.

64. Jeffrey Reinking's entrustment of firearms to Travis Reinking by Jeffrey

-10-

Reinking directly resulted in, and was the cause of, the death of Mr. DaSilva.

65. Jeffrey Reinking's breach of his duties of care proximately caused the Plaintiff to experience credible fear of imminent death and to witness his beloved brother's murder.

66. But for Jeffrey Reinking's breach of his duty of care, Akilah DaSilva would be alive today, and the Plaintiff would not have had to watch him die.

67. But for Jeffrey Reinking's breach of his duty of care, Travis Reinking would not have caused the Plaintiff to experience imminent and traumatic fear that he himself was going to die.

68. Witnessing Akilah DaSilva's murder and narrowly avoiding death himself caused the Plaintiff to suffer serious and severe emotional injury that is supported by scientific proof.

### 2. Civil Conspiracy

69. The Plaintiff incorporates and realleges the foregoing allegations as if fully set forth herein.

70. By providing Travis Reinking access to the Bushmaster XM-15 rifle and returning that deadly weapon to him despite actual knowledge that Travis Reinking's right to possess firearms had been revoked, Jeffrey Reinking conspired with Travis Reinking to violate 430 Ill. Comp. Stat. Ann. 65/0.01, *et seq.*; federal law prohibiting the unlawful transfer of firearms; and other applicable laws and regulations precluding Travis Reinking from possessing any firearm.

71. At the time that Jeffrey Reinking returned the Bushmaster XM-15 rifle to Travis Reinking, both Jeffrey Reinking and Travis Reinking had the intent and knowledge

of the other's intent to accomplish by concert an unlawful purpose, or to accomplish by concert a lawful purpose by unlawful means.

72. Akilah DaSilva's death; the Plaintiff's near-death; and the Plaintiff's traumatic experience of seeing his brother murdered were all products of Jeffrey Reinking's and Travis Reinking's conspiracy to violate the law.

73. As a consequence, Jeffrey Reinking is jointly and severally liable for the unlawful acts of Travis Reinking pursuant to Tenn. Code Ann. § 29-11-107(b)(1).

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff respectfully requests:

1. That process issue and be served upon the Defendant, and that the Defendant be required to appear and answer this Complaint within the time required by law;
2. All compensatory, consequential and incidental damages to which the Plaintiff is entitled in an amount not less than $5,000,000.00;
3. Punitive damages in an amount not less than $15,000,000.00;
4. That the Plaintiff be awarded the discretionary costs of trying this action;
5. That pre-judgment and post-judgment interest be awarded to the Plaintiff;
6. That all costs be taxed against the Defendant;
7. That a jury of 12 be empaneled to try this cause; and
8. All such further relief as this Court deems just and proper.

Respectfully submitted,

By: /s/Daniel A. Horwitz_____
Daniel A. Horwitz, BPR #032176
1803 Broadway, Suite #531
Nashville, TN  37203
daniel.a.horwitz@gmail.com
(615) 739-2888

Brian P. Manookian, BPR #26455
Cummings Manookian, PLC
45 Music Square West
Nashville, TN 37203
(T) 615-266-3333
(F) 615-266-0250
bmanookian@cummingsmanookian.com