1   IN THE UNITED STATES DISTRICT COURT FOR THE
2  MIDDLE DISTRICT OF TENNESSEE AT NASHVILLE

3
    ABEDE DASILVA,              )
4                               )
         Plaintiff,             )
5                               )
    -VS-                        ) No. 3:18-CV-00640
6                               )
    JEFFREY L. REINKING,        )
7                               )
         Defendant.             )
8

9       THE TELEPHONIC LIMITED SCOPE DEPOSITION
10  of JEFFREY L. REINKING, a defendant, called by
11  the plaintiff for examination pursuant to
12  agreement, and pursuant to the provisions of
13  the Code of Civil Procedure, and the Rules of
14  the Supreme Court thereof pertaining to the
15  taking of depositions for the purpose of
16  discovery, taken before me, Cindy M. Scribner,
17  CSR-RPR, License #084-004465, a Notary Public
18  in and for the County of Peoria and State of
19  Illinois, at 416 Main Street, Suite 1300, in
20  the City of Peoria, County of Peoria and State
21  of Illinois, on the 4th day of December, A.D.,
22  2018, at the hour of 10:00 a.m.

23

24

25

**Network Court Reporting & Video**
**866.256.1799**

```
 1   APPEARANCES:

 2

 3     Cummings Manookian
       45 Music Square West
 4     Nashville, TN  37203
       *By:  Brian P. Manookian, Esq.*
 5     Bmanookian@cummingsmanookian.com
       For the plaintiff;
 6

 7     Law Offices of Joel Brown
       416 Main Street, Suite 1300
 8     Peoria, IL  61602
       By:  Joel Brown, Esq.
 9     Jb@joelebrown.com
       Co-counsel for the defendant;
10

11     Brewer, Krause, Brooks & Chastain
       545 Mainstream Drive, Suite 101
12     Nashville, TN  37228
       By:  Parks T. Chastain, Esq.
13     Pchastain@bkblaw.com
       Co-counsel for the defendant.
14

15

16

17

18

19

20

21

22

23

24

25
```

**Network Court Reporting & Video**
**866.256.1799**

1

2                  *   *   *   *   *

3                    I N D E X

4  Examination by:

5    Mr. Manookian              Page      5

6    Mr. Chastain               Page      114

7

8              (No exhibits marked.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 3 of 132 PageID #: 107

1         (Witness sworn.)

2         MR. CHASTAIN:  This is Parks

3 Chastain, representing Mr. Reinking along with

4 Joel Brown.  We want to put a statement on the

5 record, agree as to the caption that will be

6 used for this deposition.  And I would propose

7 that all objections except as to form and

8 scope of the deposition, that meaning governed

9 by the protective order or the rulings that

10 Judge Binkley has made in the state court be

11 reserved; do you agree with that?

12         MR. MANOOKIAN:  I agree that the

13 scope of the deposition is limited as

14 described in the notice to personal

15 jurisdiction.  To the extent that you think

16 any of my questions exceed that scope, I'll

17 withdraw the question.  I understand that

18 there's going to be some gray area in terms of

19 what is a question about personal jurisdiction

20 versus content or allegations in the broader

21 suit.  And I'll keep everything to personal

22 jurisdiction.  If you think it is outside of

23 that line, just let me know and I'll withdraw

24 the question.

25         MR. CHASTAIN:  All right.  Sounds

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 4 of 132 PageID #: 108

1  good.  Thank you.  And, Brian, one more thing,
2  Jeff has hearing aids, so so far so good,
3  correct?
4           THE WITNESS:  Yep.
5           MR. CHASTAIN:  But he may need you
6  to repeat questions every once in a while.
7           MR. MANOOKIAN:  Understood.
8
9           JEFFREY REINKING,
10 being first duly sworn, deposes and says as
11 follows, in answer to:
12 DIRECT EXAMINATION BY MR. MANOOKIAN:
13      Q.   Mr. Reinking, can you state your
14 full name and address for the record?
15      A.   Yes, it's Jeffrey Louis Reinking,
16 27380 Broadway Road, Morton, Illinois, 61550.
17      Q.   Mr. Reinking, I'm taking this
18 deposition over a telephone today, so we don't
19 have the benefit of being able to see one
20 another face-to-face.  As I ask you questions
21 today, I'm going to leave an audible and
22 noticeable pause after my questions so that we
23 don't speak over one another.  Will you wait
24 until I finish each question before you
25 provide an answer?

Case 3:18-cv-00640  Document 27-1  Filed 12/17/18  Page 5 of 132 PageID #: 109

1      A.   Yes, sir.

2      Q.   Likewise, when I ask you a

3  question, if you do not understand the

4  question or need some type of clarification,

5  will you tell me?

6      A.   Yes, sir.

7      Q.   As a result, if you provide an

8  answer to a question today, is it fair to

9  presume for me and for any later reader of

10 this transcript that you understood my

11 question?

12     A.   Yes, sir.

13     Q.   Mr. Reinking, have you ever

14 traveled to the State of Tennessee?

15     A.   Yes.

16     Q.   When was the last time you traveled

17 to the State of Tennessee?

18     A.   About probably three weeks ago.

19     Q.   So you were physically present in

20 the State of Tennessee in the month of

21 November 2018?

22     A.   Yes.

23     Q.   The State of Tennessee in November

24 2018?

25     A.   You might have cut out, can you

**Network Court Reporting & Video**
**866.256.1799**

1  repeat that?

2       Q.   What was the purpose of your visit

3  to the State of Tennessee in November of 2018?

4       A.   To visit my son.

5       Q.   Did you visit with your son in the

6  State of Tennessee in November of 2018?

7       A.   Yes.

8       Q.   Where in the State of Tennessee did

9  you visit with your son in November of 2018?

10      A.   Davidson County jail.

11      Q.   How did you travel to the State of

12  Tennessee in November of 2018?

13      A.   Car.

14      Q.   Did you come down I-65 south from

15  Illinois to enter the State of Tennessee in

16  November of 2018 when you visited your son?

17      A.   Yes.

18      Q.   How long were you in the State of

19  Tennessee in November of 2018 when you came

20  for the purpose of visiting your son?

21      A.   Include travel time?

22      Q.   From the time you crossed the

23  border into Tennessee until the time you

24  crossed the border out of Tennessee?

25      A.   Approximately five hours.

**Network Court Reporting & Video**
**866.256.1799**

1      Q.   Was it a one-day trip to come visit
2  your son?  And by that I mean, you did not
3  spend the night anyplace other than your
4  house?
5      A.   At that time we were staying at my
6  daughter's in Kentucky and, yes, it was a
7  one-day trip.
8      Q.   Where in Kentucky does your
9  daughter live?
10     A.   Louisville.
11     Q.   What was the purpose of visiting
12 your son in Davidson County, Tennessee, in
13 November of 2018?
14     A.   Just to see how he was doing.
15     Q.   Did you speak with him while you
16 were present in Davidson County, Tennessee, in
17 November 2018?
18     A.   Yes.
19     Q.   What did he tell you when you spoke
20 with him in Tennessee in November of 2018?
21     A.   I guess basically it was small
22 talk.
23     Q.   How long did you see him while you
24 were in Tennessee in November of 2018 visiting
25 your son, Travis Reinking?

**Network Court Reporting & Video**
**866.256.1799**

1     A.   Well, you're allowed a one-hour

2  visit, and my wife was present with me, so we

3  shared the time.

4     Q.   Would you estimate that you spoke

5  with your son, Travis Reinking, in person at

6  the Davidson County jail in November 2018 for

7  approximately 30 minutes?

8     A.   More or less.

9     Q.   Do you recall any of the substance

10  of your conversation with your son, Travis

11  Reinking, when you visited him in person at

12  the Davidson County jail in November of 2018?

13     A.   Well, we probably talked a little

14  about what his younger brother has been doing,

15  what we were doing for Thanksgiving with

16  Rebecca, that kind of thing.

17     Q.   Is that the extent of your

18  recollection of your conversation with your

19  son, Travis Reinking, you had in person at the

20  Davidson County jail in November of 2018?

21     A.   Yes.

22     Q.   Prior to that visit when was the

23  last time you were present in the State of

24  Tennessee?

25     A.   I think we were doing visits like

**Network Court Reporting & Video**
**866.256.1799**

1  every two weeks or so, three weeks.

2      Q.   I'm sorry, did you say that you

3  were doing business every two or three weeks

4  in Tennessee?

5      A.   No, sir, I said we were doing

6  visits.

7      Q.   I see.

8      A.   Yes.

9      Q.   You visited the State of Tennessee

10  roughly every two to three weeks to visit your

11  son, Travis Reinking, since he was first

12  incarcerated in April of 2018?

13      A.   Yes.

14      Q.   When you visited your son, Travis

15  Reinking, in November of 2018, did you

16  purchase gas in the State of Tennessee?

17      A.   Possibly.

18      Q.   Do you use a debit or credit card

19  frequently as opposed to cash?

20      A.   Yes.

21      Q.   Is it rare that you would use cash

22  to purchase items on a day-to-day basis?

23      A.   Yes.

24      Q.   You would primarily use a debit or

25  credit card to make everyday purchases,

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 10 of 132 PageID #: 114

1    correct?

2         A.    Generally.

3         Q.    Will your debit or credit cards

4    reflect transactions that you made in the

5    State of Tennessee in November of 2018 and in

6    the visits that you made to the State of

7    Tennessee roughly twice a month since April of

8    2018?

9         A.    Yes.

10        Q.    You have made a significant number

11   of purchases while you were present in the

12   State of Tennessee since April of 2018 during

13   your visits to the State of Tennessee,

14   correct?

15             MR. CHASTAIN:  Object to the form.

16             You can answer.

17             THE WITNESS:  What was the question

18   again?

19   BY MR. MANOOKIAN:

20        Q.    You've made a significant number of

21   purchases in the State of Tennessee while you

22   were present in the State of Tennessee for the

23   purpose of visiting your son since April of

24   2018, correct?

25        A.    Yeah.  Numerous, yes.

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 11 of 132 PageID #: 115

1    Q.    Your son was first incarcerated in

2  Tennessee in April of 2018, correct?

3         A.    Could you rephrase that?

4         Q.    When was the first time your son

5  was incarcerated in the State of Tennessee?

6         A.    You mean arrested?

7         Q.    Sure.

8         A.    I guess just sometime after the

9  incident.

10        Q.    Do you recall the date of the

11  incident?

12        A.    It was the 22nd of April.

13        Q.    Do you agree that your son was

14  incarcerated or being held by authorities in

15  the State of Tennessee at least by May 1,

16  2018?

17        A.    Yes.

18        Q.    When was the first time you visited

19  the State of Tennessee as an adult?

20        A.    Do you mean like passing through or

21  staying?

22        Q.    For any purpose other than just

23  traveling through the state.

24        A.    I would say 2010 -- around 2010 for

25  crane school.

1    Q.   What is crane school?

2    A.   It's to get certified to be a crane

3 operator.

4    Q.   And are you a crane operator?

5    A.   Yes, sir.

6    Q.   The first time you became certified

7 to be a crane operator was in 2010, correct?

8    A.   Yes.

9    Q.   Are you currently a crane operator?

10    A.   Yes.

11    Q.   Have you been a crane operator

12 continually from 2010 until today's date?

13    A.   Yes.

14    Q.   You received your education and

15 training for the business that you have been

16 continually involved in since 2010 in the

17 State of Tennessee, correct?

18    A.   Could you repeat that?

19    Q.   Yes, sir.  For the business of

20 operating cranes, which you have been

21 continually involved in as your primary source

22 of income since 2010, you received that

23 training and education in the State of

24 Tennessee, correct?

25    A.   Part of it.

**Network Court Reporting & Video**
**866.256.1799**

1    Q.   What other training and education
2  did you require other than the training and
3  education you received in Tennessee to be
4  permitted to operate a crane?
5    A.   That would -- just a lot of that
6  just on-hand (sic) experience.  I did also
7  have before that mobile crane inspectors
8  course in Chicago.
9    Q.   And crane inspection is different
10 than crane operation, correct?
11   A.   Yes.
12   Q.   And I certainly appreciate that
13 you've gained significant experience operating
14 a crane, and I'll give you a bit of an
15 analogy.  I've gained a lot of experience as a
16 lawyer doing things like taking depositions
17 like we're doing today, but I received my
18 education as a lawyer at Vanderbilt Law School
19 in Tennessee.  Do you agree that you received
20 your education and training such that you
21 could be a crane operator in the State of
22 Tennessee?
23   A.   No.
24   Q.   Where else did you attend crane
25 school other than the State of Tennessee?

**Network Court Reporting & Video**
**866.256.1799**

1    A.    I've been operating cranes since
2  1985, and back then there is no -- there was
3  no formal training.
4    Q.    Where else have you attended crane
5  school other than the State of Tennessee?
6    A.    I took -- when I first came out, I
7  went to I believe it was Colorado, I don't
8  know the year, it's probably around late
9  '90's, for basically a rigging and crane
10  operations class.
11    Q.    Why did you decide to take crane
12  operating courses in the State of Tennessee in
13  2010 if you had previously already been
14  operating cranes?
15    A.    Because it's becoming required by
16  OSHA to be certified.
17    Q.    What was the name of the crane
18  operating school that you attended in
19  Tennessee?
20    A.    Sullivan Training.
21    Q.    You agree that you attended crane
22  operating school at Sullivan Training in the
23  State of Tennessee for the purpose of becoming
24  OSHA certified so that you could continue in
25  your business?

**Network Court Reporting & Video**
**866.256.1799**

1   A. Yes, sir.

2   Q. You agree that your attendance at

3 crane operating school in Tennessee was

4 imperative to you continuing your business?

5   A. No.

6   Q. You were not required to receive

7 that certification in order to continue in

8 your business?

9   A. No.

10   Q. You agree then that you made the

11 discretionary decision to come to Tennessee in

12 order to become certified in crane operation

13 for your business?

14   A. Yes.

15   Q. After attending crane operation

16 school in 2010, when was the next time you

17 visited the State of Tennessee?

18    MR. CHASTAIN: Brian, are you again

19 asking other than just driving through?

20    MR. MANOOKIAN: Yes, sir.

21 BY MR. MANOOKIAN:

22   Q. And for all of these questions --

23 and I understand, I've driven through the

24 State of Illinois a number of times or passed

25 through it on the way to visit relatives. I

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 16 of 132 PageID #: 120

1  don't mean just driving through Tennessee.  I

2  understand that it's a significant artery

3  maybe on the way down to Florida or Atlanta.

4  I'm talking about coming to Tennessee for any

5  purpose other than just driving on through.

6  Can we agree to that, when I talk about coming

7  to the State of Tennessee?

8        A.   Yes.

9        Q.   After 2010 when you attended crane

10  operator school in Tennessee, when was the

11  next time you visited the State of Tennessee?

12        A.   Somewhere in '17, like April maybe.

13        Q.   What was the purpose of your visit

14  to Tennessee in April of 2017?

15        A.   I was told there was a lot of work

16  in Tennessee.

17        Q.   You came to Tennessee in April of

18  2017 in an attempt to secure work as a crane

19  operator?

20        A.   No.

21        Q.   What type of work were you told

22  there was a lot of in Tennessee in April of

23  2017?

24        A.   It was crane work.

25        Q.   You came to Tennessee in April of

1    2017 to secure crane work for your business?

2         A.   It was just an avenue I was looking

3    at.

4         Q.   I understand, but you came to

5    Tennessee in April of 2017 in order to secure

6    work for your crane business, correct?

7         A.   No, I was just seeing if it was a

8    place I would want my business.

9         Q.   You came to Tennessee in April of

10   2017 in order to explore business

11   opportunities, correct?

12        A.   Correct.

13        Q.   Who told you that there was a lot

14   of work in Tennessee?

15        A.   John --

16        Q.   I'm sorry, and that's my fault, we

17   can't see one another.  Let me finish that

18   question.  And I'll start over.  Who told you

19   that there was a lot of work in Tennessee such

20   that you visited the State of Tennessee in

21   April 2017 to explore business opportunities?

22        A.   John from crane school.

23        Q.   Do you know John's last name?

24        A.   Not offhand.

25        Q.   Would you be able to get John's

**Network Court Reporting & Video**
**866.256.1799**

1 | last name by virtue of calling him?

2 |     A.   Yes.

3 |     Q.   Do you have John's phone number?

4 |     A.   I don't know if I have it with me.

5 |     Q.   I understand, sir.  My question is

6 | more geared towards if we needed to find

7 | John's last name later on, it's something that

8 | you could put your hands on and give to your

9 | attorneys?

10 |     A.   Yes.

11 |     Q.   Do you think that you spoke to John

12 | from crane school in April of 2017 or

13 | potentially a little earlier?

14 |     A.   Yes.

15 |     Q.   Do you know whether you called him

16 | or he called you out of the blue to tell you

17 | that there was a lot of work in Tennessee?

18 |     A.   I think he said it in passing,

19 | because he was going to Chicago for work.  I

20 | don't remember who contacted who.

21 |     Q.   Did you and John talk on if not a

22 | regular occasion at least from time to time as

23 | business colleagues?  I'm sorry, I didn't hear

24 | your answer if you gave one.

25 |     A.   No, I was just thinking on that.

**Network Court Reporting & Video**
**866.256.1799**

1  Could you repeat that?

2       Q.   Yes, sir.  And, again, sometimes

3  these questions are less than artful.  I'm

4  trying to understand your relationship with

5  John from crane school, if it was -- are you

6  two close friends?

7       A.   Not really.

8       Q.   Is this someone you met during

9  crane school and might have a conversation

10 with him from time to time?

11      A.   Just, yep, time to time, yep.

12      Q.   Were you speaking to John from

13 crane school because you were interested in

14 trying to find out if there were work

15 opportunities in Tennessee?

16      A.   No, he told me about the work

17 opportunities.

18      Q.   When John from crane school told

19 you about the work opportunities in Tennessee,

20 you then made plans to visit Tennessee to

21 explore those opportunities in April of 2017,

22 correct?

23      A.   Around there, yes.

24      Q.   Did you drive to Tennessee in April

25 of 2017 to explore business opportunities for

Case 3:18-cv-00640  Document 27-1  Filed 12/17/18  Page 20 of 132 PageID #: 124

1  your business?

2       A.   Yes.

3       Q.   Did anyone go with you?

4       A.   My wife and my young son.

5       Q.   And what's your son's name that

6  traveled with you to Tennessee in April of

7  2017 to explore business opportunities?

8            MR. BROWN:  I'm going to object to

9  the disclosure of the minor's name on the

10 record, Counsel.  This is Joel Brown.

11           MR. MANOOKIAN:  Understood.

12 BY MR. MANOOKIAN:

13      Q.   If it's a minor, you don't have to

14 tell me that.  It was not Travis Reinking that

15 traveled with you to Tennessee in April 2017,

16 correct?

17      A.   Correct.

18      Q.   And, sir, if I ask you any

19 questions that call for your minor son's name,

20 just tell me that, and I -- don't tell me his

21 name, tell me the question calls for his name

22 and I'll withdraw that; is that fair?

23      A.   Yes.

24      Q.   Likewise, if I ask you a question

25 that calls for some private, personal,

 1  confidential, or even information that you
 2  don't feel comfortable, will you tell me so
 3  that your lawyer can then decide whether or
 4  not it's something that we can decide not to
 5  put on the record?
 6      A.   Yes.
 7      Q.   When you traveled to Tennessee in
 8  April of 2017 to explore business
 9  opportunities, did you spend the night?
10      A.   Yes.
11      Q.   How many nights did you stay in the
12  State of Tennessee when you traveled to the
13  State of Tennessee to explore business
14  opportunities in April 2017?
15      A.   Two to three.
16      Q.   Did you come to Nashville?
17      A.   It was Nashville, Knoxville,
18  Chattanooga.
19      Q.   Did you visit any other cities when
20  you came to Tennessee to explore business
21  opportunities in April 2017?
22      A.   Yes, those three.
23      Q.   Can you tell me those again?
24      A.   Nashville, Knoxville, and
25  Chattanooga, and back to Nashville.

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 22 of 132 PageID #: 126

1    Q.    When you came to Tennessee in April

2    of 2017 to explore business opportunities, did

3    you spend the first night in Nashville,

4    Tennessee?

5    A.    I believe it was on 40 between

6    Nashville and Knoxville.

7    Q.    I don't have any experience in the

8    crane industry, I can tell just from looking

9    around in Nashville these days that it's

10   booming here.  Tell me what one does and what

11   you did to explore business opportunities in

12   the crane business.

13   A.    You look at industry as far as

14   commercial work, like projects going on, what

15   kind of cranes they use, who is on those

16   projects.

17   Q.    So are you truly driving around the

18   city looking at construction projects that are

19   going on and the size and scope of the cranes

20   that they're using to determine whether or not

21   these are the types of cranes and the services

22   that you provide as well?

23   A.    Yes.

24   Q.    And you did that in Nashville,

25   Knoxville, and Chattanooga personally and

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 23 of 132 PageID #: 127

1  present in the State of Tennessee in April of

2  2017 for the purpose of exploring business

3  opportunities?

4       A.   Yes.

5       Q.   Did you speak to any individuals in

6  Tennessee in April of 2017 when you visited

7  about business opportunities?

8       A.   No.

9       Q.   When you came to visit, it was

10 truly a scouting trip for you to determine

11 what types of cranes were being used in the

12 major cities in Tennessee such that you could

13 determine whether they were business

14 opportunities for you?

15      A.   Yes.

16      Q.   What was your conclusion after

17 making that trip?

18      A.   The state of Tennessee is doing

19 something right.

20      Q.   There's a lot of construction going

21 on, isn't there?

22      A.   Yes.

23      Q.   Was it the type of construction

24 where you thought you might be able to provide

25 cranes or services to projects that were going

1  on in the State of Tennessee?

2      A.   I still wasn't sure.

3      Q.   Well, having spent two or three

4  nights there and driving from the middle of

5  Tennessee to the east, to the southeast and

6  back, did you come to some conclusions about

7  whether or not there were business

8  opportunities as John from crane school had

9  told you?

10     A.   Yes, it was possible.

11     Q.   Did you pursue any business

12 opportunities in the State of Tennessee after

13 April of 2017?

14     A.   No.

15     Q.   Why not?

16     A.   Well, I'm almost 55, and I thought

17 do I want to start a new venture.

18     Q.   I'm going to ask you a few

19 questions about your business.  This isn't

20 focused on the State of Tennessee, and if your

21 lawyers think that it's beyond the scope of

22 today's deposition, I'll withdraw them.  I'll

23 tell you as a preface, I'm just trying to

24 understand a little bit more about your

25 business so I can understand how or why you

1    concluded that whatever business opportunities

2    might have been available in Tennessee that

3    those were not things you were going to

4    pursue.

5            Do you contract out other crane

6    operators such that they might work for your

7    company but work in a state other than

8    Illinois?

9        A.   No.

10       Q.   Have you ever done that?

11       A.   No.

12       Q.   Do you contract out other crane

13   operators, or are you simply providing your

14   own service as a crane operator?

15       A.   Yes, it was providing our own

16   service.

17       Q.   And by providing your own service

18   you mean personally Jeffrey Reinking is

19   operating the crane?

20       A.   Yes, that and I have a couple

21   employees.

22       Q.   Do they also operate cranes?

23       A.   Yes.

24       Q.   Have you ever provided crane

25   operating services or employees to provide

**Network Court Reporting & Video**
**866.256.1799**

1 crane operating services in any state other

2 than Illinois?

3          MR. CHASTAIN:  I'm going to object

4 to that one.  You can ask him if he's ever

5 done it in Tennessee.

6 BY MR. MANOOKIAN:

7     Q.   Okay.  With the caveat that your

8 attorney provided, can you answer that

9 question?

10     A.   No, I've never operated in

11 Tennessee.

12     Q.   You've never provided any employees

13 to operate cranes in Tennessee either,

14 correct?

15     A.   Correct.

16     Q.   If you answered, I didn't hear.

17     A.   Oh, correct.

18     Q.   When you visited Tennessee in April

19 of 2017 for the purpose of exploring business

20 opportunities, did you purchase gas?

21     A.   I'm sure I did.

22     Q.   Did you pay for hotel rooms in the

23 State of Tennessee?

24     A.   Yes.

25     Q.   Did you purchase food in the State

**Network Court Reporting & Video**
**866.256.1799**

1  of Tennessee?

2       A.    Yes.

3       Q.    Did you do all those things in

4  furtherance of exploring business

5  opportunities in the State of Tennessee in

6  April of 2017?

7       A.    Yes.

8       Q.    You were not in Tennessee in April

9  of 2017 on a pleasure trip, correct?

10       A.    Well, it was kind of both, because

11  we have the little one.

12       Q.    Did you do any sightseeing or what

13  you might consider traditionally tourist

14  actives when you were in Tennessee in April of

15  2017?

16       A.    Well, we took the scenic route to

17  Chattanooga.

18       Q.    Understood.  Did you go to Lookout

19  Mountain?

20       A.    No, we didn't actually go up on it.

21       Q.    Did you go see Ruby Falls?

22       A.    Went by there.

23       Q.    Did you do anything other than

24  explore business opportunities while you were

25  in the State of Tennessee in April of 2017?

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 28 of 132 PageID #: 132

1     A.   Not that we paid for.

2     Q.   And, sir, I don't mean just driving

3 down the highway and enjoying the scenery or

4 having a good time on a road trip.  I mean,

5 did you do anything planned or otherwise that

6 you would consider constituting anything other

7 than exploring business opportunities while

8 you were in the State of Tennessee in April of

9 2017?

10     A.   No.

11     Q.   Your multi-night trip to the State

12 of Tennessee was for the purpose of exploring

13 business opportunities for your crane

14 business, correct?

15     A.   Can you repeat that?  You cut out.

16     Q.   Yes, sir.  Your multi-night trip to

17 the State of Tennessee was solely for the

18 purpose of exploring business opportunities,

19 correct?

20     A.   Yes, exploring.  Yes.

21     Q.   After that trip in April 2017 when

22 was the next time that you were in the State

23 of Tennessee for anything other than simply

24 passing through?

25     A.   We stayed at a campground for a

1   couple nights.
2          Q.   Was that Yogi Bear's Jelly Stone
3   Park Camp Resort?
4          A.   Yes.
5          Q.   Was that in August of 2017?
6          A.   Sounds about right.
7          Q.   Was the campground that you stayed
8   at in August of 2017 located in Nashville,
9   Tennessee?
10         A.   Yes.
11         Q.   What was the purpose of your visit
12  to Nashville, Tennessee, in August of 2017?
13         A.   That was to kind of enjoy the park
14  there and also look at the business
15  opportunities still.
16         Q.   So you came back to the State of
17  Tennessee and specifically Nashville,
18  Tennessee, in August of 2017 to further
19  explore business opportunities for your crane
20  business?
21         A.   Yes.
22         Q.   How long did you stay in Nashville,
23  Tennessee, in August of 2017 for the purpose
24  of exploring business opportunities for your
25  crane business?

**Network Court Reporting & Video**
**866.256.1799**

1      A.    I believe it was two nights.

2      Q.    What did you do in Nashville,

3   Tennessee, in August of 2017 other than

4   explore business opportunities?

5      A.    Walked next to the campgrounds, I

6   walked through the RV parks or the sales next

7   to it looking at other campers.

8      Q.    Okay.  That's -- there's a big RV

9   dealership right there on Music Valley Drive,

10  right?

11     A.    Right.

12     Q.    So you went over there and looked

13  at RV's, correct?

14     A.    Yeah, walked through the lot

15  checking out equipment.

16     Q.    Do you use your RV as part of your

17  business?

18     A.    Now and then.

19     Q.    How do you use your RV as part of

20  your business?

21     A.    Yes.

22     Q.    I'm sorry, I said how do you use

23  your RV as part of your business.  And I'll

24  tell you, again, I don't know much about the

25  crane industry, but are there times when you

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 31 of 132 PageID #: 135

1  have a job that takes you far enough away from
2  your house that you might take the RV so you
3  could stay on-site to complete your job?
4       A.   No.
5       Q.   Okay.  Tell me then how you use
6  your RV as part of your business from time to
7  time.
8       A.   I go through to Florida
9  occasionally, like I'd look at a crane down
10 there at a dealership or go to a Ritchie
11 Brothers auction, so that's how we traveled
12 and stayed down in Florida.
13      Q.   I see.  Have you been to any
14 Ritchie Brothers auctions in Tennessee?
15      A.   No.
16      Q.   What did you do to explore business
17 opportunities in Nashville, Tennessee, when
18 you came to Nashville, Tennessee, in August of
19 2017?
20      A.   I went by some of the heating and
21 air companies, heating and air conditioning
22 companies, went by their yards.
23      Q.   Why did you do that?
24      A.   To see the size of the companies
25 and who they were.

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 32 of 132 PageID #: 136

1    Q.   Tell me why heating and air
2  companies would be relevant to what you do.
3  Do you use your crane to place heating and air
4  units on top of buildings?
5    A.   Yes.
6    Q.   Did you meet with anybody at any
7  heating and air companies when you came to
8  Nashville in August of 2017?
9    A.   No.
10    Q.   Did you meet with any individuals
11  about your business when you came to Nashville
12  in August of 2017?
13    A.   No.
14    Q.   So you had already been in
15  Nashville to explore business opportunities in
16  April of 2017, you were at least tantalized or
17  had your curiosity piqued enough to make
18  another visit four months later in August of
19  2017, correct?
20    A.   I guess I was just checking things
21  out some more.
22    Q.   Well, what other states did you
23  visit between April and August of 2017 to
24  explore business opportunities other than
25  Tennessee?

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 33 of 132 PageID #: 137

1      A.    Between that time, none.

2      Q.    So Tennessee was a significant

3  focus of potential business opportunities for

4  you in 2017, correct?

5          MR. CHASTAIN:  Object to the form.

6          THE WITNESS:  Yes, I did remember I

7  did check out Louisville somewhat, about the

8  same way, just drove around there looking.

9  BY MR. MANOOKIAN:

10     Q.    But you can't think of another

11 state that you made two separate out of state

12 trips to visit in order to explore business

13 opportunities other than Tennessee in 2017,

14 correct?

15     A.    Right.

16     Q.    In 2017 Tennessee was a significant

17 focus of your efforts in terms of exploring

18 business opportunities, correct?

19          MR. CHASTAIN:  Object to the form.

20          You can answer.

21          THE WITNESS:  I guess, yes.

22 BY MR. MANOOKIAN:

23     Q.    And because Tennessee was a

24 significant focus of your efforts in terms of

25 exploring business opportunities in 2017, you

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 34 of 132 PageID #: 138

1   made at least two trips personally to
2   Tennessee during this time, correct?
3         A.   Yes.
4         Q.   And the purpose of those trips were
5   to explore business opportunities in Tennessee
6   and you did explore business opportunities in
7   Tennessee in 2017, correct?
8         A.   Yes.
9         Q.   After August of 2017 when was the
10  next time you visited the State of Tennessee?
11        A.   I believe it was the end of January
12  of '18.
13        Q.   And what was the purpose of your
14  visit to Tennessee then in January of 2018?
15        A.   I was looking for Travis.
16        Q.   And when you say Travis and when I
17  say Travis through the course of this
18  deposition, we're both referring to your son,
19  Travis Reinking, correct?
20        A.   Correct.
21        Q.   Why did you think Travis would be
22  in Tennessee in January of 2018?
23        A.   At some point after he left home I
24  think he said something to my wife about
25  getting an apartment there somewhere.

**Network Court Reporting & Video**
**866.256.1799**

1    Q.    Do you recall when the conversation

2  was that your son, Travis Reinking, told you

3  or your wife that he would be getting an

4  apartment in Tennessee?

5         A.    Repeat that again, please.

6         Q.    Yes, sir.  I'm just trying to

7  determine whether you recall when Travis

8  Reinking first told you or your wife that he

9  was getting or thinking about getting an

10  apartment in Tennessee?

11        A.    Might have been near the end of

12  December of '17.

13        Q.    Sometime around Christmas or New

14  Year's in 2017?

15        A.    Maybe before Christmas.

16        Q.    Is there any event in your mind

17  that you recall him telling you or your wife

18  that he was thinking about moving to

19  Tennessee?

20        A.    You mean -- repeat the question,

21  please.

22        Q.    Yes, sir.  I'm just -- sometimes

23  when I remember things in terms of dates, it's

24  because I remember what was going on at the

25  time.  Like I had family in town for

1  Thanksgiving or there was a big trial going on
2  that I remember.  I'm not saying that you
3  should or that there was an event, I'm just
4  asking was there some event that precipitated
5  your son, Travis, telling you or your wife
6  that he was going to move or get an apartment
7  in Tennessee?
8       A.   No.
9       Q.   Do you know why of the 49 other
10 states in the Union your son chose Tennessee
11 to look for an apartment?
12      A.   I could only speculate.
13      Q.   Well, I mean, if you have an
14 opinion or your speculation is based on your
15 own observation or experience with your son,
16 I'd like to know.  It's fine if -- you can
17 preface it by saying, you know, that this is
18 speculation.  But this is my opportunity to
19 ask you the questions.
20      A.   Yeah.
21      Q.   Do you have any reason to know why
22 he would want to move to Tennessee as opposed
23 to any other state?
24      A.   May have been back before that, he
25 probably knew I was down there looking at

Case 3:18-cv-00640  Document 27-1  Filed 12/17/18  Page 37 of 132 PageID #: 141

1  work.

2       Q.   Your son, Travis Reinking,

3  understood that there were a lot of business

4  opportunities in Tennessee because of your

5  prior travels exploring those business

6  opportunities in Tennessee, correct?

7            MR. CHASTAIN:  Object to the form.

8            THE WITNESS:  I may have mentioned

9  to Travis Reinking about John saying there was

10  work down there.

11 BY MR. MANOOKIAN:

12      Q.   You agree that as a result of your

13 travels through Tennessee on multiple

14 occasions in 2017 you told your son, Travis

15 Reinking, that there were business

16 opportunities for crane operators in

17 Tennessee, correct?

18      A.   I don't know if I referred to it as

19 crane operators or just crane work.

20      Q.   As a result of your multiple

21 travels through Tennessee in 2017 exploring

22 business opportunities you agree that you told

23 your son, Travis Reinking, that there was

24 crane work to be had in Tennessee, correct?

25      A.   Correct.

1    Q.   You agree that that is the reason
2  that Travis moved to Tennessee, correct?
3    A.   No.
4    Q.   Why did Travis Reinking move to
5  Tennessee?
6    A.   I don't know that.
7    Q.   Do you agree that your son, Travis
8  Reinking, moved to Tennessee at least in part
9  to secure crane work?
10   A.   No.
11   Q.   It's your position that Travis
12 Reinking did not move to Tennessee in any part
13 because of the availability of crane work?
14   A.   No.
15   Q.   I didn't ask a good question there
16 because yes or no could have meant the same
17 thing.  Let me ask it again.  Was crane work
18 in any way a factor in Travis Reinking's
19 decision to move to Tennessee?
20   A.   I don't know that.
21   Q.   Do you know any factor that
22 motivated Travis Reinking to move to
23 Tennessee?
24   A.   No.
25   Q.   You never had a discussion with

1   your son about why he was moving to Tennessee?

2       A.   No, he didn't tell me when he left

3   where he was going.

4       Q.   When did you learn that Travis

5   Reinking had moved to Tennessee?

6       A.   Maybe a week before the incident

7   possibly.

8       Q.   When did you suspect Travis

9   Reinking had moved to Tennessee?

10      A.   When I got a call from employers

11  for references.

12      Q.   And when was that?

13      A.   There's been a couple different

14  occasions.  I was thinking it was after the

15  first of the year in '18.

16      Q.   Well, you actually traveled to

17  Tennessee in January of '18 to look for

18  Travis, right?

19      A.   Yes.

20      Q.   So at least by then you suspected

21  he moved to Tennessee, right?

22      A.   Suspected.

23      Q.   Did you go looking for him in any

24  other states?

25      A.   No.

**Network Court Reporting & Video**
**866.256.1799**

1    Q.   Why did you suspect he had gone to
2  Tennessee?
3    A.   He had told my wife he secured an
4  apartment $300 or less, and some -- I thought
5  she said around the Knoxville area, so that's
6  where I went looking for him.
7    Q.   Why did you feel the need to go
8  looking for Travis Reinking in January of
9  2018?
10   A.   I haven't heard from him.
11   Q.   How long had it been since you
12  heard from him?
13   A.   Me, myself, wasn't since he left
14  Illinois.
15   Q.   When did he leave Illinois?
16   A.   In about the time of October,
17  November '17.
18   Q.   And then you didn't hear from him
19  through January of 2018?
20   A.   Well, my wife had talked to him at
21  some point, I was thinking somewhere maybe
22  late December.
23   Q.   Okay.  We'll get back to that topic
24  about Travis.  But just tell me, what did you
25  do when you traveled to Tennessee in January

**Network Court Reporting & Video**
**866.256.1799**

1  of 2018?

2       A.   I went across -- I come into the

3  state, I went across Ohio and come down from

4  the north, I don't remember the route, to

5  Knoxville.  And I drove around Knoxville for

6  two or three days.

7       Q.   When you drove around Knoxville for

8  two or three days, what were you doing to try

9  to locate your son?

10      A.   I Googled apartments $300 or less,

11 and I drove by their lots.  The only thing I

12 had to go by was his truck.

13      Q.   What kind of truck was he driving

14 at the time?

15      A.   A pickup truck, Silverado.

16      Q.   What color?

17      A.   Gold.

18      Q.   Did you buy that for him?

19      A.   No.

20      Q.   Why did you feel like you needed to

21 go locate your son in Tennessee in January of

22 2018?

23           MR. CHASTAIN:  I think you've

24 established that he went to Tennessee, I think

25 that's beyond the scope.

Case 3:18-cv-00640  Document 27-1  Filed 12/17/18  Page 42 of 132 PageID #: 146

1          MR. MANOOKIAN:  Well, I'll push

2    back a bit here, Parks.  The purpose of being

3    there is also important.  I mean, those are

4    the types of things that the Court is going to

5    want to look at for personal jurisdiction.  I

6    won't ask the question -- I'll ask the

7    question.  If you want to instruct him not to

8    answer, that's fine.  But I think this one's

9    completely fair game.  What was the purpose of

10   being there is the same question I've been

11   asking.

12          MR. CHASTAIN:  Well, but he's

13   already answered that part of it.  So --

14   BY MR. MANOOKIAN:

15      Q.   Tell me -- the question is, why did

16   you feel like you needed to go locate your

17   son?

18          MR. BROWN:  Well, Brian, this is

19   Joel, I'm going to instruct my client not to

20   answer any questions regarding communications

21   between my client and his wife based upon the

22   Illinois Statutory Marital Privilege.  And I

23   think that question potentially invades that.

24   That statutory citation is 735 ILCS 5/8-801.

25   So I'm going to instruct Jeff that if he has

1  to get into discussions between husband and

2  wife in order to answer that question -- and I

3  don't know -- but if he does, I'm going to

4  instruct Jeff not to answer based on the

5  marital privilege.

6          MR. MANOOKIAN:  Okay.  That's a

7  legitimate privilege.  Let me ask him the

8  question.  And if he says --

9  BY MR. MANOOKIAN:

10         Q.   And, Mr. Reinking, I'm going to ask

11 you this question.  Your attorneys have made a

12 valid objection.  If it calls for you to tell

13 me something that you and your wife spoke

14 about or your only knowledge about it is from

15 your wife, your attorneys have made an

16 objection based upon the spousal privilege.

17 Give them an opportunity to instruct you not

18 to answer.  But I'm going to go ahead and ask

19 the question so that we get it cleanly on the

20 record and they have an opportunity to

21 instruct you cleanly on the record; is that

22 fair?

23         A.   Yes.

24         Q.   In January of 2018 when you visited

25 the State of Tennessee, why did you feel like

**Network Court Reporting & Video**
**866.256.1799**

1  you needed to locate your son, Travis

2  Reinking?

3          MR. BROWN:  And I'm going to

4  instruct you, Jeff, not to answer that

5  question if you have to reveal husband and

6  wife communications in order to answer it.  If

7  you don't have to reveal husband and wife

8  communications, then you may answer it.

9          THE WITNESS:  I have not talked to

10 Travis in a time.

11 BY MR. MANOOKIAN:

12      Q.   Is that the best answer you can

13 give me without revealing things that you and

14 your wife spoke about?

15      A.   Yeah.  Yes.

16      Q.   Did you locate your son when you

17 traveled to Tennessee in January of 2018?

18      A.   No.

19      Q.   Did you stay multiple nights in the

20 State of Tennessee in January of '18?

21      A.   Yes.

22      Q.   Did you spend money in the State of

23 Tennessee when you traveled there in January

24 of 2018?

25      A.   Yes.

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 45 of 132 PageID #: 149

1      Q.   Did you stay in a hotel when you
2  traveled to Tennessee in January of 2018?
3      A.   Yes.
4      Q.   Did you look at any business
5  opportunities while you were there, or was
6  this solely to try to locate your son?
7      A.   Solely to try to find Travis.
8      Q.   After January of 2018, when was the
9  next time that you were in the State of
10 Tennessee?
11     A.   It was after the event.
12     Q.   And when we say event or incident
13 we're talking about the shooting that took
14 place at Waffle House in April of 2018,
15 correct?
16     A.   Correct.
17     Q.   Why did you travel to -- well, what
18 was the date that you traveled to Tennessee
19 after the shooting event in 2018?
20     A.   I don't know the date.
21     Q.   Was it sometime after your son was
22 apprehended or before that?
23     A.   No, after.
24          MR. CHASTAIN:  Brian, when you get
25 to a short stopping point, let's take a short

1   break if we can.

2   MR. MANOOKIAN:  Yep, let's do it.

3   (An off the record discussion was held.)

4   (A brief recess was held.)

5   MR. MANOOKIAN:  Back on the record.

6   Let me just make a quick comment.  Generally I

7   would object to more than one lawyer objecting

8   during a deposition.  But since this is a

9   limited scope deposition on personal

10  jurisdiction and because of the kind of gray

11  area where that goes and also because I know

12  Mr. Brown is also representing Mr. Reinking in

13  other actions, I don't have any problem with

14  both of you participating and both of you

15  objecting.  I just want to put that on the

16  record in case that ever becomes an issue or

17  anyone looks at the transcript.  Either one of

18  you are welcome to object or instruct the

19  deponent during the deposition.  I assume

20  that's okay with both of you?

21  MR. BROWN:  Brian, this is Joel, I

22  appreciate that.  I agree as a general matter

23  really as a matter of fairness if nothing else

24  that only one lawyer should be at the plate at

25  a time.  And my intent here is not to jump in

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 47 of 132 PageID #: 151

1  unnecessarily.  I'm licensed in Illinois, as
2  you know, and Parks is not.  And with regard
3  to the marital privilege issue, that's a
4  creature of Illinois law, so I felt like it
5  was important for me to make that objection.
6  And I'm going to make every effort not to
7  talk, which is really hard as I'm sure you
8  know for all lawyers.  But I appreciate that.
9  And also just tell you, I don't -- I really
10 don't plan to make any objections that are not
11 specific to Illinois.
12         MR. MANOOKIAN:  Understood.  And
13 you both have been wonderfully polite about
14 not interrupting the examination.  But I do
15 want to say I'm not sure I've ever made this
16 concession before, but either one of you are
17 welcome to object or instruct including
18 because this is kind of a special
19 circumstance.  And I respect both of your
20 objections or instructions on the record.  And
21 either one of you are more than welcome to
22 jump in if you feel like you need to.
23         MR. BROWN:  Thank you.
24         MR. CHASTAIN:  Thank you.
25 BY MR. MANOOKIAN:

Case 3:18-cv-00640  Document 27-1  Filed 12/17/18  Page 48 of 132 PageID #: 152

1       Q.   Mr. Reinking, when we left off I
2  had been asking you about your visit to
3  Tennessee in January of 2018.  You had
4  provided your phone records in response to
5  some requests for production.  One of the
6  questions that I had is between January 3rd,
7  2018, and January 4th, 2018, you had around 30
8  separate calls with people in Knoxville,
9  Tennessee, and Alcoa, Tennessee, do you think
10 that that was you calling apartment complexes
11 in the area trying to locate your son?
12      A.   Yes.
13      Q.   On August 28th, 2017, in your phone
14 records you had a four-minute call with a
15 number that appears to be Insurance Auto
16 Auctions.  That lines up with your August 2018
17 visit to scout business opportunities in
18 Tennessee, do you know who that might have
19 been?
20           MR. CHASTAIN:  Brian, I think you
21 interposed your dates there or changed them
22 up, are you talking about August of 2017?
23           MR. MANOOKIAN:  That's correct.
24 Let me ask the question again.
25 BY MR. MANOOKIAN:

**Network Court Reporting & Video**
**866.256.1799**

1    Q.   Your phone records reflect a call

2   on August 28th, 2017, for four minutes with a

3   listing described as Insurance Auto Auctions,

4   that coincides with your testimony about

5   visiting Tennessee in August of 2017.  Do you

6   know who that might have been or what it might

7   have been for?

8        A.   Yes, it was -- at one time I

9   belonged with Insurance Auto Auctions and I

10  looked and I bought before damaged cranes from

11  them, and there was one down there in auction

12  I was looking at for parts.

13       Q.   Did you actually look at that crane

14  when you came to Tennessee?

15       A.   No.

16       Q.   After January of 2018 you next

17  visited the State of Tennessee following the

18  shooting incident at the Waffle House,

19  correct?

20       A.   Correct.

21       Q.   Tell me everything you remember

22  about that visit.

23       A.   I believe I didn't even talk to

24  Travis that first visit, because I couldn't

25  hear over the monitor because of all the

1  background noise.

2       Q.   Did you drive into Tennessee on

3  that visit?

4       A.   Yes.

5       Q.   How did you learn about the

6  shooting incident at the Waffle House?

7       A.   A friend of mine in Illinois called

8  me that morning and said it was on the news.

9       Q.   At that time did you have any

10 reason to think that it might be your son?

11      A.   I don't think I understand the

12 question.

13      Q.   Sure.  Were they already reporting

14 that your son might have been the shooter at

15 that point?

16      A.   I believe so.

17      Q.   Did you know at that time that your

18 son was living in Nashville, Tennessee?

19      A.   I wasn't sure.

20      Q.   When did you first learn that your

21 son was residing in Nashville, Tennessee?

22      A.   To actually see for myself is when

23 I afterwards had to go clean out his

24 apartment.

25      Q.   From January of 2018 when you were

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 51 of 132 PageID #: 155

1  looking for him in Knoxville to April of 2018

2  when you learned about the shooting incident,

3  were you not aware that your son was living in

4  Nashville, Tennessee?

5          A.   I didn't know where he was.

6          Q.   And I don't mean in some

7  metaphysical sense.  You know, I don't know

8  where my wife is at this very moment, but I

9  know she lives in Nashville and I think she's

10  at my house right now, but she could be at the

11  grocery store.  I don't mean in a very

12  technical sense that from moment to moment you

13  don't know where they are.  Did you not know

14  at any time between January of 2018 and April

15  of 2018 that your son was residing in

16  Tennessee?

17          A.   I could only assume.

18          Q.   Well, why would you have made that

19  assumption?

20          A.   Because people were calling for

21  work references.

22          Q.   I see.  Your son was working in

23  Nashville, Tennessee, between January of 2018

24  and April of 2018?

25          A.   I'm not sure where he was working.

**Network Court Reporting & Video**
**866.256.1799**

1    Q.   Well, who called you asking for
2  references about your son from Tennessee
3  specifically?
4        A.   Well, I --
5        Q.   In the calendar year 2018?
6        A.   I thought it was somebody from
7  Knoxville area first and then it was the
8  Nashville area later.
9        Q.   Were they calling you on your cell
10 phone or your business line?
11       A.   My guy that does dispatching is the
12 business line, and I believe he called me
13 saying they wanted references, so I called
14 them back.
15       Q.   And I only ask because I don't see
16 any 615 or 865 calls in your phone records on
17 your cell phone other than on January 18th,
18 2018.  And that was a Clark Crane, LLC, does
19 that ring any bell for you?
20       A.   Yeah, Clark, yes, it does.
21       Q.   Who's Clark Crane?
22       A.   I'm not sure who they are, but the
23 name sounds familiar from one of the guys that
24 called.
25       Q.   Was that a reference?

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 53 of 132 PageID #: 157

1      A.   Yeah, reference, yes.

2      Q.   And I only ask because, I mean, I

3  suspect you get calls from other crane

4  companies from time to time, and I was looking

5  for certain area codes.  But you recall that

6  Clark Crane is somebody who called you seeking

7  a reference for your son, Travis Reinking,

8  correct?

9      A.   Correct.

10     Q.   That call was on January 18th,

11  2018, according to your phone record; do you

12  dispute that?

13     A.   No.

14     Q.   That sounds about right, doesn't

15  it?

16     A.   It does.

17     Q.   That was within a couple of weeks

18  of you looking for your son in Knoxville,

19  correct?

20     A.   Right.  Correct.

21     Q.   So a couple weeks later you get a

22  call from a crane company in Nashville seeking

23  references for your son, correct?

24     A.   Correct.

25     Q.   What did you tell them?

**Network Court Reporting & Video**
**866.256.1799**

1       A.    I just told them he was a good
2  crane operator.
3       Q.    Did you tell them anything else?
4       A.    Nope, nothing personal.
5       Q.    Why not?
6       A.    Because as an employer I have to
7  watch what I disclose on employees.
8       Q.    Had you previously employed your
9  son as a crane operator?
10      A.    Yes.
11      Q.    Is he a good crane operator?
12      A.    Yes.
13      Q.    Was he always a good crane operator
14 when he was in your employ?
15      A.    Yes.
16      Q.    By January 18th, 2018, you agree
17 that you had communicated a reference and
18 suggested to a crane company in Nashville,
19 Tennessee, that they hire your son, Travis
20 Reinking, for the purpose of operating a
21 crane?
22      A.    Yes.
23      Q.    You agree that your son, Travis
24 Reinking, had traveled to Tennessee to seek
25 employment operating cranes at least in part

**Network Court Reporting & Video**
**866.256.1799**

1  based upon your advice to him that there was
2  ample opportunity for crane work in Tennessee,
3  correct?
4          MR. CHASTAIN:  Objection, asked and
5  answered.
6          Go ahead.
7          THE WITNESS:  No.
8  BY MR. MANOOKIAN:
9      Q.   On April 22nd, 2018, you had a
10  14-minute call with someone you describe as
11  Danny from the Metro Nashville Police
12  Department, do you recall that conversation?
13      A.   Somewhat.
14      Q.   Well, tell me what you recall.
15      A.   He was looking for Travis.
16      Q.   Did he tell you why?
17      A.   Well, because they hadn't found him
18  yet after the event.
19      Q.   The call went on for 14 minutes,
20  which is -- it's a decent time to be speaking
21  to somebody.  Do you remember the substance of
22  the call?
23      A.   He was just asking if I knew where
24  he might have gone or then he actually texted
25  me a picture at a gas station of someone else,

Case 3:18-cv-00640  Document 27-1  Filed 12/17/18  Page 56 of 132 PageID #: 160

1  and it wasn't him to identify him.

2      Q.   Well, what did you tell him with

3  regard to your knowledge about Travis in the

4  State of Tennessee?

5      A.   I didn't know his whereabouts.  I

6  also talked to him about the FBI was there, I

7  had people at the door and he was trying to

8  keep me on the phone to talk to me.

9      Q.   But the FBI was at your house at

10 that point?

11     A.   Yes.

12     Q.   Between January 2018 and April 2018

13 did you have any contact with your son

14 including if he was in the State of Tennessee?

15     A.   No.

16     Q.   By January 18th of 2018 you could

17 conclude that your son was in the State of

18 Tennessee because you were receiving calls

19 requesting employment references from people

20 in Tennessee, correct?

21     A.   Yes.

22     Q.   I'm going to ask you a couple of

23 questions, and I'm not trying to be cute or

24 snarky.  In this day and age there are a lot

25 of jobs that can be performed remotely, I'm

**Network Court Reporting & Video**
**866.256.1799**

1  deposing you right now from Nashville,

2  Tennessee, and you're in Peoria, Illinois,

3  right?

4      A.    Correct.

5      Q.    A crane operator is not a job that

6  can be performed remotely, is it?

7      A.    No.

8      Q.    This isn't like flying a drone

9  where you might be able to do it from an Air

10 Force base, but you're piloting something

11 that's halfway around the world, correct?

12     A.    Yes.

13     Q.    If you're operating a crane, you're

14 there on-site, correct?

15     A.    Yes.

16     Q.    Thus, when you began receiving

17 calls from people requesting references about

18 your son, Travis Reinking, for operating

19 cranes in Nashville, Tennessee, you knew he

20 was in Nashville, Tennessee, didn't you?

21     A.    Well, I didn't know where he was

22 living.

23     Q.    I understand that, sir.  I mean, he

24 might have been living in any bedroom

25 community or suburb of Nashville, Tennessee,

 1  but you understood that he was seeking
 2  employment to operate cranes physically
 3  located in or around Nashville, Tennessee,
 4  correct?
 5      A.   I could assume.
 6      Q.   And that assumption was fair and
 7  accurate, wasn't it?
 8      A.   Well, like if I had a job in
 9  Indiana, I would drive to there to do it.  So
10  it didn't necessarily mean I lived in Indiana.
11      Q.   But you would be working in
12  Indiana, right?
13      A.   Right.
14      Q.   So by January 18th, 2018, you knew
15  and had concluded that your son was working in
16  Nashville, Tennessee, or Middle Tennessee,
17  correct?
18      A.   He was just seeking employment.
19      Q.   And that would have required him to
20  be present in Nashville, Tennessee, or Middle
21  Tennessee, correct?
22      A.   Correct.
23      Q.   And you knew that by January 18th,
24  2018, when you received calls from Clark
25  Crane, correct?

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 59 of 132 PageID #: 163

1     A.    Correct.

2     Q.    When Travis Reinking left Illinois

3  in October or November of 2017 he went to

4  Tennessee, correct?

5     A.    No.

6     Q.    Where did he go other than

7  Tennessee?

8     A.    I don't know.

9     Q.    So you can't deny that he went to

10  Tennessee directly after that, correct?

11     A.    Correct.

12     Q.    I may not have heard your answer.

13     A.    Well, repeat the question.

14     Q.    You don't know where Travis

15  Reinking went when he left Illinois in October

16  or November of 2017, correct?

17     A.    Correct.

18     Q.    As a result you can't deny that he

19  went to Tennessee after leaving Illinois in

20  October or November of 2017, correct?

21     A.    Correct.

22     Q.    You can't deny that Travis Reinking

23  went directly to Tennessee after leaving

24  Illinois in October or November of 2017,

25  correct?

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 60 of 132 PageID #: 164

1      A.   Correct.

2      Q.   You know that by January 18th,

3 2018, Travis Reinking was in Middle Tennessee,

4 correct?

5      A.   What's Middle Tennessee?

6      Q.   You know that by January 18th,

7 2018, Travis Reinking was in Tennessee,

8 correct?

9      A.   Correct.

10     Q.   You have no information suggesting

11 that Travis Reinking was anywhere but

12 Tennessee between November 2017 and January

13 2018, correct?

14     A.   I did not know he was there then.

15 I never did find him until I got that first

16 call.

17     Q.   Right.  I understand.  Listen to

18 the question, it's specific about a lack of

19 knowledge and absence of knowledge.  You don't

20 have any information to suggest that Travis

21 Reinking was anywhere other than Tennessee

22 after he left Illinois in October or November

23 of 2017, correct?

24     A.   Correct.

25     Q.   Do you know a date or approximate

1  date that you traveled to Tennessee following

2  the shooting at the Waffle House?

3      A.   I don't know if it was like a week

4  or two weeks after.

5      Q.   Do you think -- the shooting was on

6  April 22nd, 2018.  Do you think it was

7  probably in May, that would have been nine or

8  10 days later?

9      A.   Could have been.  I really don't

10 remember the date.

11     Q.   I understand.  It's just when I ask

12 you questions about this, I want to be precise

13 about the date that you were there.  If you

14 don't remember, then that's fine.  That's the

15 correct answer.  You don't know if it was late

16 April or early May?

17     A.   I don't remember.

18     Q.   Okay.  I'm going to ask you some

19 questions about coming to Tennessee after the

20 incident.  And let me tell you, I understand

21 that this is not the easiest thing to talk

22 about.  I can't imagine being in your

23 situation.  I've read your text messages with

24 your son.  I told your attorney yesterday,

25 I've got a lot of sympathy for what you've

Case 3:18-cv-00640  Document 27-1  Filed 12/17/18  Page 62 of 132 PageID #: 166

1  been through as a father, what your wife has

2  dealt with as well.  I've had cases where my

3  clients were, you know, had Schizophrenia or

4  other mental health issues, and it can be very

5  tough dealing with that as a parent.  And so

6  I'm not trying to be rude to you when I ask

7  any of these questions.  I'm not trying to be

8  abusive.  We're all where we are in this

9  situation either as lawyers or deponents

10 because of somebody else's actions.  I'm just

11 trying to get information.  And so as I ask

12 these questions, I just want you to understand

13 that I'm doing so to get that information, not

14 to be rude or harass you or abusive in any

15 way.  And if you feel like any of the

16 questions are so, just tell me; is that fair?

17      A.   Yes.

18      Q.   You found out that your son was a

19 suspect in a mass shooting sometime in late

20 April of 2018, correct?

21      A.   Right.

22      Q.   As a result of that there was some

23 agencies created for you, I'm sure, that

24 required you to come to Tennessee, correct?

25      A.   Correct.

**Network Court Reporting & Video**
**866.256.1799**

1    Q.   At a minimum you had to do the type
2  of things that would be left to, you know, a
3  father or a parent in this type of situation
4  which includes cleaning out an apartment,
5  right?
6         A.   Correct.
7         Q.   You did that, didn't you?
8         A.   Yes.
9         Q.   That apartment that Travis Reinking
10 was residing in was in Nashville, Tennessee,
11 right?
12        A.   Correct.
13        Q.   Did you come down by yourself?
14        A.   No, my daughter came with me.
15        Q.   Is that your daughter that lives in
16 Louisville?
17        A.   No, I have one that lives in
18 Morton.
19        Q.   Did you clean out your son's
20 apartment in Nashville, Tennessee, following
21 the shooting incident?
22        A.   Yes.
23        Q.   As you were doing that, did you
24 have occasion to meet a gentleman by the name
25 of Jonathan Wink?

1      A.    Yes.

2      Q.    Can you describe that interaction

3 to me?

4      A.    I think he had an investigator with

5 him there going through the apartment.  And I

6 volunteered to go through clothing to make

7 sure there's nothing left in the pockets for

8 them.  And then after they got their pictures,

9 they took my daughter out and interviewed her

10 outside the vehicle or something while I was

11 packing up.  So they were gone for some time

12 doing that.  And then when they were done,

13 they just left, and Amanda helped me finish up

14 and pack up, bring stuff back.

15     Q.    Were there any firearms in the

16 apartment that you packed up?

17     A.    No.

18     Q.    Did Travis Reinking have any

19 firearms when he was in Nashville, Tennessee,

20 to your knowledge?

21     A.    I don't know that.

22     Q.    In October or November of 2017 when

23 you knew that Travis Reinking was leaving the

24 state, did you provide him with any firearms?

25     A.    No.

1    Q.   Have you ever provided firearms to
2  Travis Reinking?
3    A.   No.
4    Q.   Have you ever provided access to
5  firearms to Travis Reinking?
6    A.   No.
7    Q.   Have you -- do you have a gun safe
8  in your house?
9    A.   Yes.
10    Q.   Have you ever placed Travis
11  Reinking's firearms in your gun safe?
12    A.   Yes.
13    Q.   Does Travis Reinking have the code
14  to your gun safe?
15    A.   No.
16    Q.   Are you the only person with the
17  code to your gun safe?
18    A.   Yes.
19    Q.   In your text messages with your son
20  there is an exchange where he tells you that
21  he's found on apartment out of state; do you
22  recall that?
23    A.   Yes.
24    Q.   Do you recall where out of state --
25    A.   No.

**Network Court Reporting & Video**
**866.256.1799**

1    Q.    -- he had found an apartment?

2    A.    No.

3    Q.    Did you ask?

4    A.    No.

5    Q.    Do you know that when he asked

6    you -- when he -- strike that.

7          When Travis Reinking told you that

8    he had found an apartment out of state, was

9    that around the same time that you learned he

10   had found a $300 a month apartment in

11   Tennessee?

12   A.    No.

13   Q.    Were you curious at all where the

14   apartment was out of state that he was telling

15   you about?

16   A.    Yes.

17   Q.    Did you ask him?

18   A.    No.

19   Q.    Why not?

20   A.    He didn't trust us.

21   Q.    At the time was your son suffering

22   from paranoia?

23   A.    I don't know that.

24   Q.    Well, could you discern that from

25   some of your messages with him?

1       A.    I don't know that it was paranoia.

2       Q.    Well, I've read them.  I mean, from
3  everything I could tell, you were a pretty
4  good dad to him, inviting him to come eat with
5  you, go to church, do things.  And then there
6  would be what I would describe as breaks in
7  his mental health where he would begin
8  accusing you of things that, again, from what
9  I could tell didn't seem to have any basis in
10 reality.  You don't think your son suffered
11 from paranoia?

12      A.    Well, at that time I didn't see it
13 if he did.

14      Q.    Do you recall at that time he told
15 you he had secured an out of state apartment
16 he was also asking to have his guns back?

17      A.    Yes.

18      Q.    Why was he asking for his guns
19 back; did you have them?

20      A.    Yes.

21      Q.    Why did you have his guns when he
22 was asking for them back?

23            MR. CHASTAIN:  Okay, Brian, I think
24 that's going beyond the scope of personal
25 jurisdiction questioning.

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 68 of 132 PageID #: 172

1          MR. MANOOKIAN:  All right.  Let me

2   finish the question and see if you still feel

3   that way.

4   BY MR. MANOOKIAN:

5          Q.   Why was your son asking for his

6   guns back in relation to having secured an out

7   of state apartment?

8          MR. CHASTAIN:  And I think

9   consistent with the Davidson County Circuit

10  Court order that that question has to be

11  limited to Tennessee, and it has not been

12  established that that apartment was in

13  Tennessee.  So I don't think that is a proper

14  scope of questioning.

15         MR. MANOOKIAN:  That's fine.  I

16  mean, I'll ask it again if you feel that way.

17  You know, I'm constrained, it says out of

18  state.  He doesn't say Tennessee.  And I don't

19  think the deponent -- I think I've laid a very

20  good foundation in the fact that he's admitted

21  that he doesn't know of him going anywhere

22  other than Tennessee.  But if you want to

23  instruct him not to answer based upon the

24  notice, I don't think that's unfair.  But let

25  me ask the question cleanly and then you can

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 69 of 132 PageID #: 173

1   give the instruction; is that okay?

2             MR. CHASTAIN:  Yes.  Yes.

3   BY MR. MANOOKIAN:

4        Q.   Mr. Reinking, do you know why your

5   son was asking for his guns back from you at

6   the same time and in relation to informing you

7   that he had secured an apartment out of state?

8             MR. CHASTAIN:  And I will instruct

9   you not to answer unless you were advised that

10  that apartment was in Tennessee.

11            So based on that, can you answer?

12            THE WITNESS:  No.

13  BY MR. MANOOKIAN:

14       Q.   I'm going to ask a follow-up, and

15  give your lawyer an opportunity to instruct

16  you before you give an answer.  When your son

17  asked you for his guns back in relation to

18  having secured an out of state apartment, did

19  you know that that out of state apartment was

20  not in Tennessee?

21       A.   No, I did not know that.

22       Q.   When your son asked you for his

23  guns back in relation to having secured an out

24  of state apartment, were you aware of any

25  state in the Union other than Tennessee where

Case 3:18-cv-00640  Document 27-1  Filed 12/17/18  Page 70 of 132 PageID #: 174

1  he may have secured an apartment?

2          MR. CHASTAIN:  Well, I'm going to

3  object to the form of that one.  Try that one

4  again, Brian.

5          MR. MANOOKIAN:  Okay.

6  BY MR. MANOOKIAN:

7      Q.   When your son asked you for his

8  guns back in relation to having secured an out

9  of state apartment, you lived in Illinois and

10 he previously lived in Illinois, correct?

11     A.   Yes.

12     Q.   It was fair to conclude then that

13 he had secured an apartment somewhere outside

14 the State of Illinois, correct?

15     A.   Correct.

16     Q.   Were you aware of him securing an

17 apartment at that time in any state other than

18 Tennessee?

19     A.   Well, he said out of the State of

20 Illinois.

21     Q.   Right.  And I'm asking you, because

22 again by January 2018 you were fairly certain

23 that he had an apartment in Tennessee such

24 that, I mean, you drove down there and spent

25 days driving around looking for that apartment

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 71 of 132 PageID #: 175

1  in Tennessee, right?

2        A.    It was a hunch, but I never found

3  him, so I don't know.

4        Q.    No, I understand.  I understand.

5  But part of this is just we're taking

6  discovery here, I'm trying to find out what

7  you know.  And we're talking about he's

8  telling you, look, I've got an apartment out

9  of state.  At some time after that you, as his

10 dad, were concerned about him enough that you

11 drove to Tennessee and spent days driving

12 around looking for that apartment in Tennessee

13 to the exclusion of every other state in the

14 country, right?

15       A.    Uh-huh.  Yes.

16       Q.    I mean, did you go to any other

17 states looking for him?

18       A.    No.

19       Q.    You didn't go to Indiana and drive

20 around looking for his gold Silverado at an

21 apartment complex, right?

22       A.    Right.  Correct.

23       Q.    You didn't go to Ohio and look for

24 his gold Silverado at apartment complexes,

25 correct?

Case 3:18-cv-00640  Document 27-1  Filed 12/17/18  Page 72 of 132 PageID #: 176

1      A.    Correct.

2      Q.    You didn't go to any other state

3    other than Tennessee looking for your son and

4    that apartment that he secured out of state,

5    correct?

6      A.    Correct.

7      Q.    You knew he was in Tennessee,

8    didn't you?

9      A.    No.

10      Q.    Well, you at least suspected it

11   enough to take time away from your family and

12   work to go drive around in apartment complexes

13   in Tennessee, right?

14      A.    I had to try something.

15      Q.    I know.  And honestly you sound

16   like a hell of a father.  I mean, we should

17   all be lucky enough to have somebody who cares

18   about us enough to get in his car, drive eight

19   hours, 11 hours, and search apartment

20   complexes.  But I'm just asking you, did you

21   think he was anywhere other than the State of

22   Tennessee because it sounds like if you did,

23   you would have walked over fire and brimstone

24   to find him, right?

25      A.    Correct.

**Network Court Reporting & Video**
**866.256.1799**

```
1         Q.    You thought he was in Tennessee,
2   didn't you?
3         A.    Well, I suspected.
4         Q.    That's why you came here, right?
5         A.    Right.
6         Q.    When he told you he got an
7   apartment out of state, you concluded that was
8   in Tennessee, didn't you?
9         A.    No.
10        Q.    Say again.  I didn't hear you.
11        A.    No.
12        Q.    But nevertheless, that's the only
13  place as a very devoted father you went and
14  looked for him, correct?
15             MR. CHASTAIN:  Object to the form.
16             Go ahead and answer.
17             THE WITNESS:  After we got -- after
18  he talked to my wife a little --
19             MR. CHASTAIN:  Don't tell anything
20  that you heard from your wife.
21             THE WITNESS:  Yeah.
22             MR. CHASTAIN:  So go ahead and
23  answer that without doing that.
24             THE WITNESS:  Sources told me later
25  on, gave me an hunch he could be in Tennessee.
```

**Network Court Reporting & Video**
**866.256.1799**

 1  BY MR. MANOOKIAN:

 2      Q.   Understood.  From those sources and

 3  the references that you were asked to provide

 4  you can look back at that text message when he

 5  said that he had secured an out of state

 6  apartment and conclude correctly that that was

 7  in Tennessee?

 8      A.   Not at that time.

 9      Q.   I know, but today, right?

10      A.   Today, yes.

11      Q.   When he told you that he had

12  secured an out of state apartment, today

13  looking back on it, you know that that

14  apartment was in Tennessee, correct?

15      A.   Yes.

16      Q.   You've been in that apartment,

17  right?

18      A.   Correct.

19      Q.   You cleaned it out, didn't you?

20      A.   Well, I don't know if that's the

21  first place he stayed.

22      Q.   But when he said he had an out of

23  state apartment and wanted his guns back, that

24  apartment was in Tennessee, wasn't it?

25      A.   Looking back, yes.

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 75 of 132 PageID #: 179

```
1        Q.    Looking back when you gave him
2   those guns back, he took them directly to
3   Tennessee in that out of state apartment,
4   correct?
5        A.    I don't know that.
6        Q.    Well, you can conclude that, can't
7   you?
8        A.    Now I can.
9             MR. MANOOKIAN:   It's been two
10  hours, let's take another break.
11            MR. CHASTAIN:   Okay.
12  (An off the record discussion was held.)
13  (A brief recess was held.)
14  BY MR. MANOOKIAN:
15       Q.    Mr. Reinking, before we broke you
16  acknowledged that the guns that you had in
17  your possession and in your safe Travis
18  Reinking took from Illinois to Tennessee,
19  correct?
20       A.    The guns that belonged to Travis,
21  he took.
22       Q.    Understood.  And, you know, the
23  ownership of the guns is going to be a legal
24  issue that the lawyers are going to argue
25  about in this case.  I'm getting to take your
```

**Network Court Reporting & Video**
**866.256.1799**

1  deposition today about personal jurisdiction,
2  which is really about any connection to
3  Tennessee.  And so I'm going to ask you some
4  questions now about the process by which he
5  got those guns and they ended up in Tennessee.
6  I'm not here to argue about whether he owned
7  them or you own them or anything like that.
8  Just by way of background, I owned a big gun
9  store and shooting range here in Nashville,
10 Tennessee.  I'm very familiar with firearms
11 law, it's incredibly Byzantine, there are a
12 lot of technicalities in it.  I'm not
13 interested in any of that.  I just want to
14 talk about facts, the things that occurred
15 that led to the guns ending up in Tennessee.
16 Understood?
17      A.   Yes.
18      Q.   Is that fair?
19      A.   Yes.
20      Q.   Okay.  The guns ended up in
21 Tennessee, right?
22      A.   Evidently.
23      Q.   Well, I mean, not to be insensitive
24 about it, but he used the AR-15 that you had
25 in your safe to shoot and kill my clients,

1  right?

2       A.   That's what they say.

3       Q.   Well, do you think that your son

4  did not shoot and kill my clients?

5       A.   I have no proof.  He hasn't even

6  been indicted.

7       Q.   Okay.  Do you have any reason to

8  believe that it wasn't Travis Reinking with

9  the AR-15 that you previously had in your gun

10 safe that shot and killed my client?

11      A.   Can you repeat the question again,

12 please?

13      Q.   Sure.  Do you have any reason to

14 believe that it was anyone other than your

15 son, Travis Reinking, that shot and killed my

16 client?

17           MR. CHASTAIN:  Okay.  That is

18 outside the scope of a personal jurisdiction

19 question as you phrased it.  That has nothing

20 to do with connections to Tennessee.

21           MR. MANOOKIAN:  Do you have any

22 reason to believe that Travis Reinking --

23 strike that.

24 BY MR. MANOOKIAN:

25      Q.   Do you have any reason to dispute

1  that your son, Travis Reinking, shot and

2  killed my client with an AR-15 that you gave

3  him in Illinois and that he traveled to

4  Tennessee with?

5          MR. CHASTAIN:  Object to the word

6  gave.

7          But other than that, you can answer

8  if you understand.

9          THE WITNESS:  I guess a lot of what

10 I've known is just strictly from media on what

11 happened down there.

12 BY MR. MANOOKIAN:

13      Q.  Well, you get that I wasn't there

14 either, right?  You understand that humans can

15 have knowledge of things that they didn't

16 personally witness, correct?

17      A.  Yes.

18      Q.  Like I wasn't in Pearl Harbor, but

19 I'm fairly certain that the Japanese bombed

20 it, you understand that concept?

21      A.  That I do, yes.

22      Q.  And your knowledge isn't limited to

23 things that you've personally laid on eyes,

24 right?  Do you have any reason to believe that

25 it was anyone other than your son, Travis

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 79 of 132 PageID #: 183

1  Reinking, with the AR-15 that was provided to
2  him from your safe that shot and killed my
3  client?
4       A.   No, I have no other -- I have no
5  other knowledge of anything else happening,
6  you know, even when I returned the guns to
7  him.
8       Q.   Do you have any alternative
9  explanation for how that 5.56 round ended up
10 in my client's chest cavity?
11      A.   I don't know what a 5.56 is.
12      Q.   It's a bullet fired from an AR-15.
13 Do you have any alternative explanation other
14 than your son, Travis Reinking, with a rifle
15 that he got out of your safe --
16      A.   No, I don't.
17      Q.   You agree that my client was killed
18 with a rifle by your son that your son took
19 out of your safe in Illinois and transported
20 to Tennessee, correct?
21      A.   I know he's accused of that.
22      Q.   Okay.  Do you have any reason to
23 dispute that accusation?
24      A.   No.
25      Q.   Do you think somebody else went in

1  there and did it?

2          MR. CHASTAIN:  That's beyond the

3  scope of personal jurisdiction question.

4          MR. MANOOKIAN:  Well, I'm asking

5  about a rifle that came from his safe, and

6  he's being very waffly about whether or not

7  that occurred.

8          MR. CHASTAIN:  No, he's told you

9  that the rifles were returned to Travis from

10  the safe.  And he's answered your question.

11  This one doesn't have anything to do about the

12  connection with Tennessee.

13  BY MR. MANOOKIAN:

14      Q.  Right.  Let's ask some questions

15  about the connection with Tennessee.  You

16  agree this rifle ended up in Tennessee, right?

17      A.  From what they say.

18      Q.  Who is they?

19      A.  The news.

20      Q.  The police?

21      A.  What they told the news.

22      Q.  Okay.

23      A.  The police didn't call up here and

24  tell me about it.

25      Q.  What was the FBI doing at your door

**Network Court Reporting & Video**
**866.256.1799**

1  on April 22nd, were they asking about that

2  rifle?

3          MR. CHASTAIN:  That's beyond the

4  scope of personal jurisdiction, and we also

5  would assert Fifth Amendment rights on that

6  question and instruct not to answer.

7  BY MR. MANOOKIAN:

8      Q.   Do you dispute that the AR-15 rifle

9  that my client was killed with is the same

10 AR-15 rifle that Travis Reinking removed from

11 your gun safe?

12     A.   I can assume that.

13     Q.   Do you dispute that?

14     A.   I don't know if it was or not.

15     Q.   Listen to my question, it's

16 specific.  Again, words are important in my

17 profession.  I understand that giving

18 depositions is probably not something that

19 you've done routinely.  But I want you to

20 listen to my question very specifically.  I'm

21 not asking you to verify something.  I'm

22 asking you whether or not you dispute it,

23 whether you have any information to say, no,

24 Brian, that's wrong.  Do you dispute that my

25 client was killed with a rifle that was

Case 3:18-cv-00640  Document 27-1  Filed 12/17/18  Page 82 of 132 PageID #: 186

1  removed from your gun safe?

2      A.   No.

3      Q.   I want to know how that rifle got

4  out of your gun safe and to Tennessee.  Tell

5  me.

6      A.   I called to verify the FOID card,

7  why it was revoked and to see what to do about

8  it.

9      Q.   All right.  Let's break it down.

10 How did the rifle get into your gun safe?

11     A.   The police asked to hold them.

12     Q.   When?

13     A.   I don't know.

14     Q.   Well, give me --

15     A.   Months before.

16     Q.   How many months, October, November,

17 December, when?

18     A.   I don't know, beginning of October,

19 somewhere there, September.  I don't know the

20 exact date.

21     Q.   September of '17?

22     A.   I thought it was like two months

23 prior to him leaving.

24     Q.   Well, I'm looking at my chicken

25 scratch on a legal pad right now, but he left

Case 3:18-cv-00640  Document 27-1  Filed 12/17/18  Page 83 of 132 PageID #: 187

1  somewhere in October or November of 2017 is
2  what I've got down.  I wasn't there, but does
3  that sound right to you?
4        A.    Yes.
5        Q.    Okay.  So let's say sometime in
6  August of 2017 this gun got into your gun
7  safe?
8        A.    Correct.
9        Q.    How and why that's not -- was that
10 your gun?
11             MR. CHASTAIN:  No, that -- we're
12 going to instruct you not to answer, that's
13 not a personal jurisdiction.  You've
14 established that it was in the gun safe.
15 You've established that it was returned to
16 Travis.  Those are the two facts for personal
17 jurisdiction that are relevant.  Why it was in
18 there is not subject to this deposition.
19             MR. MANOOKIAN:  Well, let me think
20 about that.  All right.  I think that's a fair
21 objection.  Parks, my line of questioning is
22 going to be about how the gun got from the
23 safe to Tennessee.  I mean, you agree, that's
24 within personal jurisdiction?
25             MR. CHASTAIN:  Yeah, assuming that

**Network Court Reporting & Video**
**866.256.1799**

1    you ask the question the right way, yes, I do

2    agree.

3                MR. MANOOKIAN:  Okay.  But how the

4    gun got into the gun safe you're saying is not

5    personal jurisdiction?

6                MR. CHASTAIN:  Right.  It has

7    nothing to do with Tennessee.  And I don't

8    know, depending on how you ask the question,

9    some of the questions about getting to

10   Tennessee may not have anything to do with it

11   either.

12               MR. MANOOKIAN:  Understood.

13   Understood.  A lot of it is about the art of

14   asking the question.  How it got into the gun

15   safe, I mean, could potentially be a personal

16   jurisdiction question, I just don't know.  As

17   I told Joel yesterday, I'm operating with a

18   significant asymmetry of information here.

19   But I see your point.  How it got into the

20   safe, and, you know, my understanding just

21   based on public records is that was likely

22   entirely intra-Illinois episode.  So that's

23   fair.  We'll talk about how it got from the

24   safe to Tennessee.

25   BY MR. MANOOKIAN:

Case 3:18-cv-00640  Document 27-1  Filed 12/17/18  Page 85 of 132 PageID #: 189

1     Q.  By August of 2017 you agree that

2 the AR-15 rifle that was used to kill my

3 client was in a gun safe in your house in

4 Illinois, correct?

5     A.  Correct.

6     Q.  You were the only person with the

7 code to unlock that gun safe, correct?

8     A.  Correct.

9     Q.  At some point you received a text

10 message from your son stating that he was

11 moving out of state and that he wanted that

12 gun back, correct?

13     A.  He wanted his possessions back,

14 correct.

15     Q.  And you've since learned and don't

16 dispute that the state that he was moving to

17 was Tennessee, correct?

18     A.  Yeah, I learned that, yes.

19 Correct.

20     Q.  Okay.  Tell me about this gun safe,

21 do you know the manufacturer?

22     A.  No, I don't.

23     Q.  What does it look like, is it a big

24 rifle safe?

25     A.  Yes.

**Network Court Reporting & Video**
**866.256.1799**

1  Q.  Big, heavy -- where did you buy it?

2  A.  I believe it was Gander Mountain in

3  Peoria.

4  Q.  Is it a Patriot Arms safe?

5  A.  I really don't know the brand.

6  Q.  Does it have a big wheel on the

7  outside of it, or is it just a digital code?

8  A.  No, it's got a dial.

9  Q.  When you say dial, do you mean like

10 an arm that you spin on it?

11 A.  No -- well, the code -- I think

12 it's like --

13 Q.  You type in a numerical code and it

14 opens the safe?

15 A.  No, it's not digital, it's not.

16 It's a dial like the old style.

17 Q.  Okay.  A rotary dial?

18 A.  Right.

19 Q.  Like the type of locker that guys

20 as old as me and Parks and Joel had on our

21 high school lockers?

22 A.  Yeah, something like that, yeah.

23 Q.  By August of 2017 that rifle was

24 locked up in that gun safe in your house,

25 correct?

**Network Court Reporting & Video**
**866.256.1799**

1      A.    My shop.

2      Q.    Where is the shop?

3      A.    On the same property.

4      Q.    Workshop on the property?

5      A.    Yeah, it's just a shop I have,

6  yeah, it's storage and all that.  I'm not

7  allowed to have guns in the house.

8      Q.    Your wife makes the rules as well?

9      A.    No, we're foster parents.

10     Q.    Okay.  You're a responsible gun

11 owner?

12     A.    Yes.

13     Q.    As a responsible gun owner you

14 shouldn't have guns in the house, right?

15     A.    Correct.

16     Q.    You shouldn't have access to guns

17 for people who shouldn't be able to get to

18 them, right?

19          MR. CHASTAIN:  Objection, that's

20 not personal jurisdiction.  Instruct him not

21 to answer.

22 BY MR. MANOOKIAN:

23     Q.    By August of 2017 the rifle that

24 was used to kill my client was locked up in a

25 gun safe that only you had access to in a shop

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 88 of 132 PageID #: 192

1  on your property, correct?

2      A.   Correct.

3      Q.   Did Travis Reinking have the code

4  to get into that safe?

5      A.   No.

6      Q.   Could Travis Reinking have gotten

7  that rifle but for you opening that safe?

8      A.   No.

9      Q.   You had to open the safe for Travis

10  Reinking to retrieve the rifle that killed my

11  client, correct?

12      A.   Correct.

13      Q.   What was the date or approximate

14  date that you opened up the gun safe that only

15  you had access to to provide that rifle that

16  killed my client to Travis Reinking?

17         MR. CHASTAIN:  Object to the form.

18         THE WITNESS:  I don't remember the

19  exact date.

20  BY MR. MANOOKIAN:

21      Q.   Can you tell me a month?

22      A.   It was that October/November time

23  frame.

24      Q.   Okay.  So it was when he left?

25      A.   Right.

1      Q.    After he told you he had an out of

2   state apartment, that's when you gave him the

3   gun back?

4      A.    Right.  He had his belongings in

5   his truck and he came by to get the last

6   items.

7      Q.    So at that very same time that he

8   told you that he had secured an out of state

9   apartment, that you later learned was in

10  Tennessee, that's when you opened up the safe

11  and gave him the rifle back?

12          MR. CHASTAIN:  Object to the form,

13  misstates his testimony.

14          THE WITNESS:  Could you repeat the

15  question?

16          MR. MANOOKIAN:  Yes.

17  BY MR. MANOOKIAN:

18     Q.    When Travis Reinking text messaged

19  you and told you that he had secured an out of

20  state apartment, that you later confirmed was

21  in Tennessee, that's when you opened up the

22  safe and gave him access to the rifle that he

23  killed my client with, correct?

24     A.    Yes.

25     Q.    You knew when he opened up that

1    safe -- strike that.

2              You knew when you opened up that

3    safe and gave him access to the rifle that he

4    killed my client with he was taking it out of

5    state, correct?

6         A.   Correct.  Well, I have another

7    thought to that.

8         Q.   Yes.

9         A.   Was when he was taking them out of

10   state -- I just lost my train of thought.  It

11   was strictly on his word that he was taking

12   them out of state.

13        Q.   Well, he told you he was taking

14   them out of state, right?

15        A.   Right.  I had no proof, but he said

16   he was.

17        Q.   Well, right.  I don't have any

18   proof of the things that you're saying today.

19   But, I mean, your son told you when you gave

20   him that rifle that he was taking it out of

21   state, correct?

22        A.   Correct.

23        Q.   You didn't have any reason to doubt

24   that, correct?

25        A.   Correct.

**Network Court Reporting & Video**
**866.256.1799**

1     Q.   When you gave him that rifle you

2  knew he was taking it out of state, correct?

3     A.   Correct.

4     Q.   You didn't have any reason to

5  believe that he would not be taking it to

6  Tennessee, correct?

7     A.   At that time I didn't know where he

8  was going.

9     Q.   Right.  But he didn't say, Dad, I'm

10  taking this rifle out of state but not to

11  Tennessee?

12     A.   No, he didn't say that.

13     Q.   It was reasonable to believe that

14  when you gave him that rifle or access to that

15  rifle from the safe that he would take it to

16  Tennessee, correct?

17         MR. CHASTAIN:  Object to the form.

18         THE WITNESS:  Can you repeat the

19  question?

20  BY MR. MANOOKIAN:

21     Q.   Sure.  Based on everything you knew

22  at the time, having traveled to Tennessee,

23  having told Travis about Tennessee and later

24  learning that he was living in Tennessee, it

25  was reasonable to believe that when you gave

Case 3:18-cv-00640  Document 27-1  Filed 12/17/18  Page 92 of 132 PageID #: 196

1 him that rifle and when he removed the rifle
2 from the safe that he would be taking it to
3 Tennessee, correct?
4      A.   No, because he told me when he was
5 leaving, too, that he didn't want to do cranes
6 anymore.  So I don't know what he was going to
7 do.
8      Q.   All right.  Let's go step by step
9 how he would have gotten that rifle out of
10 your safe.  Do you have a recollection of that
11 day?
12      A.   It's kind of vague.
13      Q.   Understood.  I mean, frequently in
14 litigation -- and this is just the nature of
15 it -- we don't know when some catastrophic
16 event is going to take place, so you're not
17 cataloging all of your memories as they occur.
18 At the time they might seem fairly routine or
19 normal.  But I want you to answer to the best
20 of your recollection if you can.  Fair?
21      A.   Fair.
22      Q.   You had the rifle that killed my
23 client in a safe on your property that only
24 you had access to, correct?
25      A.   Correct.

Case 3:18-cv-00640  Document 27-1  Filed 12/17/18  Page 93 of 132 PageID #: 197

```
 1        Q.   You received a text message from
 2   your son saying that he had secured an out of
 3   state apartment and wanted his gun back,
 4   correct?
 5        A.   Correct.
 6        Q.   He came to your property to
 7   retrieve that gun, correct?
 8        A.   Correct.
 9        Q.   You and he proceeded to that safe,
10   correct?
11        A.   I had them out before he got there.
12        Q.   Okay.  You knew when he was going
13   to arrive, correct?
14        A.   Right, he said he was on his way.
15        Q.   So you went to the safe, you
16   entered the code, you pulled the guns out,
17   correct?
18        A.   Correct.
19        Q.   What were the guns?
20        A.   I couldn't tell you.
21        Q.   Are you a gun owner?
22        A.   Yes, I am.
23        Q.   Do you have a level of familiarity
24   with guns?
25        A.   No.  I know what's a handgun and
```

**Network Court Reporting & Video**
**866.256.1799**

1   what's a rifle.

2          Q.    Okay.  When I say AR-15, do you

3   know the rifle that I'm talking about?

4          A.    I do now because I think they call

5   it a Bushmaster or something.

6          Q.    Yeah, it was a Bushmaster SM-15.  A

7   Bushmaster is midlevel AR-15.  It's not the

8   nicest AR-15, it's not the worst.  But it sure

9   looks like an AR-15.  I mean, you wouldn't

10  mistake it for a dove hunting shotgun and you

11  wouldn't mistake it for a deer hunting rifle.

12  It looks like an assault rifle, right?

13         A.    I don't know.  To me it was just

14  some rifles and a handgun or -- I don't

15  remember what all it was.

16         Q.    Did you talk to your son on the

17  phone before he showed up and asked -- before

18  he showed up and you gave him the guns back?

19         A.    I don't remember that.

20         Q.    And I can't know because the only

21  thing that I've got to look at are these text

22  messages where he says I've got an out of

23  state apartment, I want the gun back.  You

24  don't have any recollection of speaking to him

25  on the phone?

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 95 of 132 PageID #: 199

```
 1        A.    No.
 2        Q.    But you probably did if you went to
 3   the safe and pulled those things out, because
 4   you wouldn't have otherwise known, hey, he's
 5   on his way, correct?
 6        A.    Right, that could be.
 7        Q.    You went to the safe and you got
 8   these guns out that had otherwise been solely
 9   in your control and dominion, correct?
10             MR. CHASTAIN:  Object to the form,
11   calls for legal conclusion.
12             MR. MANOOKIAN:  Well, okay, let me
13   restate it.
14   BY MR. MANOOKIAN:
15        Q.    Could your son, Travis, have
16   otherwise gotten to these guns?
17        A.    No.
18        Q.    That's the point of the safe,
19   right?
20        A.    Right.
21        Q.    That's why they're locked up out
22   there in the shop away from you and your
23   foster kids, correct?
24        A.    Correct.
25        Q.    Travis Reinking could have never
```

1 gotten this rifle but for you unlocking that

2 safe, correct?

3      A.   Correct.

4      Q.   You went and unlocked that safe and

5 pulled the rifle out at his request, correct?

6      A.   Correct.

7      Q.   He then showed up and you handed

8 him the rifle or it was on a table and he took

9 it, correct?

10      A.   Correct.

11      Q.   Did you guys have any type of

12 conversation about it?

13      A.   No, not about -- just he was

14 looking for tarp straps, so I got him tarp

15 straps to tarp his belongings in the back of

16 his truck.

17      Q.   He was moving and he wanted his

18 stuff back, right?

19      A.   Right.

20      Q.   The guns were just part of that?

21      A.   Right.

22      Q.   Did you ask him where he was

23 moving?

24      A.   No.

25      Q.   I got to ask you, why?  I mean, you

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 97 of 132 PageID #: 201

1  spent so much time looking for your son.

2      A.   Well, he didn't trust us for some

3  reason, and he didn't want to say.  So I

4  didn't want to pry.  I thought it was just,

5  you know, he wanted to go find his own way,

6  you know, and not be with mom and pop, you

7  know, and just go do his own thing, which I

8  can remember being that at a certain age.

9      Q.   All right.  All right.  When he

10 took the guns he didn't say anything to you

11 about he was going to go shoot anybody or be

12 violent, correct?

13     A.   Correct.

14     Q.   Mr. Reinking, when you gave him

15 those guns, did you think that he was going to

16 go do anything with them that would have led

17 to the reason that we're here today?

18     A.   No.

19     Q.   Have you ever supported your son

20 financially over the last couple of years?

21     A.   No.

22     Q.   Never given him any money?

23     A.   No.

24     Q.   Have you talked to Jonathan Wing

25 since you saw him at the apartment that you

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 98 of 132 PageID #: 202

1  went to clean out in April of 2018?

2      A.   I don't believe I have.

3      Q.   Have you talked to any lawyer

4  representing Travis Reinking since April of

5  2018?

6      A.   Just Jonathan Wing.

7      Q.   And the only time you ever spoke

8  with him is when you saw him at that

9  apartment?

10     A.   Once there and once in his office

11  to meet him and his team.

12     Q.   Do you know when that was

13  approximately?

14     A.   I don't.

15     Q.   Okay.  I'm going to step back from

16  some of these specific questions and ask you a

17  few general ones if that's okay.

18     A.   Okay.

19     Q.   When we first started talking you

20  told me that you have been to Nashville two to

21  three times a month since April of 2018; is

22  that correct?

23     A.   What was that question again?  I'm

24  sorry.

25     Q.   Yes, sir.  I had started this

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 99 of 132 PageID #: 203

1  deposition asking you about your visits to
2  Nashville, Tennessee, or just the State of
3  Tennessee in general.  You told me that you've
4  been two to three times a month since April of
5  2018 which would coincide with when your son
6  was apprehended; is that correct?
7          A.    Correct.
8          Q.    So in April of 2018 you think that
9  you likely visited Nashville, Tennessee,
10 correct?
11         A.    You mean after the event?
12         Q.    Yes, sir.
13         A.    Well, I can't -- I'm trying to
14 think when the first time I went down.  I
15 can't remember the date.
16         Q.    All right.  Well, strike April,
17 because it happened on April 22nd.  I think
18 there was some period of days before he was
19 apprehended.  Let's talk about May of 2018.
20 You think that you likely visited two to three
21 times that month?
22         A.    It's likely.
23         Q.    And it's also likely that you
24 visited two to three times in the month of
25 June 2018, correct?

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 100 of 132 PageID #: 204

1      A.    Correct.

2      Q.    And you also visited two to three

3 times in the State of Tennessee in July of

4 2018, correct?

5      A.    Correct.

6      Q.    And you also visited the State of

7 Tennessee two to three times in the month of

8 August 2018, correct?

9      A.    Correct.

10      Q.    And you also visited the State of

11 Tennessee two to three times in the month of

12 September 2018, correct?

13      A.    Correct.

14      Q.    And you also visited the State of

15 Tennessee two to three times in the month of

16 October 2018, correct?

17      A.    Correct.

18      Q.    And you also visited the State of

19 Tennessee two to three times in the month of

20 November 2018, correct?

21      A.    Correct.

22      Q.    So I want to add up the number of

23 times that you've been physically present and

24 visited the State of Tennessee for either

25 business or personal reasons since April of

1  2017.  You agree that you visited the State of
2  Tennessee in April of 2017 to explore business
3  opportunities, correct?
4         A.    Correct.
5         Q.    You then visited the State of
6  Tennessee again in August of 2017 to explore
7  business opportunities, correct?
8         A.    Correct.
9         Q.    And both of those visits included
10 multi-night stays for business purposes,
11 correct?
12        A.    Correct.
13        Q.    You also visited the State of
14 Tennessee in January of 2018 for a multi-night
15 stay, correct?
16        A.    Correct.
17        Q.    You then visited the State of
18 Tennessee two to three times in May of 2018,
19 correct?
20        A.    Oh, I thought I answered that, yes.
21        Q.    And I'll just short circuit it,
22 because you've already told me you visited two
23 to three times in May, June, July, August,
24 September, October, and November of 2018, I've
25 got a piece of scratch pad in front of me, so

**Network Court Reporting & Video**
**866.256.1799**

1    I can do this pretty easily.  Maybe you
2    require one, too.  At a minimum -- and I'm
3    just taking the two times presumption instead
4    of three -- you have visited the State of
5    Tennessee since April of 2017 one, two, three,
6    five, seven, nine, 11, 13, 15 -- at least 17
7    times between April of 2017 and November of
8    2018; you don't dispute that, do you?
9          A.   No.
10         Q.   Each of those times you spent money
11   in the state, correct?
12         A.   Repeat that again, please.
13         Q.   Each of the 17 times that you
14   visited the State of Tennessee since April of
15   2017 you spent money in the state, correct?
16         A.   Correct.
17         Q.   You agree you've got significant
18   contacts with the State of Tennessee, correct?
19              MR. CHASTAIN:  Object to the form,
20   calls for a legal conclusion.
21              MR. MANOOKIAN:  You can answer.
22              MR. CHASTAIN:  If you understand
23   the question, you can answer.
24              THE WITNESS:  Repeat it again.
25   BY MR. MANOOKIAN:

**Network Court Reporting & Video**
**866.256.1799**

1    Q.   You agree that you have significant
2  contacts with the State of Tennessee dating
3  back to at least April of 2017?
4           MR. CHASTAIN:  Same objection.
5           THE WITNESS:  Yes.
6  BY MR. MANOOKIAN:
7    Q.   You agree that you have significant
8  contact with the State of Tennessee dating
9  back to 2010 when you took your crane operator
10 class in this case, correct?
11          MR. CHASTAIN:  Objection, calls for
12 a legal conclusion.
13          You can answer.
14          THE WITNESS:  Not significant back
15 then.
16 BY MR. MANOOKIAN:
17   Q.   When do you think that your
18 significant contacts with the State of
19 Tennessee began?
20          MR. CHASTAIN:  Object to the form,
21 calls for a legal conclusion again.
22          THE WITNESS:  After the event.
23 BY MR. MANOOKIAN:
24   Q.   You agree that you have significant
25 contacts with the State of Tennessee by at

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 104 of 132 PageID #: 208

1  least April of 2017 when you began coming down

2  to Tennessee to explore business

3  opportunities, correct?

4          MR. CHASTAIN:  Object to the form,

5  calls for legal conclusion, and misstates his

6  prior testimony.

7  BY MR. MANOOKIAN:

8      Q.   You can answer the question.

9      A.   Can you repeat it again?

10      Q.   Sure.  You agree that you've had

11  significant contacts with the State of

12  Tennessee since at least April of 2017 when

13  you began visiting the state to explore

14  business opportunities, correct?

15          MR. CHASTAIN:  Same objections.

16          THE WITNESS:  Correct.  Yes.

17  BY MR. MANOOKIAN:

18      Q.   Do you know what interrogatories

19  are, sir?

20      A.   Questions?

21      Q.   Yeah, that's all it is.  I got to

22  send you a list of questions that you answered

23  in this case.  I want to ask you about some of

24  your interrogatory answers.

25          Parks and Joel, I'm going to ask

**Network Court Reporting & Video**
**866.256.1799**

1  him about interrogatory number 20.  I'm not

2  there.  If I was, I would hand it to him,

3  because I only think it's fair that he gets to

4  see his full answer and the question that was

5  provided.  I don't know if you have it.  If

6  you don't, and you want to grab it, that's

7  fine with me.

8           MR. CHASTAIN:  Well, we don't have

9  it.  Why don't you read the question and

10  answer?

11          MR. MANOOKIAN:  Okay.

12  BY MR. MANOOKIAN:

13      Q.   The question is, please indicate

14  whether you complied with law enforcement's

15  instructions that you needed to keep firearms

16  secure and away from Travis Reinking after his

17  Firearms Owners Identification Card was

18  revoked.  The answer was, objection, this

19  interrogatory contains a false predicate that

20  Mr. Reinking was provided instructions from

21  law enforcement regarding firearms.  Subject

22  to and without waiving said objections, please

23  refer to response number 18 above.  Response

24  number 18 is the exact same objection and then

25  it states, I was not advised by law

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 106 of 132 PageID #: 210

1 enforcement that I needed to keep firearms

2 secure and away from Travis Reinking after his

3 Illinois Firearm Owners Identification card

4 was revoked due to residency.  But it seemed

5 to me they wanted me to do so at the time, so

6 I did.  I was given no information,

7 instruction, or guidance regarding keeping the

8 guns in my gun safe until Travis began

9 demanding return of the guns, whereupon I

10 called the Tazewell County Sheriff's office

11 for advice.

12          It's a long answer so, again, if

13 you guys wanted to give him a printed out copy

14 of the interrogatory, or take a break and

15 print it out, that's fine.  I'll tell you what

16 my question is going to be.  The question is

17 simply, Mr. Reinking was provided instructions

18 from law enforcement regarding firearms, what

19 specific instructions did you receive, from

20 who, and when?

21          MR. CHASTAIN:  Well, I think the

22 objection was that he wasn't given the

23 instructions, that was the point of the

24 response.

25          MR. MANOOKIAN:  Okay.  If that's

1  the answer.  It wasn't clear to me.  But if

2  that's the answer under oath that he didn't

3  get any instructions from law enforcement,

4  that's fine.  I just need that answer.

5          THE WITNESS:  Yes, that's correct.

6          MR. BROWN:  We're talking about at

7  the time that they were taken from Travis?

8          MR. CHASTAIN:  Yeah, that's the

9  time we're talking about, correct?

10  BY MR. MANOOKIAN:

11      Q.   At the time they were taken from

12  Travis, you were not given any instructions,

13  correct?

14      A.   Correct.

15      Q.   Now, how about at the time that you

16  gave them back then?

17          MR. CHASTAIN:  All right.  That --

18          MR. MANOOKIAN:  I think that's very

19  well within personal jurisdiction.  I've laid

20  a very good foundation.

21          MR. BROWN:  Well, Brian, this is

22  Joel, let me say this, we don't -- we don't

23  have those statements, but we know they exist,

24  that those -- there were telephone calls.  And

25  so I don't think it's fair to ask Jeff what

1  exactly was said when I can represent to you

2  we know that those telephone calls were

3  recorded.  Those recordings have been

4  preserved.  And we do not have copies of them

5  and we have been denied copies of them.

6          MR. MANOOKIAN:  Well, I can ask him

7  what he recalls.

8          MR. BROWN:  Due to an ongoing

9  criminal investigation --

10          MR. MANOOKIAN:  Well, he can take

11  the Fifth on it.

12          MR. CHASTAIN:  Hold on.  Hold on.

13          MR. BROWN:  Let me just make a

14  record here, because I'm not fighting you on

15  this.  And I think ultimately we're all going

16  to get it.  Okay.  And what we're going to get

17  is we're going to get recordings of telephone

18  calls between Jeffrey Reinking and sheriff's

19  deputies in Tazewell County, Illinois.  So --

20  and the reason why we don't have them is

21  because there's an ongoing criminal

22  investigation in Tazewell County as to

23  Jeffrey.  So --

24          MR. MANOOKIAN:  I get it.  I get

25  it.  That sounds like the best evidence.  But

1  that's a trial inadmissibility rule.

2          MR. BROWN:  Right.  What I'm trying

3  to get at and not very artful and perhaps too

4  slowly is I'm going to instruct my client not

5  to answer what his recollection is of those

6  discussions because that touches upon the

7  criminal investigation, and we're going to

8  assert the privilege under the Fifth

9  Amendment.

10          MR. MANOOKIAN:  Okay.  That's fair.

11          MR. CHASTAIN:  But having said

12  that, we will permit you to ask the question

13  regarding the interrogatory answer you read,

14  who did the advice come from with response --

15  or with respect to returning the guns if you

16  want to ask that question.

17          MR. MANOOKIAN:  Well, I'm trying to

18  think this through.  If he's taking the Fifth

19  on what the advice was -- all right.  That's

20  fine.

21  BY MR. MANOOKIAN:

22      Q.   Mr. Reinking, did you receive

23  advice from a particular individual or entity

24  regarding returning guns to your son, Travis

25  Reinking?  If so, I'm only asking who the

1  advice was received from.

2         THE WITNESS:  Can I say the name?

3         MR. CHASTAIN:  Yes, you can answer.

4         THE WITNESS:  Sergeant Ryan Tarby,

5  with the Tazewell County Sheriff's Office.

6  BY MR. MANOOKIAN:

7     Q.   All right.  I'm going to ask you

8  now what he told you.  I think that your

9  lawyers are going to object to it, so give

10  them an opportunity.

11         MR. BROWN:  Well, I'm going to

12  object and I'm going to instruct Jeff not to

13  answer at this time based on the Fifth

14  Amendment privilege and also based upon the

15  fact that we know the recording of the call

16  exists.  So we would --

17         MR. MANOOKIAN:  We --

18         MR. BROWN:  Let me finish.  We'll

19  withdraw that Fifth Amendment privilege

20  assertion either when we're told that there's

21  not going to be a prosecution or when we win

22  the criminal case.

23         MR. MANOOKIAN:  Well, I'm not sure

24  that there's a conditional Fifth Amendment

25  privilege.

1          MR. BROWN:  Oh, sure there is.  We

2    can assert it now.  I can absolutely assure

3    you that there is a conditional Fifth

4    Amendment privilege.  We can assert it as to

5    part or all of a topic or for a period of time

6    or indefinitely.  And that's what we're

7    asserting.  And we'll just have to agree to

8    disagree on that.  I'd be happy to get a

9    ruling on it.  But I can tell you I've

10   litigated it, and I feel very comfortable

11   asserting the privilege in that regard on

12   behalf of my client.

13          MR. MANOOKIAN:  Okay.  Joel, I

14   think that you are far more versed in that

15   area of law than I am, and I do not doubt that

16   you're right on it.  So let's do this, let me

17   just ask the question and then he can take the

18   privilege; how is that?

19          MR. BROWN:  That's fine.

20   BY MR. MANOOKIAN:

21      Q.   Okay.  Mr. Reinking, what was the

22   instruction, advice, or content of the

23   communication that you received from the

24   individual that you just referred to?

25          MR. BROWN:  I'm going to instruct

1  my client not to answer, assert the privilege
2  under the Fifth Amendment, the privilege
3  against self-incrimination.
4          MR. MANOOKIAN:  Sure.  Okay.  I'll
5  move on.
6          I'm going to look at my notes,
7  gentlemen, I think I'm very close to done
8  here.  If you'll give me maybe 10 minutes.
9          MR. BROWN:  Sure.
10         MR. MANOOKIAN:  I think I'll come
11 back and tell you that I don't have any more
12 questions, but if I do, it's going to be very
13 limited.
14 (An off the record discussion was held.)
15 (A brief recess was held.)
16         MR. MANOOKIAN:  I only have a few
17 questions.
18 BY MR. MANOOKIAN:
19     Q.   Mr. Reinking, your response to
20 interrogatory number two indicates that you
21 called a few pawnshops after the incident in
22 April, can you tell me why?
23     A.   There was record in his apartment
24 that he had bought this, whether it was gold
25 or silver, and if he ever -- was it a pawnshop

1  or a --

2     Q.   It was a pawnshop.  It looks like

3  you called a few pawnshops after April 22nd,

4  2018, in Tennessee.  I'm just trying to figure

5  out what you were calling them about.

6     A.   Well, there was a receipt in his

7  apartment about him buying that and it said to

8  pick up in one week.

9     Q.   Okay.

10    A.   And I don't know if that picked up,

11  but then, you know, we heard sources say that

12  he sold it or something.

13         MR. BROWN:  What?  You said that.

14         THE WITNESS:  The gold or silver or

15  whatever he bought.  But nothing became of it.

16  Nobody seemed to know anything.

17         MR. MANOOKIAN:  I think those are

18  going to be all my questions.

19         MR. CHASTAIN:  I do have one

20  follow-up, Brian.

21  EXAMINATION BY MR. CHASTAIN:

22    Q.   Mr. Reinking, you were asked about

23  discussions with Travis' lawyer, John Wing,

24  and you told us about a conversation at his

25  office and a conversation at the apartment.

```
 1   Do you remember also participating in a
 2   telephone call with him in May of 2018?
 3             MR. BROWN:  At your house?
 4             THE WITNESS:  Oh, yeah.  Yeah.
 5   Yeah.
 6   BY MR. MANOOKIAN:
 7        Q.   Tell Mr. Manookian about that
 8   conversation.
 9        A.   Well, we had a telephone
10   conversation as well at my house.
11        Q.   What was the content of that
12   conversation?
13        A.   I guess I don't really remember.
14             MR. CHASTAIN:  That's all I had,
15   Brian.
16             MR. MANOOKIAN:  Joel and Parks, can
17   you guys do me a favor, I would like to have a
18   quick 408 call with you guys, and if your
19   client could be in the room, that would be
20   great.  If you don't want him to, that's fine
21   as well.  But let's go off the record and if
22   we could reconvene with a Rule 408
23   communication, I would appreciate that.
24             (End of deposition.)
25
```

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 115 of 132 PageID #: 219

```
 1  STATE OF ILLINOIS    )
 2                       ) SS
 3  COUNTY OF PEORIA     )
 4             C E R T I F I C A T E
 5    I, Cindy M. Scribner, CSR-RPR, License
 6  #084-004465, a Notary Public duly commissioned
 7  and qualified in and for the County of Peoria
 8  and State of Illinois, DO HEREBY CERTIFY that,
 9  pursuant to notice, there came before me on
10  the 4th day of December, A.D., 2018, at 416
11  Main Street, Suite 1300, Peoria, Illinois, the
12  following named person, to wit:
13               JEFFREY REINKING,
14  called by the plaintiff who was by me first
15  duly sworn to testify to the truth and nothing
16  but the truth of his knowledge touching and
17  concerning the matters in controversy in this
18  cause and that he was thereupon carefully
19  examined upon his oath, and his examination
20  immediately reduced to shorthand by means of
21  stenotype by me.
22    I ALSO CERTIFY that the deposition is a true
23  record of the testimony given by the witness,
24  that the reading and signing of the deposition
25  by the said witness were expressly waived, and
```

```
1   that the necessity of calling the court
2   reporter at time of trial for the purpose of
3   authenticating said transcript was also
4   waived.
5     I FURTHER CERTIFY that I am neither attorney
6   or counsel for, nor related to or employed by,
7   any of the parties to the action in which this
8   deposition is taken, and, further, that I am
9   not a relative or employee of any attorney or
10  counsel employed by the parties hereto, or
11  financially interested in the action.
12    IN WITNESS WHEREOF, I have hereunto set my
13  hand at Peoria, Illinois, this 10th day of
14  December, A.D., 2018.
15
16
17                        CSR-RPR
18
19
20
21
22
23
24
25
```

## A

**A.D** 1:21, 116:10
117:14
**ABEDE** 1:3
**able** 5:19, 18:25
24:24, 58:9, 88:17
**absence** 61:19
**absolutely** 112:2
**abusive** 63:8, 63:14
**access** 66:4, 88:16
88:25, 89:15, 90:22
91:3, 92:14, 93:24
**accurate** 59:7
**accusation** 80:23
**accused** 80:21
**accusing** 68:8
**acknowledged**
76:16
**action** 117:7
117:11
**actions** 47:13
63:10
**actives** 28:14
**add** 101:22
**address** 5:14
**admitted** 69:20
**adult** 12:19
**advice** 56:1, 107:11
110:14, 110:19
110:23, 111:1
112:22
**advised** 70:9
106:25
**age** 57:24, 98:8
**agencies** 63:23
**ago** 6:18
**agree** 4:5, 4:11
4:12, 12:13, 14:19
15:21, 16:2, 16:10
17:6, 38:12, 38:22
39:1, 39:7, 47:22
55:16, 55:23, 80:17
81:16, 84:23, 85:2
86:1, 102:1, 103:17
104:1, 104:7

104:24, 105:10
112:7
**agreement** 1:12
**ahead** 44:18, 56:6
74:16, 74:22
**aids** 5:2
**air** 32:21, 32:21
33:1, 33:3, 33:7
58:9
**Alcoa** 49:9
**allegations** 4:20
**allowed** 9:1, 88:7
**alternative** 80:8
80:13
**Amanda** 65:13
**Amendment** 82:5
110:9, 111:14
111:19, 111:24
112:4, 113:2
**ample** 56:2
**analogy** 14:15
**answer** 5:11, 5:25
6:8, 11:16, 19:24
27:8, 34:20, 43:8
43:20, 44:2, 44:4
44:18, 45:4, 45:6
45:8, 45:12, 60:12
62:15, 69:23, 70:9
70:11, 70:16, 74:16
74:23, 79:7, 82:6
84:12, 88:21, 93:19
103:21, 103:23
104:13, 105:8
106:4, 106:10
106:18, 107:12
108:1, 108:2, 108:4
110:5, 110:13
111:3, 111:13
113:1
**answered** 27:16
43:13, 56:5, 81:10
102:20, 105:22
**answers** 105:24
**anybody** 33:6
98:11
**anymore** 93:6

**anyplace** 8:3
**apartment** 35:25
36:4, 36:10, 37:6
37:11, 41:4, 49:10
51:24, 64:4, 64:9
64:20, 65:5, 65:16
66:21, 67:1, 67:8
67:10, 67:14, 68:15
69:7, 69:12, 70:7
70:10, 70:18, 70:19
70:24, 71:1, 71:9
71:13, 71:17, 71:23
71:25, 72:8, 72:12
72:21, 72:24, 73:4
73:12, 73:19, 74:7
75:6, 75:12, 75:14
75:16, 75:23, 75:24
76:3, 90:2, 90:9
90:20, 94:3, 95:23
98:25, 99:9, 113:23
114:7, 114:25
**apartments** 42:10
**APPEARANCES**
2:1
**appears** 49:15
**appreciate** 14:12
47:22, 48:8, 115:23
**apprehended**
46:22, 100:6
100:19
**approximate** 61:25
89:13
**approximately**
7:25, 9:7, 99:13
**April** 10:12, 11:7
11:12, 11:23, 12:2
12:12, 17:12, 17:14
17:17, 17:22, 17:25
18:5, 18:9, 18:21
19:12, 20:21, 20:24
21:6, 21:15, 22:8
22:14, 22:21, 23:1
24:1, 24:6, 25:13
27:18, 28:6, 28:8
28:14, 28:25, 29:8
29:21, 33:16, 33:23

46:14, 52:1, 52:14
52:24, 56:9, 57:12
62:6, 62:16, 63:20
82:1, 99:1, 99:4
99:21, 100:4, 100:8
100:16, 100:17
101:25, 102:2
103:5, 103:7
103:14, 104:3
105:1, 105:12
113:22, 114:3
**AR-15** 77:24, 78:9
79:2, 80:1, 80:12
82:8, 82:10, 86:2
95:2, 95:7, 95:8
95:9
**area** 4:18, 41:5
47:11, 49:11, 53:7
53:8, 54:5, 112:15
**argue** 76:24, 77:6
**arm** 87:10
**Arms** 87:4
**arrested** 12:6
**arrive** 94:13
**art** 85:13
**artery** 17:2
**artful** 20:3, 110:3
**asked** 56:4, 67:5
70:17, 70:22, 71:7
75:3, 83:11, 95:17
114:22
**asking** 16:19, 37:4
43:11, 49:2, 53:1
56:23, 68:16, 68:18
68:22, 69:5, 70:5
71:21, 73:20, 81:4
82:1, 82:21, 82:22
85:14, 100:1
110:25
**assault** 95:12
**assert** 82:5, 110:8
112:2, 112:4, 113:1
**asserting** 112:7
112:11
**assertion** 111:20
**assume** 47:19

52:17, 59:5, 82:12
**assuming** 84:25
**assumption** 52:19
59:6
**assure** 112:2
**asymmetry** 85:18
**Atlanta** 17:3
**attempt** 17:18
**attend** 14:24
**attendance** 16:2
**attended** 15:4
15:18, 15:21, 17:9
**attending** 16:15
**attorney** 27:8
62:24, 117:5, 117:9
**attorneys** 19:9
44:11, 44:15
**auction** 32:11
50:11
**auctions** 32:14
49:16, 50:3, 50:9
**audible** 5:21
**August** 30:5, 30:8
30:12, 30:18, 30:23
31:3, 32:18, 33:8
33:12, 33:18, 33:23
35:9, 49:13, 49:16
49:22, 50:2, 50:5
84:6, 86:1, 87:23
88:23, 101:8, 102:6
102:23
**authenticating**
117:3
**authorities** 12:14
**Auto** 49:15, 50:3
50:9
**availability** 39:13
**available** 26:2
**avenue** 18:2
**aware** 52:3, 70:24
71:16

## B

**back** 15:2, 22:25
25:6, 30:16, 37:24

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 118 of 132 PageID #: 222

41:23, 43:2, 47:5
53:14, 65:14, 68:16
68:19, 68:22, 69:6
70:5, 70:17, 70:23
71:8, 75:4, 75:13
75:23, 75:25, 76:1
76:2, 86:12, 86:13
90:3, 90:11, 94:3
95:18, 95:23, 97:15
97:18, 99:15, 104:3
104:9, 104:14
108:16, 113:11
**background** 51:1
77:8
**base** 58:10
**based** 37:14, 43:21
44:4, 44:16, 56:1
69:23, 70:11, 85:21
92:21, 111:13
111:14
**basically** 8:21, 15:9
**basis** 10:22, 68:9
**Bear's** 30:2
**becoming** 15:15
15:23
**bedroom** 58:24
**began** 58:16
104:19, 105:1
105:13, 107:8
**beginning** 83:18
**behalf** 112:12
**believe** 15:7, 23:5
31:1, 35:11, 50:23
51:16, 53:12, 78:8
78:14, 78:22, 79:24
87:2, 92:5, 92:13
92:25, 99:2
**bell** 53:19
**belonged** 50:9
76:20
**belongings** 90:4
97:15
**benefit** 5:19
**best** 45:12, 93:19
109:25
**beyond** 25:21

42:25, 68:24, 81:2
82:3
**big** 31:8, 37:1, 77:8
86:23, 87:1, 87:6
**Binkley** 4:10
**bit** 14:14, 25:24
43:2
**blue** 19:16
**Bmanookian@cu...**
2:5
**bombed** 79:19
**booming** 23:10
**border** 7:23, 7:24
**bought** 50:10
113:24, 114:15
**brand** 87:5
**break** 47:1, 76:10
83:9, 107:14
**breaks** 68:6
**Brewer** 2:11
**Brian** 2:4, 5:1
16:18, 43:18, 46:24
47:21, 49:20, 68:23
71:4, 82:24, 108:21
114:20, 115:15
**brief** 47:4, 76:13
113:15
**brimstone** 73:23
**bring** 65:14
**broader** 4:20
**Broadway** 5:16
**broke** 76:15
**Brooks** 2:11
**brother** 9:14
**Brothers** 32:11
32:14
**Brown** 2:7, 2:8, 4:4
21:8, 21:10, 43:18
45:3, 47:12, 47:21
48:23, 108:6
108:21, 109:8
109:13, 110:2
111:11, 111:18
112:1, 112:19
112:25, 113:9
114:13, 115:3

**buildings** 33:4
**bullet** 80:12
**Bushmaster** 95:5
95:6, 95:7
**business** 10:3
13:15, 13:19, 15:25
16:4, 16:8, 16:13
18:1, 18:6, 18:8
18:10, 18:21, 19:23
20:25, 21:1, 21:7
22:8, 22:13, 22:20
23:2, 23:11, 23:12
24:2, 24:7, 24:13
25:7, 25:11, 25:19
25:25, 26:1, 27:19
28:4, 28:24, 29:7
29:13, 29:14, 29:18
30:14, 30:19, 30:20
30:24, 30:25, 31:4
31:17, 31:20, 31:23
32:6, 32:16, 33:11
33:15, 33:24, 34:3
34:12, 34:18, 34:25
35:5, 35:6, 38:3
38:5, 38:15, 38:22
46:4, 49:17, 53:10
53:12, 101:25
102:2, 102:7
102:10, 105:2
105:14
**buy** 42:18, 87:1
**buying** 114:7
**Byzantine** 77:11

**C**

**calendar** 53:5
**call** 21:19, 40:10
49:14, 50:1, 54:10
54:22, 56:10, 56:19
56:22, 61:16, 81:23
95:4, 111:15, 115:2
115:18
**called** 1:10, 19:15
19:16, 51:7, 53:1
53:12, 53:13, 53:24

54:6, 83:6, 107:10
113:21, 114:3
116:14
**calling** 19:1, 49:10
52:20, 53:9, 114:5
117:1
**calls** 21:21, 21:25
44:12, 49:8, 53:16
54:3, 57:18, 58:17
59:24, 96:11
103:20, 104:11
104:21, 105:5
108:24, 109:2
109:18
**Camp** 30:3
**campers** 31:7
**campground** 29:25
30:7
**campgrounds** 31:5
**caption** 4:5
**car** 7:13, 73:18
**card** 10:18, 10:25
83:6, 106:17, 107:3
**cards** 11:3
**carefully** 116:18
**cares** 73:17
**case** 47:16, 76:25
104:10, 105:23
111:22
**cases** 63:2
**cash** 10:19, 10:21
**cataloging** 93:17
**catastrophic** 93:15
**cause** 116:18
**caveat** 27:7
**cavity** 80:10
**cell** 53:9, 53:17
**certain** 54:5, 71:22
79:19, 98:8
**certainly** 14:12
**certification** 16:7
**certified** 13:2, 13:6
15:16, 15:24, 16:12
**CERTIFY** 116:8
116:22, 117:5
**changed** 49:21

**Chastain** 2:11
2:12, 3:6, 4:2, 4:3
4:25, 5:5, 11:15
16:18, 27:3, 34:5
34:19, 38:7, 42:23
43:12, 46:24, 48:24
49:20, 56:4, 68:23
69:8, 70:2, 70:8
71:2, 74:15, 74:19
74:22, 76:11, 78:17
79:5, 81:2, 81:8
82:3, 84:11, 84:25
85:6, 88:19, 89:17
90:12, 92:17, 96:10
103:19, 103:22
104:4, 104:11
104:20, 105:4
105:15, 106:8
107:21, 108:8
108:17, 109:12
110:11, 111:3
114:19, 114:21
115:14
**Chattanooga** 22:18
22:25, 23:25, 28:17
**check** 34:7
**checking** 31:15
33:20
**chest** 80:10
**Chicago** 14:8
19:19
**chicken** 83:24
**chose** 37:10
**Christmas** 36:13
36:15
**church** 68:5
**Cindy** 1:16, 116:5
**circuit** 69:9, 102:21
**circumstance**
48:19
**citation** 43:24
**cities** 22:19, 24:12
**city** 1:20, 23:18
**Civil** 1:13
**clarification** 6:4
**Clark** 53:18, 53:20

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 119 of 132 PageID #: 223

53:21, 54:6, 59:24
**class** 15:10, 104:10
**clean** 51:23, 64:19
  99:1
**cleaned** 75:19
**cleaning** 64:4
**cleanly** 44:19
  44:21, 69:25
**clear** 108:1
**client** 43:19, 43:21
  78:10, 78:16, 79:2
  80:3, 80:17, 82:9
  82:25, 86:3, 88:24
  89:11, 89:16, 90:23
  91:4, 93:23, 110:4
  112:12, 113:1
  115:19
**client's** 80:10
**clients** 63:3, 77:25
  78:4
**close** 20:6, 113:7
**clothing** 65:6
**Co-counsel** 2:9
  2:13
**code** 1:13, 66:13
  66:17, 86:7, 87:7
  87:11, 87:13, 89:3
  94:16
**codes** 54:5
**coincide** 100:5
**coincides** 50:4
**colleagues** 19:23
**color** 42:16
**Colorado** 15:7
**come** 7:14, 8:1
  16:11, 22:16, 25:6
  42:2, 42:3, 63:24
  64:13, 68:4, 110:14
  113:10
**comfortable** 22:2
  112:10
**coming** 17:4, 17:6
  62:19, 105:1
**comment** 47:6
**commercial** 23:14
**commissioned**

116:6
**communicated**
  55:17
**communication**
  112:23, 115:23
**communications**
  43:20, 45:6, 45:8
**community** 58:25
**companies** 32:21
  32:22, 32:24, 33:2
  33:7, 54:4
**company** 26:7
  54:22, 55:18
**complete** 32:3
**completely** 43:9
**complex** 72:21
**complexes** 49:10
  72:24, 73:12, 73:20
**complied** 106:14
**concept** 79:20
**concerned** 72:10
**concerning** 116:17
**concession** 48:16
**conclude** 57:17
  71:12, 75:6, 76:6
**concluded** 26:1
  59:15, 74:7
**conclusion** 24:16
  96:11, 103:20
  104:12, 104:21
  105:5
**conclusions** 25:6
**conditional** 111:24
  112:3
**conditioning** 32:21
**confidential** 22:1
**confirmed** 90:20
**connection** 77:2
  81:12, 81:15
**connections** 78:20
**consider** 28:13
  29:6
**consistent** 69:9
**constituting** 29:6
**constrained** 69:17
**construction** 23:18

24:20, 24:23
**contact** 57:13
  104:8
**contacted** 19:20
**contacts** 103:18
  104:2, 104:18
  104:25, 105:11
**contains** 106:19
**content** 4:20
  112:22, 115:11
**continually** 13:12
  13:16, 13:21
**continue** 15:24
  16:7
**continuing** 16:4
**contract** 26:5
  26:12
**control** 96:9
**controversy** 116:17
**conversation** 9:10
  9:18, 20:9, 36:1
  56:12, 97:12
  114:24, 114:25
  115:8, 115:10
  115:12
**copies** 109:4, 109:5
**copy** 107:13
**correct** 5:3, 11:1
  11:14, 11:24, 12:2
  13:7, 13:17, 13:24
  14:10, 18:6, 18:11
  18:12, 20:22, 21:16
  21:17, 27:14, 27:15
  27:17, 28:9, 29:14
  29:19, 31:13, 33:19
  34:4, 34:14, 34:18
  35:2, 35:7, 35:19
  35:20, 38:6, 38:17
  38:24, 38:25, 39:2
  46:15, 46:16, 49:23
  50:19, 50:20, 54:8
  54:9, 54:19, 54:20
  54:23, 54:24, 56:3
  57:20, 58:4, 58:11
  58:14, 59:4, 59:17
  59:21, 59:22, 59:25

60:1, 60:4, 60:10
  60:11, 60:16, 60:17
  60:20, 60:21, 60:25
  61:1, 61:4, 61:8
  61:9, 61:13, 61:23
  61:24, 62:15, 63:20
  63:24, 63:25, 64:6
  64:12, 71:10, 71:14
  71:15, 72:22, 72:25
  73:1, 73:5, 73:6
  73:25, 74:14, 75:14
  75:18, 76:4, 76:19
  79:16, 80:20, 84:8
  86:4, 86:5, 86:7
  86:8, 86:12, 86:14
  86:17, 86:19, 87:25
  88:15, 89:1, 89:2
  89:11, 89:12, 90:23
  91:5, 91:6, 91:21
  91:22, 91:24, 91:25
  92:2, 92:3, 92:6
  92:16, 93:3, 93:24
  93:25, 94:4, 94:5
  94:7, 94:8, 94:10
  94:13, 94:17, 94:18
  96:5, 96:9, 96:23
  96:24, 97:2, 97:3
  97:5, 97:6, 97:9
  97:10, 98:12, 98:13
  99:22, 100:6, 100:7
  100:10, 100:25
  101:1, 101:4, 101:5
  101:8, 101:9
  101:12, 101:13
  101:16, 101:17
  101:20, 101:21
  102:3, 102:4, 102:7
  102:8, 102:11
  102:12, 102:15
  102:16, 102:19
  103:11, 103:15
  103:16, 103:18
  104:10, 105:3
  105:14, 105:16
  108:5, 108:9
  108:13, 108:14

**correctly** 75:6
**counsel** 21:10
  117:6, 117:10
**country** 72:14
**County** 1:18, 1:20
  7:10, 8:12, 8:16
  9:6, 9:12, 9:20
  69:9, 107:10
  109:19, 109:22
  111:5, 116:3, 116:7
**couple** 26:20, 30:1
  40:13, 54:17, 54:21
  57:22, 98:20
**course** 14:8, 35:17
**courses** 15:12
**court** 1:1, 1:14
  4:10, 43:4, 69:10
  117:1
**crane** 12:25, 13:1
  13:2, 13:4, 13:7
  13:9, 13:11, 14:4
  14:7, 14:9, 14:10
  14:14, 14:21, 14:24
  15:4, 15:9, 15:11
  15:17, 15:21, 16:3
  16:12, 16:15, 17:9
  17:18, 17:24, 18:1
  18:6, 18:22, 19:12
  20:5, 20:9, 20:13
  20:18, 23:8, 23:12
  25:8, 26:5, 26:12
  26:14, 26:19, 26:24
  27:1, 29:13, 30:19
  30:25, 31:25, 32:9
  33:3, 38:16, 38:19
  38:19, 38:24, 39:9
  39:13, 39:17, 50:13
  53:18, 53:21, 54:3
  54:6, 54:22, 55:2
  55:9, 55:11, 55:13
  55:18, 55:21, 56:2
  58:5, 58:13, 59:25
  104:9
**cranes** 13:20, 15:1
  15:14, 23:15, 23:19
  23:21, 24:11, 24:25

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 120 of 132 PageID #: 224

26:22, 27:13, 50:10
55:25, 58:19, 59:2
93:5
**created** 63:23
**creature** 48:4
**credit** 10:18, 10:25
11:3
**criminal** 109:9
109:21, 110:7
111:22
**crossed** 7:22, 7:24
**CSR-RPR** 1:17
116:5, 117:17
**Cummings** 2:3
**curiosity** 33:17
**curious** 67:13
**currently** 13:9
**cut** 6:25, 29:15
**cute** 57:23

**D**

**dad** 68:4, 72:10
92:9
**damaged** 50:10
**Danny** 56:11
**DASILVA** 1:3
**date** 12:10, 13:12
46:18, 46:20, 61:25
62:1, 62:10, 62:13
83:20, 89:13, 89:14
89:19, 100:15
**dates** 36:23, 49:21
**dating** 104:2, 104:8
**daughter** 8:9
64:14, 64:15, 65:9
**daughter's** 8:6
**Davidson** 7:10
8:12, 8:16, 9:6
9:12, 9:20, 69:9
**day** 1:21, 57:24
93:11, 116:10
117:13
**day-to-day** 10:22
**days** 23:9, 42:6
42:8, 62:8, 71:25

72:11, 100:18
**dealership** 31:9
32:10
**dealing** 63:5
**dealt** 63:2
**debit** 10:18, 10:24
11:3
**December** 1:21
36:12, 41:22, 83:17
116:10, 117:14
**decent** 56:20
**decide** 15:11, 22:3
22:4
**decision** 16:11
39:19
**deer** 95:11
**defendant** 1:7
1:10, 2:9, 2:13
**demanding** 107:9
**denied** 109:5
**deny** 60:9, 60:18
60:22
**Department** 56:12
**depending** 85:8
**deponent** 47:19
69:19
**deponents** 63:9
**deposes** 5:10
**deposing** 58:1
**deposition** 1:9, 4:6
4:8, 4:13, 5:18
25:22, 35:18, 47:8
47:9, 47:19, 77:1
84:18, 100:1
115:24, 116:22
116:24, 117:8
**depositions** 1:15
14:16, 82:18
**deputies** 109:19
**describe** 56:10
65:2, 68:6
**described** 4:14
50:3
**determine** 23:20
24:10, 24:13, 36:7
**devoted** 74:13

**dial** 87:8, 87:9
87:16, 87:17
**different** 14:9
40:13
**digital** 87:7, 87:15
**DIRECT** 5:12
**directly** 60:10
60:23, 76:2
**disagree** 112:8
**discern** 67:24
**disclose** 55:7
**disclosure** 21:9
**discovery** 1:16
72:6
**discretionary**
16:11
**discussion** 39:25
47:3, 76:12, 113:14
**discussions** 44:1
110:6, 114:23
**dispatching** 53:11
**dispute** 54:12
78:25, 80:23, 82:8
82:13, 82:22, 82:24
86:16, 103:8
**DISTRICT** 1:1
1:2
**doing** 8:14, 9:14
9:15, 9:25, 10:3
10:5, 14:16, 14:17
24:18, 42:8, 63:13
64:23, 65:12, 74:23
81:25
**dominion** 96:9
**door** 57:7, 81:25
**doubt** 91:23
112:15
**dove** 95:10
**drive** 2:11, 20:24
31:9, 51:2, 59:9
72:19, 73:12, 73:18
**driven** 16:23
**driving** 16:19, 17:1
17:5, 23:17, 25:4
29:2, 42:13, 71:25
72:11

**drone** 58:8
**drove** 34:8, 42:5
42:7, 42:11, 71:24
72:11
**due** 107:4, 109:8
**duly** 5:10, 116:6
116:15

**E**

**earlier** 19:13
**early** 62:16
**easiest** 62:21
**easily** 103:1
**east** 25:5
**eat** 68:4
**education** 13:14
13:23, 14:1, 14:3
14:18, 14:20
**effort** 48:6
**efforts** 34:17, 34:24
**eight** 73:18
**either** 27:13, 47:17
48:16, 48:21, 63:9
79:14, 85:11
101:24, 111:20
**else's** 63:10
**employ** 55:14
**employed** 55:8
117:6, 117:10
**employee** 117:9
**employees** 26:21
26:25, 27:12, 55:7
**employer** 55:6
**employers** 40:10
**employment** 55:25
57:19, 59:2, 59:18
**ended** 77:5, 77:20
80:9, 81:16
**enforcement**
106:21, 107:1
107:18, 108:3
**enforcement's**
106:14
**enjoy** 30:13
**enjoying** 29:3

**enter** 7:15
**entered** 94:16
**entirely** 85:22
**entity** 110:23
**episode** 85:22
**equipment** 31:15
**Esq** 2:4, 2:8, 2:12
**established** 42:24
69:12, 82:14, 84:15
**estimate** 9:4
**event** 36:16, 37:3
37:4, 46:11, 46:12
46:19, 56:18, 93:16
100:11, 104:22
**everyday** 10:25
**evidence** 109:25
**Evidently** 77:22
**exact** 83:20, 89:19
106:24
**exactly** 109:1
**examination** 1:11
3:4, 5:12, 48:14
114:21, 116:19
**examined** 116:19
**exceed** 4:16
**exchange** 66:20
**exclusion** 72:13
**exhibits** 3:8
**exist** 108:23
**exists** 111:16
**experience** 14:6
14:13, 14:15, 23:7
37:15
**explanation** 80:9
80:13
**explore** 18:10
18:21, 20:21, 20:25
21:7, 22:8, 22:13
22:20, 23:2, 23:11
28:24, 30:19, 31:4
32:16, 33:15, 33:24
34:12, 35:5, 35:6
102:2, 102:6, 105:2
105:13
**exploring** 24:2
27:19, 28:4, 29:7

29:12, 29:18, 29:20
30:24, 34:17, 34:25
38:5, 38:21
**expressly** 116:25
**extent** 4:15, 9:17
**eyes** 79:23

**F**

**face-to-face** 5:20
**fact** 69:20, 111:15
**factor** 39:18, 39:21
**facts** 77:14, 84:16
**fair** 6:8, 21:22
43:9, 44:22, 59:6
63:16, 71:12, 77:18
84:20, 85:23, 93:20
93:21, 106:3
108:25, 110:10
**fairly** 71:22, 79:19
93:18
**fairness** 47:23
**Falls** 28:21
**false** 106:19
**familiar** 53:23
77:10
**familiarity** 94:23
**family** 36:25, 73:11
**far** 5:2, 23:13, 32:1
112:14
**father** 63:1, 64:3
73:16, 74:13
**fault** 18:16
**favor** 115:17
**FBI** 57:6, 57:9
81:25
**feel** 22:2, 41:7
42:20, 43:16, 44:25
48:22, 63:15, 69:2
69:16, 112:10
**felt** 48:4
**Fifth** 82:5, 109:11
110:8, 110:18
111:13, 111:19
111:24, 112:3
113:2

**fighting** 109:14
**figure** 114:4
**financially** 98:20
117:11
**find** 19:6, 20:14
46:7, 61:15, 72:6
73:24, 98:5
**fine** 37:16, 43:8
62:14, 69:15, 106:7
107:15, 108:4
110:20, 112:19
115:20
**finish** 5:24, 18:17
65:13, 69:2, 111:18
**fire** 73:23
**Firearm** 107:3
**firearms** 65:15
65:19, 65:24, 66:1
66:5, 66:11, 77:10
106:15, 106:17
106:21, 107:1
107:18
**fired** 80:12
**first** 5:10, 10:11
12:1, 12:4, 12:18
13:6, 15:6, 23:3
36:8, 40:15, 50:24
51:20, 53:7, 61:15
75:21, 99:19
100:14, 116:14
**five** 7:25, 103:6
**Florida** 17:3, 32:8
32:12
**flying** 58:8
**focus** 34:3, 34:17
34:24
**focused** 25:20
**FOID** 83:6
**follow-up** 70:14
114:20
**following** 50:17
62:1, 64:20, 116:12
**follows** 5:11
**food** 27:25
**Force** 58:10
**form** 4:7, 11:15

34:5, 34:19, 38:7
71:3, 74:15, 89:17
90:12, 92:17, 96:10
103:19, 104:20
105:4
**formal** 15:3
**foster** 88:9, 96:23
**found** 56:17, 63:18
66:21, 67:1, 67:8
67:10, 72:2
**foundation** 69:20
108:20
**four** 33:18, 50:2
**four-minute** 49:14
**frame** 89:23
**frequently** 10:19
93:13
**friend** 51:7
**friends** 20:6
**front** 102:25
**full** 5:14, 106:4
**further** 30:18
117:5, 117:8
**furtherance** 28:4

**G**

**gained** 14:13
14:15
**game** 43:9
**Gander** 87:2
**gas** 10:16, 27:20
56:25
**geared** 19:6
**general** 47:22
99:17, 100:3
**Generally** 11:2
47:6
**gentleman** 64:24
**gentlemen** 113:7
**getting** 35:25, 36:3
36:9, 36:9, 76:25
85:9
**give** 14:14, 19:8
44:17, 45:13, 70:1
70:15, 70:16, 83:14

107:13, 111:9
113:8
**given** 98:22, 107:6
107:22, 108:12
116:23
**giving** 82:17
**go** 21:3, 28:18
28:20, 28:21, 32:8
32:10, 40:23, 41:7
42:12, 42:21, 43:16
44:18, 51:23, 56:6
60:6, 65:6, 68:5
72:16, 72:19, 72:23
73:2, 73:12, 74:16
74:22, 93:8, 98:5
98:7, 98:11, 98:16
115:21
**goes** 47:11
**going** 4:18, 5:21
19:19, 21:8, 23:14
23:19, 24:20, 24:25
25:18, 26:3, 27:3
36:24, 37:1, 37:6
40:3, 43:4, 43:19
43:25, 44:3, 44:10
44:18, 45:3, 48:6
57:22, 62:18, 65:5
68:24, 69:21, 70:14
71:2, 76:23, 76:24
77:3, 84:12, 84:22
92:8, 93:6, 93:16
94:12, 98:11, 98:15
99:15, 105:25
107:16, 109:15
109:16, 109:17
110:4, 110:7, 111:7
111:9, 111:11
111:12, 111:21
112:25, 113:6
113:12, 114:18
**gold** 42:17, 72:20
72:24, 113:24
114:14
**good** 5:1, 5:2, 29:4
39:15, 55:1, 55:11
55:13, 68:4, 69:20

108:20
**Googled** 42:10
**gotten** 89:6, 93:9
96:16, 97:1
**governed** 4:8
**grab** 106:6
**gray** 4:18, 47:10
**great** 115:20
**grocery** 52:11
**guess** 8:21, 12:8
33:20, 34:21, 79:9
115:13
**guidance** 107:7
**gun** 66:7, 66:11
66:14, 66:17, 77:8
78:9, 82:11, 83:1
83:4, 83:10, 84:6
84:6, 84:10, 84:14
84:22, 85:4, 85:4
85:14, 86:3, 86:7
86:12, 86:20, 87:24
88:10, 88:13, 88:25
89:14, 90:3, 94:3
94:7, 94:21, 95:23
107:8
**guns** 68:16, 68:18
68:21, 69:6, 70:5
70:17, 70:23, 71:8
75:23, 76:2, 76:16
76:20, 76:23, 77:5
77:15, 77:20, 80:6
88:7, 88:14, 88:16
94:16, 94:19, 94:24
95:18, 96:8, 96:16
97:20, 98:10, 98:15
107:8, 107:9
110:15, 110:24
**guy** 53:11
**guys** 53:23, 87:19
97:11, 107:13
115:17, 115:18

**H**

**halfway** 58:11
**hand** 106:2, 117:13

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 122 of 132 PageID #: 226

handed 97:7
handgun 94:25
    95:14
hands 19:8
happened 79:11
    100:17
happening 80:5
happy 112:8
harass 63:14
Harbor 79:18
hard 48:7
health 63:4, 68:7
hear 19:23, 27:16
    41:18, 50:25, 74:10
heard 41:10, 41:12
    60:12, 74:20
    114:11
hearing 5:2
heating 32:20
    32:21, 33:1, 33:3
    33:7
heavy 87:1
held 12:14, 47:3
    47:4, 76:12, 76:13
    113:14, 113:15
hell 73:16
helped 65:13
hereto 117:10
hereunto 117:12
hey 96:4
high 87:21
highway 29:3
hire 55:19
hold 83:11, 109:12
    109:12
home 35:23
honestly 73:15
hotel 27:22, 46:1
hour 1:22
hours 7:25, 73:19
    73:19, 76:10
house 8:4, 32:2
    46:14, 50:18, 51:6
    52:10, 57:9, 62:2
    66:8, 86:3, 87:24
    88:7, 88:14, 115:3

115:10
humans 79:14
hunch 72:2, 74:25
hunting 95:10
    95:11
husband 44:1, 45:5
    45:7

I

I-65 7:14
Identification
    106:17, 107:3
identify 57:1
IL 2:8
ILCS 43:24
Illinois 1:19, 1:21
    5:16, 7:15, 16:24
    26:8, 27:2, 41:14
    41:15, 43:22, 48:1
    48:4, 48:11, 51:7
    58:2, 60:2, 60:15
    60:19, 60:24, 61:22
    71:9, 71:10, 71:14
    71:20, 76:18, 79:3
    80:19, 86:4, 107:3
    109:19, 116:1
    116:8, 116:11
    117:13
imagine 62:22
immediately
    116:20
imperative 16:4
important 43:3
    48:5, 82:16
inadmissibility
    110:1
incarcerated 10:12
    12:1, 12:5, 12:14
incident 12:9
    12:11, 40:6, 46:12
    50:18, 51:6, 52:2
    62:20, 64:21
    113:21
Include 7:21
included 102:9

includes 64:4
including 48:17
    57:14
income 13:22
incredibly 77:11
indefinitely 112:6
Indiana 59:9
    59:10, 59:12, 72:19
indicate 106:13
indicates 113:20
indicted 78:6
individual 110:23
    112:24
individuals 24:5
    33:10
industry 23:8
    23:13, 31:25
information 22:1
    61:10, 61:20, 63:11
    63:13, 82:23, 85:18
    107:6
informing 70:6
insensitive 77:23
inspection 14:9
inspectors 14:7
instruct 43:7
    43:19, 43:25, 44:4
    44:17, 44:21, 45:4
    47:18, 48:17, 69:23
    70:8, 70:15, 82:6
    84:12, 88:20, 110:4
    111:12, 112:25
instruction 70:1
    107:7, 112:22
instructions 48:20
    106:15, 106:20
    107:17, 107:19
    107:23, 108:3
    108:12
Insurance 49:15
    50:3, 50:9
intent 47:25
interaction 65:2
interested 20:13
    77:13, 117:11
interposed 49:21

interrogatories
    105:18
interrogatory
    105:24, 106:1
    106:19, 107:14
    110:13, 113:20
interrupting 48:14
interviewed 65:9
intra-Illinois 85:22
invades 43:23
investigation 109:9
    109:22, 110:7
investigator 65:4
inviting 68:4
involved 13:16
    13:21
issue 47:16, 48:3
    76:24
issues 63:4
items 10:22, 90:6

J

jail 7:10, 9:6, 9:12
    9:20
January 35:11
    35:14, 35:22, 40:17
    41:8, 41:19, 41:25
    42:21, 44:24, 45:17
    45:20, 45:23, 46:2
    46:8, 49:3, 49:6
    49:7, 50:16, 51:25
    52:14, 52:23, 53:17
    54:10, 55:16, 57:12
    57:16, 59:14, 59:23
    61:2, 61:6, 61:12
    71:22, 102:14
Japanese 79:19
Jb@joelebrown.c...
    2:9
Jeff 5:2, 43:25
    44:4, 45:4, 108:25
    111:12
Jeffrey 1:6, 1:10
    5:9, 5:15, 26:18
    109:18, 109:23

116:13
Jelly 30:2
job 32:1, 32:3, 58:5
    59:8
jobs 57:25
Joel 2:7, 2:8, 4:4
    21:10, 43:19, 47:21
    85:17, 87:20
    105:25, 108:22
    112:13, 115:16
John 18:15, 18:22
    19:11, 19:21, 20:5
    20:12, 20:18, 25:8
    38:9, 114:23
John's 18:23
    18:25, 19:3, 19:7
Jonathan 64:25
    98:24, 99:6
Judge 4:10
July 101:3, 102:23
jump 47:25, 48:22
June 100:25
    102:23
jurisdiction 4:15
    4:19, 4:22, 43:5
    47:10, 68:25, 77:1
    78:18, 81:3, 82:4
    84:13, 84:17, 84:24
    85:5, 85:16, 88:20
    108:19

K

keep 4:21, 57:8
    106:15, 107:1
keeping 107:7
Kentucky 8:6, 8:8
kids 96:23
kill 77:25, 78:4
    86:2, 88:24
killed 78:10, 78:15
    79:2, 80:2, 80:17
    82:9, 82:25, 89:10
    89:16, 90:23, 91:4
    93:22
kind 9:16, 23:15

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 123 of 132 PageID #: 227

28:10, 30:13, 42:13
47:10, 48:18, 93:12
**knew** 37:25, 56:23
58:19, 59:14, 59:23
65:23, 73:7, 90:25
91:2, 92:2, 92:21
94:12
**know** 4:23, 15:8
18:23, 19:4, 19:15
31:24, 37:9, 37:16
37:17, 37:21, 38:18
39:6, 39:20, 39:21
44:3, 46:20, 47:11
48:2, 48:8, 49:18
50:6, 51:17, 52:5
52:7, 52:7, 52:9
52:13, 52:13, 57:5
58:21, 60:8, 60:14
61:2, 61:6, 61:14
61:25, 62:3, 62:15
63:3, 64:2, 65:21
67:5, 67:23, 68:1
69:17, 69:21, 70:4
70:19, 70:21, 72:3
72:7, 73:15, 75:9
75:13, 75:20, 76:5
76:22, 80:6, 80:11
80:21, 82:14, 83:3
83:13, 83:18, 83:19
85:8, 85:16, 85:20
86:21, 87:5, 92:7
93:6, 93:15, 94:25
95:3, 95:13, 95:20
98:5, 98:6, 98:7
99:12, 105:18
106:5, 108:23
109:2, 111:15
114:10, 114:11
114:16
**knowledge** 44:14
57:3, 61:19, 61:19
65:20, 79:15, 79:22
80:5, 116:16
**known** 79:10, 96:4
**Knoxville** 22:17
22:24, 23:6, 23:25

41:5, 42:5, 42:5
42:7, 49:8, 52:1
53:7, 54:18
**Krause** 2:11

**L**

**lack** 61:18
**laid** 69:19, 79:23
108:19
**late** 15:8, 41:22
62:15, 63:19
**law** 2:7, 14:18
48:4, 77:11, 106:14
106:21, 106:25
107:18, 108:3
112:15
**lawyer** 14:16
14:18, 22:3, 47:7
47:24, 70:15, 99:3
114:23
**lawyers** 25:21, 48:8
63:9, 76:24, 111:9
**learn** 40:4, 51:5
51:20
**learned** 52:2, 67:9
86:15, 86:18, 90:9
**learning** 92:24
**leave** 5:21, 41:15
**leaving** 60:19
60:23, 65:23, 83:23
93:5
**led** 77:15, 98:16
**left** 35:23, 40:2
41:13, 49:1, 60:2
60:15, 61:22, 64:2
65:7, 65:13, 83:25
89:24
**legal** 76:23, 83:25
96:11, 103:20
104:12, 104:21
105:5
**legitimate** 44:7
**level** 94:23
**License** 1:17, 116:5
**licensed** 48:1

**Likewise** 6:2
21:24
**limited** 1:9, 4:13
47:9, 69:11, 79:22
113:13
**line** 4:23, 53:10
53:12, 84:21
**lines** 49:16
**list** 105:22
**listen** 61:17, 82:15
82:20
**listing** 50:3
**litigated** 112:10
**litigation** 93:14
**little** 9:13, 19:13
25:24, 28:11, 74:18
**live** 8:9
**lived** 59:10, 71:9
71:10
**lives** 52:9, 64:15
64:17
**living** 51:18, 52:3
58:22, 58:24, 92:24
**LLC** 53:18
**locate** 42:9, 42:21
43:16, 45:1, 45:16
46:6, 49:11
**located** 30:8, 59:3
**locked** 87:14
88:24, 96:21
**locker** 87:19
**lockers** 87:21
**long** 7:18, 8:23
30:22, 41:11
107:12
**look** 23:13, 30:14
32:9, 37:11, 40:17
43:5, 46:4, 50:13
72:8, 72:23, 75:4
86:23, 95:21, 113:6
**looked** 31:12
50:10, 74:14
**looking** 18:2, 23:8
23:18, 31:7, 34:8
35:15, 37:25, 40:23
41:6, 41:8, 50:12

52:1, 54:4, 54:18
56:15, 71:25, 72:12
72:17, 72:20, 73:3
75:13, 75:25, 76:1
83:24, 97:14, 98:1
**Lookout** 28:18
**looks** 47:17, 95:9
95:12, 114:2
**lost** 91:10
**lot** 14:5, 14:15
17:15, 17:22, 18:13
18:19, 19:17, 24:20
31:14, 38:3, 57:24
62:25, 77:12, 79:9
85:13
**lots** 42:11
**Louis** 5:15
**Louisville** 8:10
34:7, 64:16
**lucky** 73:17

**M**

**Main** 1:19, 2:7
116:11
**Mainstream** 2:11
**major** 24:12
**making** 24:17
**Manookian** 2:3
2:4, 3:5, 4:12, 5:7
5:12, 11:19, 16:20
16:21, 21:11, 21:12
27:6, 34:9, 34:22
38:11, 43:1, 43:14
44:6, 44:9, 45:11
47:2, 47:5, 48:12
48:25, 49:23, 49:25
56:8, 69:1, 69:4
69:15, 70:3, 70:13
71:5, 71:6, 75:1
76:9, 76:14, 78:21
78:24, 79:12, 81:4
81:13, 82:7, 84:19
85:3, 85:12, 85:25
88:22, 89:20, 90:16
90:17, 92:20, 96:12

96:14, 103:21
103:25, 104:6
104:16, 104:23
105:7, 105:17
106:11, 106:12
107:25, 108:10
108:18, 109:6
109:10, 109:24
110:10, 110:17
110:21, 111:6
111:17, 111:23
112:13, 112:20
113:4, 113:10
113:16, 113:18
114:17, 115:6
115:7, 115:16
**manufacturer**
86:21
**marital** 43:22, 44:5
48:3
**marked** 3:8
**mass** 63:19
**matter** 47:22
47:23
**matters** 116:17
**mean** 8:2, 12:6
12:20, 17:1, 26:18
29:2, 29:4, 36:20
37:13, 43:3, 52:6
52:11, 54:2, 58:23
59:10, 68:2, 69:16
71:24, 72:16, 73:16
77:23, 84:23, 85:15
87:9, 91:19, 93:13
95:9, 97:25, 100:11
**meaning** 4:8
**means** 116:20
**meant** 39:16
**media** 79:10
**meet** 33:6, 33:10
64:24, 99:11
**memories** 93:17
**mental** 63:4, 68:7
**mentioned** 38:8
**message** 75:4
86:10, 94:1

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 124 of 132 PageID #: 228

**messaged** 90:18
**messages** 62:23
　66:19, 67:25, 95:22
**met** 20:8
**metaphysical** 52:7
**Metro** 56:11
**middle** 1:2, 25:4
　59:16, 59:20, 61:3
　61:5
**midlevel** 95:7
**mind** 36:16
**mine** 51:7
**minimum** 64:1
　103:2
**minor** 21:13, 21:19
**minor's** 21:9
**minutes** 9:7, 50:2
　56:19, 113:8
**misstates** 90:13
　105:5
**mistake** 95:10
　95:11
**mobile** 14:7
**mom** 98:6
**moment** 52:8
　52:12, 52:12
**money** 45:22
　98:22, 103:10
　103:15
**monitor** 50:25
**month** 6:20, 11:7
　67:10, 89:21, 99:21
　100:4, 100:21
　100:24, 101:7
　101:11, 101:15
　101:19
**months** 33:18
　83:15, 83:16, 83:22
**morning** 51:8
**Morton** 5:16, 64:18
**motivated** 39:22
**Mountain** 28:19
　87:2
**move** 37:6, 37:22
　39:4, 39:12, 39:19
　39:22, 113:5

**moved** 39:2, 39:8
　40:5, 40:9, 40:21
**moving** 36:18, 40:1
　86:11, 86:16, 97:17
　97:23
**multi-night** 29:11
　29:16, 102:10
　102:14
**multiple** 38:13
　38:20, 45:19
**Music** 2:3, 31:9

### N

**name** 5:14, 15:17
　18:23, 19:1, 19:7
　21:5, 21:9, 21:19
　21:21, 21:21, 53:23
　64:24, 111:2
**named** 116:12
**Nashville** 1:2, 2:4
　2:12, 22:16, 22:17
　22:24, 22:25, 23:3
　23:6, 23:9, 23:24
　30:8, 30:12, 30:17
　30:22, 31:2, 32:17
　32:18, 33:8, 33:11
　33:15, 51:18, 51:21
　52:4, 52:9, 52:23
　53:8, 54:22, 55:18
　56:11, 58:1, 58:19
　58:20, 58:25, 59:3
　59:16, 59:20, 64:10
　64:20, 65:19, 77:9
　99:20, 100:2, 100:9
**nature** 93:14
**near** 36:11
**necessarily** 59:10
**necessity** 117:1
**need** 5:5, 6:4, 41:7
　48:22, 108:4
**needed** 19:6, 42:20
　43:16, 45:1, 106:15
　107:1
**neither** 117:5
**never** 27:10, 27:12

39:25, 61:15, 72:2
　96:25, 98:22
**nevertheless** 74:12
**new** 25:17, 36:13
**news** 51:8, 81:19
　81:21
**nicest** 95:8
**night** 8:3, 22:9
　23:3
**nights** 22:11, 25:4
　30:1, 31:1, 45:19
**nine** 62:7, 103:6
**noise** 51:1
**Nope** 55:4
**normal** 93:19
**north** 42:4
**Notary** 1:17, 116:6
**notes** 113:6
**notice** 4:14, 69:24
　116:9
**noticeable** 5:22
**November** 6:21
　6:23, 7:3, 7:6, 7:9
　7:12, 7:16, 7:19
　8:13, 8:17, 8:20
　8:24, 9:6, 9:12
　9:20, 10:15, 11:5
　41:17, 60:3, 60:16
　60:20, 60:24, 61:12
　61:22, 65:22, 83:16
　84:1, 101:20
　102:24, 103:7
**number** 11:10
　11:20, 16:24, 19:3
　49:15, 101:22
　106:1, 106:23
　106:24, 113:20
**numerical** 87:13
**Numerous** 11:25

### O

**oath** 108:2, 116:19
**object** 11:15, 21:8
　27:3, 34:5, 34:19
　38:7, 47:7, 47:18

48:17, 71:3, 74:15
　79:5, 89:17, 90:12
　92:17, 96:10
　103:19, 104:20
　105:4, 111:9
　111:12
**objecting** 47:7
　47:15
**objection** 44:12
　44:16, 48:5, 56:4
　84:21, 88:19, 104:4
　104:11, 106:18
　106:24, 107:22
**objections** 4:7
　48:10, 48:20
　105:15, 106:22
**observation** 37:15
**occasion** 19:22
　64:24
**occasionally** 32:9
**occasions** 38:14
　40:14
**occur** 93:17
**occurred** 77:14
　81:7
**October** 41:16
　60:3, 60:15, 60:20
　60:24, 61:22, 65:22
　83:16, 83:18, 84:1
　101:16, 102:24
**October/November**
　89:22
**offhand** 18:24
**office** 99:10
　107:10, 111:5
　114:25
**Offices** 2:7
**Oh** 27:17, 102:20
　112:1, 115:4
**Ohio** 42:3, 72:23
**okay** 27:7, 31:8
　32:5, 41:23, 44:6
　47:20, 62:18, 68:23
　70:1, 71:5, 76:11
　77:20, 78:7, 78:17
　80:22, 81:22, 84:5

85:3, 86:20, 87:17
　88:10, 89:24, 94:12
　95:2, 96:12, 99:15
　99:17, 99:18
　106:11, 107:25
　109:16, 110:10
　112:13, 112:21
　113:4, 114:9
**old** 87:16, 87:20
**on-hand** 14:6
**on-site** 32:3, 58:14
**once** 5:6, 99:10
　99:10
**one's** 43:8
**one-day** 8:1, 8:7
**one-hour** 9:1
**ones** 99:17
**ongoing** 109:8
　109:21
**open** 89:9
**opened** 89:14
　90:10, 90:21, 90:25
　91:2
**opening** 89:7
**opens** 87:14
**operate** 14:4, 26:22
　27:13, 59:2
**operated** 27:10
**operating** 13:20
　14:13, 15:1, 15:12
　15:14, 15:18, 15:22
　16:3, 26:19, 26:25
　27:1, 55:20, 55:25
　58:13, 58:18, 85:17
**operation** 14:10
　16:12, 16:15
**operations** 15:10
**operator** 13:3, 13:4
　13:7, 13:9, 13:11
　14:21, 17:10, 17:19
　26:14, 55:2, 55:9
　55:11, 55:13, 58:5
　104:9
**operators** 26:6
　26:13, 38:16, 38:19
**opinion** 37:14

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 125 of 132 PageID #: 229

**opportunities**
18:11, 18:21, 20:15
20:17, 20:19, 20:21
20:25, 21:7, 22:9
22:14, 22:21, 23:2
23:11, 24:3, 24:7
24:14, 25:8, 25:12
26:1, 27:20, 28:5
28:24, 29:7, 29:13
29:18, 30:15, 30:19
30:24, 31:4, 32:17
33:15, 33:24, 34:3
34:13, 34:18, 34:25
35:5, 35:6, 38:4
38:6, 38:16, 38:22
46:5, 49:17, 102:3
102:7, 105:3
105:14
**opportunity** 37:18
44:17, 44:20, 56:2
70:15, 111:10
**opposed** 10:19
37:22
**order** 4:9, 16:7
16:12, 18:5, 18:10
34:12, 44:2, 45:6
69:10
**OSHA** 15:16
15:24
**outside** 4:22, 65:10
71:13, 78:18, 87:7
**owned** 77:6, 77:8
**owner** 88:11, 88:13
94:21
**Owners** 106:17
107:3
**ownership** 76:23

**P**

**pack** 65:14
**packed** 65:16
**packing** 65:11
**pad** 83:25, 102:25
**Page** 3:5, 3:6
**paid** 29:1

**paranoia** 67:22
68:1, 68:11
**parent** 63:5, 64:3
**parents** 88:9
**park** 30:3, 30:13
**parks** 2:12, 4:2
31:6, 43:2, 48:2
84:21, 87:20
105:25, 115:16
**part** 13:25, 31:16
31:19, 31:23, 32:6
39:8, 39:12, 43:13
55:25, 72:5, 97:20
112:5
**participating**
47:14, 115:1
**particular** 110:23
**parties** 117:7
117:10
**parts** 50:12
**passed** 16:24
**passing** 12:20
19:18, 29:24
**Patriot** 87:4
**pause** 5:22
**pawnshop** 113:25
114:2
**pawnshops** 113:21
114:3
**pay** 27:22
**Pchastain@bkbla...**
2:13
**Pearl** 79:18
**people** 49:8, 52:20
57:7, 57:19, 58:17
88:17
**Peoria** 1:18, 1:20
1:20, 2:8, 58:2
87:3, 116:3, 116:7
116:11, 117:13
**performed** 57:25
58:6
**period** 100:18
112:5
**permit** 110:12
**permitted** 14:4

**person** 9:5, 9:11
9:19, 66:16, 86:6
116:12
**personal** 4:14, 4:19
4:21, 21:25, 43:5
47:9, 55:4, 68:24
77:1, 78:18, 81:3
82:4, 84:13, 84:16
84:24, 85:5, 85:15
88:20, 101:25
108:19
**personally** 23:25
26:18, 35:1, 79:16
79:23
**pertaining** 1:14
**phone** 19:3, 49:4
49:13, 50:1, 53:10
53:16, 53:17, 54:11
57:8, 95:17, 95:25
**phrased** 78:19
**physically** 6:19
59:2, 101:23
**pick** 114:8
**picked** 114:10
**pickup** 42:15
**picture** 56:25
**pictures** 65:8
**piece** 102:25
**piloting** 58:10
**piqued** 33:17
**place** 18:8, 33:3
46:14, 74:13, 75:21
93:16
**placed** 66:10
**plaintiff** 1:4, 1:11
2:5, 116:14
**plan** 48:10
**planned** 29:5
**plans** 20:20
**plate** 47:24
**please** 36:5, 36:21
78:12, 103:12
106:13, 106:22
**pleasure** 28:9
**pockets** 65:7
**point** 35:23, 41:21

46:25, 51:15, 57:10
85:19, 86:9, 96:18
107:23
**police** 56:11, 81:20
81:23, 83:11
**polite** 48:13
**pop** 98:6
**position** 39:11
**possession** 76:17
**possessions** 86:13
**possible** 25:10
**possibly** 10:17
40:7
**potential** 34:3
**potentially** 19:13
43:23, 85:15
**precipitated** 37:4
**precise** 62:12
**predicate** 106:19
**preface** 25:23
37:17
**present** 6:19, 8:16
9:2, 9:23, 11:11
11:22, 24:1, 59:20
101:23
**preserved** 109:4
**presume** 6:9
**presumption** 103:3
**pretty** 68:3, 103:1
**previously** 15:13
55:8, 71:10, 78:9
**primarily** 10:24
**primary** 13:21
**print** 107:15
**printed** 107:13
**prior** 9:22, 38:5
83:23, 105:6
**private** 21:25
**privilege** 43:22
44:5, 44:7, 44:16
48:3, 110:8, 111:14
111:19, 111:25
112:4, 112:11
112:18, 113:1
113:2
**probably** 6:18

9:13, 15:8, 37:25
62:7, 82:18, 96:2
**problem** 47:13
**Procedure** 1:13
**proceeded** 94:9
**process** 77:4
**production** 49:5
**profession** 82:17
**projects** 23:14
23:16, 23:18, 24:25
**proof** 78:5, 91:15
91:18
**proper** 69:13
**property** 88:3, 88:4
89:1, 93:23, 94:6
**propose** 4:6
**prosecution** 111:21
**protective** 4:9
**provide** 5:25, 6:7
23:22, 24:24, 26:25
65:24, 75:3, 89:15
**provided** 26:24
27:8, 27:12, 49:4
66:1, 66:4, 80:1
106:5, 106:20
107:17
**providing** 26:13
26:15, 26:17
**provisions** 1:12
**pry** 98:4
**public** 1:17, 85:21
116:6
**pulled** 94:16, 96:3
97:5
**purchase** 10:16
10:22, 27:20, 27:25
**purchases** 10:25
11:11, 11:21
**purpose** 1:15, 7:2
7:20, 8:11, 11:23
12:22, 15:23, 17:5
17:13, 24:2, 27:19
29:12, 29:18, 30:11
30:23, 35:4, 35:13
43:2, 43:9, 55:20
117:2

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 126 of 132 PageID #: 230

purposes 102:10
pursuant 1:11
  1:12, 116:9
pursue 25:11, 26:4
push 43:1
put 4:4, 19:8, 22:5
  47:15

**Q**

qualified 116:7
question 4:17, 4:19
  4:24, 5:24, 6:3, 6:4
  6:8, 6:11, 11:17
  18:18, 19:5, 21:21
  21:24, 27:9, 36:20
  39:15, 43:6, 43:7
  43:10, 43:15, 43:23
  44:2, 44:8, 44:11
  44:19, 45:5, 49:24
  51:12, 60:13, 61:18
  69:2, 69:10, 69:25
  78:11, 78:19, 81:3
  81:10, 82:6, 82:15
  82:20, 85:1, 85:8
  85:14, 85:16, 90:15
  92:19, 99:23
  103:23, 105:8
  106:4, 106:9
  106:13, 107:16
  107:16, 110:12
  110:16, 112:17
questioning 68:25
  69:14, 84:21
questions 4:16, 5:6
  5:20, 5:22, 16:22
  20:3, 21:19, 25:19
  37:19, 43:20, 49:6
  57:23, 62:12, 62:19
  63:7, 63:12, 63:16
  77:4, 81:14, 85:9
  99:16, 105:20
  105:22, 113:12
  113:17, 114:18
quick 47:6, 115:18

**R**

range 77:9
rare 10:21
read 62:23, 68:2
  106:9, 110:13
reader 6:9
reading 116:24
reality 68:10
really 20:7, 47:23
  48:7, 48:9, 62:9
  77:2, 87:5, 115:13
reason 37:21, 39:1
  51:10, 78:7, 78:13
  78:22, 78:25, 79:24
  80:22, 91:23, 92:4
  98:3, 98:17, 109:20
reasonable 92:13
  92:25
reasons 101:25
Rebecca 9:16
recall 9:9, 12:10
  36:1, 36:7, 36:17
  54:5, 56:12, 56:14
  66:22, 66:24, 68:14
recalls 109:7
receipt 114:6
receive 16:6
  107:19, 110:22
received 13:14
  13:22, 14:3, 14:17
  14:19, 59:24, 86:9
  94:1, 111:1, 112:23
receiving 57:18
  58:16
recess 47:4, 76:13
  113:15
recollection 9:18
  93:10, 93:20, 95:24
  110:5
reconvene 115:22
record 4:5, 5:14
  21:10, 22:5, 44:20
  44:21, 47:3, 47:5
  47:16, 48:20, 54:11
  76:12, 109:14

113:14, 113:23
  115:21, 116:23
recorded 109:3
recording 111:15
recordings 109:3
  109:17
records 49:4, 49:14
  50:1, 53:16, 85:21
reduced 116:20
refer 106:23
reference 53:25
  54:1, 54:7, 55:17
references 40:11
  52:21, 53:2, 53:13
  54:23, 57:19, 58:17
  75:3
referred 38:18
  112:24
referring 35:18
reflect 11:4, 50:1
regard 48:2, 57:3
  112:11
regarding 43:20
  106:21, 107:7
  107:18, 110:13
  110:24
regular 19:22
Reinking 1:6, 1:10
  4:3, 5:9, 5:13, 5:15
  5:17, 6:13, 8:25
  9:5, 9:11, 9:19
  10:11, 10:15, 21:14
  26:18, 35:19, 36:2
  36:8, 38:2, 38:9
  38:15, 38:23, 39:4
  39:8, 39:12, 39:22
  40:5, 40:9, 41:8
  44:10, 45:2, 47:12
  49:1, 54:7, 55:20
  55:24, 58:18, 60:2
  60:15, 60:22, 61:3
  61:7, 61:11, 61:21
  64:9, 65:18, 65:23
  66:2, 66:5, 66:13
  67:7, 70:4, 76:15
  76:18, 78:8, 78:15

78:22, 79:1, 80:1
  80:14, 82:10, 89:3
  89:6, 89:10, 89:16
  90:18, 96:25, 98:14
  99:4, 106:16
  106:20, 107:2
  107:17, 109:18
  110:22, 110:25
  112:21, 113:19
  114:22, 116:13
Reinking's 39:18
  66:11
related 117:6
relation 69:6, 70:6
  70:17, 70:23, 71:8
relationship 20:4
relative 117:9
relatives 16:25
relevant 33:2
  84:17
remember 19:20
  34:6, 36:23, 36:24
  37:2, 42:4, 50:21
  56:21, 62:10, 62:14
  62:17, 89:18, 95:15
  95:19, 98:8, 100:15
  115:1, 115:13
remotely 57:25
  58:6
removed 82:10
  83:1, 93:1
repeat 5:6, 7:1
  13:18, 20:1, 29:15
  36:5, 36:20, 60:13
  78:11, 90:14, 92:18
  103:12, 103:24
  105:9
rephrase 12:3
reporter 117:2
reporting 51:13
represent 109:1
representing 4:3
  47:12, 99:4
request 97:5
requesting 57:19
  58:17

requests 49:5
require 14:2, 103:2
required 15:15
  16:6, 59:19, 63:24
reserved 4:11
residency 107:4
residing 51:21
  52:15, 64:10
Resort 30:3
respect 48:19
  110:15
response 49:4
  106:23, 106:23
  107:24, 110:14
  113:19
responsible 88:10
  88:13
restate 96:13
result 6:7, 38:12
  38:20, 60:18, 63:22
retrieve 89:10
  94:7
return 107:9
returned 80:6, 81:9
  84:15
returning 110:15
  110:24
reveal 45:5, 45:7
revealing 45:13
revoked 83:7
  106:18, 107:4
rifle 80:14, 80:18
  81:5, 81:16, 82:2
  82:8, 82:10, 82:25
  83:3, 83:10, 86:2
  86:24, 87:23, 88:23
  89:7, 89:10, 89:15
  90:11, 90:22, 91:3
  91:20, 92:1, 92:10
  92:14, 92:15, 93:1
  93:1, 93:9, 93:22
  95:1, 95:3, 95:11
  95:12, 97:1, 97:5
  97:8
rifles 81:9, 95:14
rigging 15:9

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 127 of 132 PageID #: 231

**right** 4:25, 24:19
30:6, 31:9, 31:10
31:11, 34:15, 40:18
40:21, 52:10, 54:14
54:20, 58:1, 58:3
59:12, 59:13, 61:17
63:21, 64:5, 64:11
69:1, 71:21, 72:1
72:14, 72:21, 72:22
73:13, 73:24, 74:4
74:5, 75:9, 75:17
77:21, 78:1, 79:14
79:24, 81:14, 81:16
83:9, 83:25, 84:3
84:20, 85:1, 85:6
87:18, 88:14, 88:18
89:25, 90:4, 91:14
91:15, 91:17, 92:9
93:8, 94:14, 95:12
96:6, 96:19, 96:20
97:18, 97:19, 97:21
98:9, 98:9, 100:16
108:17, 110:2
110:19, 111:7
112:16
**rights** 82:5
**ring** 53:19
**Ritchie** 32:10
32:14
**road** 5:16, 29:4
**room** 115:19
**rooms** 27:22
**rotary** 87:17
**roughly** 10:10
11:7
**round** 80:9
**route** 28:16, 42:4
**routine** 93:18
**routinely** 82:19
**Ruby** 28:21
**rude** 63:6, 63:14
**rule** 110:1, 115:22
**rules** 1:13, 88:8
**ruling** 112:9
**rulings** 4:9
**RV** 31:6, 31:8

31:16, 31:19, 31:23
32:2, 32:6
**RV's** 31:13
**Ryan** 111:4

**S**

**safe** 66:7, 66:11
66:14, 66:17, 76:17
77:25, 78:10, 80:2
80:15, 80:19, 81:5
81:10, 82:11, 83:1
83:4, 83:10, 84:7
84:14, 84:23, 85:4
85:15, 85:20, 85:24
86:3, 86:7, 86:20
86:24, 87:4, 87:14
87:24, 88:25, 89:4
89:7, 89:9, 89:14
90:10, 90:22, 91:1
91:3, 92:15, 93:2
93:10, 93:23, 94:9
94:15, 96:3, 96:7
96:18, 97:2, 97:4
107:8
**sales** 31:6
**saw** 98:25, 99:8
**saying** 37:2, 37:17
38:9, 53:13, 85:4
91:18, 94:2
**says** 5:10, 44:8
69:17, 95:22
**scenery** 29:3
**scenic** 28:16
**Schizophrenia**
63:3
**school** 12:25, 13:1
14:18, 14:25, 15:5
15:18, 15:22, 16:3
16:16, 17:10, 18:22
19:12, 20:5, 20:9
20:13, 20:18, 25:8
87:21
**scope** 1:9, 4:8, 4:13
4:16, 23:19, 25:21
42:25, 47:9, 68:24

69:14, 78:18, 81:3
82:4
**scout** 49:17
**scouting** 24:10
**scratch** 83:25
102:25
**Scribner** 1:16
116:5
**search** 73:19
**secure** 17:18, 18:1
18:5, 39:9, 106:16
107:2
**secured** 41:3, 68:15
69:6, 70:7, 70:18
70:23, 71:1, 71:8
71:13, 73:4, 75:5
75:12, 90:8, 90:19
94:2
**securing** 71:16
**see** 5:19, 8:14, 8:23
10:7, 18:17, 28:21
32:13, 32:24, 51:22
52:22, 53:15, 68:12
69:2, 83:7, 85:19
106:4
**seeing** 18:7
**seek** 55:24
**seeking** 54:6, 54:22
59:1, 59:18
**self-incrimination**
113:3
**send** 105:22
**sense** 52:7, 52:12
**separate** 34:11
49:8
**September** 83:19
83:21, 101:12
102:24
**Sergeant** 111:4
**service** 26:14
26:16, 26:17
**services** 23:21
24:25, 26:25, 27:1
**set** 117:12
**seven** 103:6
**shared** 9:3

**sheriff's** 107:10
109:18, 111:5
**shoot** 77:25, 78:4
98:11
**shooter** 51:14
**shooting** 46:13
46:19, 50:18, 51:6
52:2, 62:2, 62:5
63:19, 64:21, 77:9
**shop** 88:1, 88:2
88:5, 88:25, 96:22
**short** 46:25, 46:25
102:21
**shorthand** 116:20
**shot** 78:10, 78:15
79:1, 80:2
**shotgun** 95:10
**showed** 95:17
95:18, 97:7
**sic** 14:6
**sightseeing** 28:12
**significant** 11:10
11:20, 14:13, 17:2
34:2, 34:16, 34:24
85:18, 103:17
104:1, 104:7
104:14, 104:18
104:24, 105:11
**signing** 116:24
**silver** 113:25
114:14
**Silverado** 42:15
72:20, 72:24
**simply** 26:13
29:23, 107:17
**sir** 6:1, 6:6, 6:12
10:5, 13:5, 13:19
16:1, 16:20, 19:5
20:2, 21:18, 29:2
29:16, 36:6, 36:22
58:23, 99:25
100:12, 105:19
**situation** 62:23
63:9, 64:3
**size** 23:19, 32:24
**slowly** 110:4

**SM-15** 95:6
**small** 8:21
**snarky** 57:24
**sold** 114:12
**solely** 29:17, 46:6
46:7, 96:8
**somebody** 53:6
54:6, 56:21, 63:10
73:17, 80:25
**somewhat** 34:7
56:13
**son** 7:4, 7:5, 7:9
7:16, 7:20, 8:2
8:12, 8:25, 9:5
9:10, 9:19, 10:11
10:14, 11:23, 12:1
12:4, 12:13, 21:4
35:18, 36:2, 37:5
37:10, 37:15, 38:2
38:14, 38:23, 39:7
40:1, 42:9, 42:21
43:17, 45:1, 45:16
46:6, 46:21, 49:11
51:10, 51:14, 51:18
51:21, 52:3, 52:15
52:22, 53:2, 54:7
54:18, 54:23, 55:9
55:19, 55:23, 57:13
57:17, 58:18, 59:15
62:24, 63:18, 66:19
67:21, 68:10, 69:5
70:5, 70:16, 70:22
71:7, 73:3, 78:3
78:15, 79:1, 79:25
80:14, 80:18, 80:18
86:10, 91:19, 94:2
95:16, 96:15, 98:1
98:19, 100:5
110:24
**son's** 21:5, 21:19
64:19
**sorry** 10:2, 18:16
19:23, 31:22, 99:24
**sound** 73:15, 84:3
**sounds** 4:25, 30:6
53:23, 54:14, 73:22

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 128 of 132 PageID #: 232

109:25
source 13:21
sources 74:24, 75:2
  114:11
south 7:14
southeast 25:5
speak 5:23, 8:15
  24:5
speaking 20:12
  56:20, 95:24
special 48:18
specific 48:11
  61:18, 82:16, 99:16
  107:19
specifically 30:17
  53:3, 82:20
speculate 37:12
speculation 37:14
  37:18
spend 8:3, 22:9
  23:3, 45:22
spent 25:3, 71:24
  72:11, 98:1, 103:10
  103:15
spin 87:10
spoke 8:19, 9:4
  19:11, 44:13, 45:14
  99:7
spousal 44:16
Square 2:3
SS 116:2
start 18:18, 25:17
started 99:19
  99:25
state 1:18, 1:20
  4:10, 5:13, 6:14
  6:17, 6:20, 6:23
  7:3, 7:6, 7:8, 7:11
  7:15, 7:18, 9:23
  10:9, 10:16, 11:5
  11:6, 11:12, 11:13
  11:21, 11:22, 12:5
  12:15, 12:19, 12:23
  13:17, 13:23, 14:21
  14:25, 15:5, 15:12
  15:23, 16:17, 16:24

17:7, 17:11, 18:20
  22:12, 22:13, 24:1
  24:18, 25:1, 25:12
  25:20, 26:7, 27:1
  27:23, 27:25, 28:5
  28:25, 29:8, 29:11
  29:17, 29:22, 30:16
  34:11, 34:11, 35:10
  37:23, 42:3, 44:25
  45:20, 45:22, 46:9
  50:17, 57:4, 57:14
  57:17, 65:24, 66:21
  66:24, 67:8, 67:14
  68:15, 69:7, 69:18
  70:7, 70:18, 70:19
  70:24, 70:25, 71:9
  71:14, 71:17, 71:19
  72:9, 72:13, 73:2
  73:4, 73:21, 74:7
  75:5, 75:12, 75:23
  76:3, 86:11, 86:16
  90:2, 90:8, 90:20
  91:5, 91:10, 91:12
  91:14, 91:21, 92:2
  92:10, 94:3, 95:23
  100:2, 101:3, 101:6
  101:10, 101:14
  101:18, 101:24
  102:1, 102:5
  102:13, 102:17
  103:4, 103:11
  103:14, 103:15
  103:18, 104:2
  104:8, 104:18
  104:25, 105:11
  105:13, 116:1
  116:8
statement 4:4
statements 108:23
states 1:1, 33:22
  37:10, 40:24, 72:17
  106:25
stating 86:10
station 56:25
statutory 43:22
  43:24

stay 22:11, 30:22
  32:3, 45:19, 46:1
  102:15
stayed 29:25, 30:7
  32:12, 75:21
staying 8:5, 12:21
stays 102:10
stenotype 116:21
step 93:8, 93:8
  99:15
Stone 30:2
stopping 46:25
storage 88:6
store 52:11, 77:9
straps 97:14, 97:15
Street 1:19, 2:7
  116:11
strictly 79:10
  91:11
strike 67:6, 78:23
  91:1, 100:16
stuff 65:14, 97:18
style 87:16
subject 84:18
  106:21
substance 9:9
  56:21
suburb 58:25
suffered 68:10
suffering 67:21
suggest 61:20
suggested 55:18
suggesting 61:10
suit 4:21
Suite 1:19, 2:7
  2:11, 116:11
Sullivan 15:20
  15:22
supported 98:19
Supreme 1:14
sure 12:7, 25:2
  27:21, 48:7, 48:15
  51:13, 51:19, 52:25
  53:22, 63:23, 65:7
  78:13, 92:21, 95:8
  105:10, 111:23

112:1, 113:4, 113:9
suspect 40:8, 41:1
  54:3, 63:19
suspected 40:20
  40:22, 73:10, 74:3
sworn 4:1, 5:10
  116:15
sympathy 62:25

T

table 97:8
take 15:11, 32:2
  46:25, 73:11, 76:10
  76:25, 92:15, 93:16
  107:14, 109:10
  112:17
taken 1:16, 108:7
  108:11, 117:8
takes 32:1
talk 8:22, 17:6
  19:21, 48:7, 50:23
  57:8, 62:21, 77:14
  85:23, 95:16
  100:19
talked 9:13, 41:20
  45:9, 57:6, 74:18
  98:24, 99:3
talking 17:4, 46:13
  49:22, 72:7, 95:3
  99:19, 108:6, 108:9
tantalized 33:16
Tarby 111:4
tarp 97:14, 97:14
  97:15
Tazewell 107:10
  109:19, 109:22
  111:5
team 99:11
technical 52:12
technicalities 77:12
telephone 5:18
  108:24, 109:2
  109:17, 115:2
  115:9
TELEPHONIC

1:9
tell 6:5, 8:19, 19:16
  21:14, 21:20, 21:20
  21:21, 22:2, 22:23
  23:8, 23:10, 25:23
  31:24, 32:5, 33:1
  40:2, 41:24, 43:15
  44:12, 48:9, 50:21
  54:25, 55:3, 56:14
  56:16, 57:2, 62:20
  63:16, 68:3, 68:9
  74:19, 81:24, 83:4
  86:20, 89:21, 94:20
  107:15, 112:9
  113:11, 113:22
  115:7
telling 36:17, 37:5
  67:14, 72:8
tells 66:20
Tennessee 1:2
  6:14, 6:17, 6:20
  6:23, 7:3, 7:6, 7:8
  7:12, 7:15, 7:19
  7:23, 7:24, 8:12
  8:16, 8:20, 8:24
  9:24, 10:4, 10:9
  10:16, 11:5, 11:7
  11:12, 11:13, 11:21
  11:22, 12:2, 12:5
  12:15, 12:19, 13:17
  13:24, 14:3, 14:19
  14:22, 14:25, 15:5
  15:12, 15:19, 15:23
  16:3, 16:11, 16:17
  17:1, 17:4, 17:7
  17:10, 17:11, 17:14
  17:16, 17:17, 17:22
  17:25, 18:5, 18:9
  18:14, 18:19, 18:20
  19:17, 20:15, 20:19
  20:20, 20:24, 21:6
  21:15, 22:7, 22:12
  22:13, 22:20, 23:1
  23:4, 24:1, 24:6
  24:12, 24:18, 25:1
  25:5, 25:12, 25:20

Case 3:18-cv-00640   Document 27-1   Filed 12/17/18   Page 129 of 132 PageID #: 233

26:2, 27:5, 27:11
27:13, 27:18, 27:23
28:1, 28:5, 28:8
28:14, 28:25, 29:8
29:12, 29:17, 29:23
30:9, 30:12, 30:17
30:18, 30:23, 31:3
32:14, 32:17, 32:18
33:25, 34:2, 34:13
34:16, 34:23, 35:2
35:5, 35:7, 35:10
35:14, 35:22, 36:4
36:10, 36:19, 37:7
37:10, 37:22, 38:4
38:6, 38:13, 38:17
38:21, 38:24, 39:2
39:5, 39:8, 39:12
39:19, 39:23, 40:1
40:5, 40:9, 40:17
40:21, 41:2, 41:25
42:21, 42:24, 44:25
45:17, 45:20, 45:23
46:2, 46:10, 46:18
49:3, 49:9, 49:9
49:18, 50:5, 50:14
50:17, 51:2, 51:18
51:21, 52:4, 52:16
52:23, 53:2, 55:19
55:24, 56:2, 57:4
57:14, 57:18, 57:20
58:2, 58:19, 58:20
58:25, 59:3, 59:16
59:16, 59:20, 59:21
60:4, 60:7, 60:10
60:19, 60:23, 61:3
61:5, 61:7, 61:12
61:21, 62:1, 62:19
63:24, 64:10, 64:20
65:19, 67:11, 69:11
69:13, 69:18, 69:22
70:10, 70:20, 70:25
71:18, 71:23, 72:1
72:11, 72:12, 73:3
73:7, 73:13, 73:22
74:1, 74:8, 74:25
75:7, 75:14, 75:24

76:3, 76:18, 77:3
77:5, 77:10, 77:15
77:21, 78:20, 79:4
80:20, 81:12, 81:15
81:16, 83:4, 84:23
85:7, 85:10, 85:24
86:17, 90:10, 90:21
92:6, 92:11, 92:16
92:22, 92:23, 92:24
93:3, 100:2, 100:3
100:9, 101:3, 101:7
101:11, 101:15
101:19, 101:24
102:2, 102:6
102:14, 102:18
103:5, 103:14
103:18, 104:2
104:8, 104:19
104:25, 105:2
105:12, 114:4
**terms** 4:18, 34:17
34:24, 36:23
**testify** 116:15
**testimony** 50:4
90:13, 105:6
116:23
**text** 62:23, 66:19
75:4, 86:9, 90:18
94:1, 95:21
**texted** 56:24
**Thank** 5:1, 48:23
48:24
**Thanksgiving** 9:15
37:1
**thereof** 1:14
**thing** 5:1, 9:16
39:17, 42:11, 62:21
95:21, 98:7
**things** 14:16, 26:3
28:3, 33:20, 36:23
68:5, 68:8, 77:14
79:15, 79:23, 91:18
96:3
**think** 4:15, 4:22
9:25, 19:11, 19:14

25:21, 34:10, 35:21
35:24, 42:23, 42:24
43:8, 43:23, 49:9
49:20, 51:10, 51:11
52:9, 62:5, 62:6
65:4, 68:10, 68:23
69:8, 69:13, 69:19
69:19, 69:24, 73:21
78:3, 80:25, 84:19
84:20, 87:11, 95:4
98:15, 100:8
100:14, 100:17
100:20, 104:17
106:3, 107:21
108:18, 108:25
109:15, 110:18
111:8, 112:14
113:7, 113:10
114:17
**thinking** 19:25
36:9, 36:18, 40:14
41:21
**thought** 24:24
25:16, 41:4, 53:6
74:1, 83:22, 91:7
91:10, 98:4, 102:20
**three** 6:18, 10:1
10:3, 10:10, 22:15
22:22, 25:3, 42:6
42:8, 99:21, 100:4
100:20, 100:24
101:2, 101:7
101:11, 101:15
101:19, 102:18
102:23, 103:4
103:5
**time** 6:16, 7:21
7:22, 7:23, 8:5, 9:3
9:23, 12:4, 12:18
13:6, 16:16, 17:11
19:22, 19:22, 20:10
20:10, 20:11, 20:11
29:4, 29:22, 32:6
32:7, 34:1, 35:2
35:10, 36:25, 41:16
42:14, 45:10, 46:9

47:25, 50:8, 51:9
51:17, 52:14, 54:4
54:4, 56:20, 65:11
67:9, 67:21, 68:12
68:14, 70:6, 71:17
72:9, 73:11, 75:8
89:22, 90:7, 92:7
92:22, 93:18, 98:1
99:7, 100:14, 107:5
108:7, 108:9
108:11, 108:15
111:13, 112:5
117:2
**times** 16:24, 31:25
99:21, 100:4
100:21, 100:24
101:3, 101:7
101:11, 101:15
101:19, 101:23
102:18, 102:23
103:3, 103:7
103:10, 103:13
**TN** 2:4, 2:12
**today** 5:18, 5:21
6:8, 14:17, 75:9
75:10, 75:12, 77:1
91:18, 98:17
**today's** 13:12
25:22
**told** 17:15, 17:21
18:13, 18:18, 20:16
20:18, 25:9, 36:2
36:8, 38:14, 38:22
41:3, 55:1, 62:24
67:7, 68:14, 74:6
74:24, 75:11, 81:8
81:21, 85:17, 90:1
90:8, 90:19, 91:13
91:19, 92:23, 93:4
99:20, 100:3
102:22, 111:8
111:20, 114:24
**top** 33:4
**topic** 41:23, 112:5
**touches** 110:6
**touching** 116:16

**tough** 63:5
**tourist** 28:13
**town** 36:25
**traditionally** 28:13
**train** 91:10
**training** 13:15
13:23, 14:1, 14:2
14:20, 15:3, 15:20
15:22
**transactions** 11:4
**transcript** 6:10
47:17, 117:3
**transported** 80:19
**travel** 7:11, 7:21
46:17
**traveled** 6:14, 6:16
21:6, 21:15, 22:7
22:12, 32:11, 40:16
41:25, 45:17, 45:23
46:2, 46:18, 55:24
62:1, 79:3, 92:22
**traveling** 12:23
**travels** 38:5, 38:13
38:21
**Travis** 8:25, 9:5
9:10, 9:19, 10:11
10:14, 21:14, 35:15
35:16, 35:17, 35:19
35:21, 36:2, 36:7
37:5, 38:2, 38:9
38:14, 38:23, 39:2
39:4, 39:7, 39:11
39:18, 39:22, 40:4
40:8, 40:18, 41:8
41:24, 45:1, 45:10
46:7, 50:24, 54:7
55:19, 55:23, 56:15
57:3, 58:18, 60:2
60:14, 60:22, 61:3
61:7, 61:11, 61:20
64:9, 65:18, 65:23
66:2, 66:5, 66:10
66:13, 67:7, 76:17
76:20, 78:8, 78:15
78:22, 79:1, 79:25
80:14, 81:9, 82:10

84:16, 89:3, 89:6
89:9, 89:16, 90:18
92:23, 96:15, 96:25
99:4, 106:16, 107:2
107:8, 108:7
108:12, 110:24
114:23
**trial** 37:1, 110:1
117:2
**trip** 8:1, 8:7, 24:10
24:17, 28:9, 29:4
29:11, 29:16, 29:21
**trips** 34:12, 35:1
35:4
**truck** 42:12, 42:13
42:15, 90:5, 97:16
**true** 116:22
**truly** 23:17, 24:10
**trust** 67:20, 98:2
**truth** 116:15
116:16
**try** 42:8, 46:6, 46:7
71:3, 73:14
**trying** 20:4, 20:14
25:23, 36:6, 49:11
57:7, 57:23, 63:6
63:7, 63:11, 72:6
100:13, 110:2
110:17, 114:4
**twice** 11:7
**two** 10:1, 10:3
10:10, 20:6, 22:15
25:3, 31:1, 34:11
35:1, 42:6, 42:8
62:4, 76:9, 83:22
84:16, 99:20, 100:4
100:20, 100:24
101:2, 101:7
101:11, 101:15
101:19, 102:18
102:22, 103:3
103:5, 113:20
**type** 6:4, 17:21
24:23, 64:1, 64:3
87:13, 87:19, 97:11
**types** 23:21, 24:11

43:4

**U**

**Uh-huh** 72:15
**ultimately** 109:15
**understand** 4:17
6:3, 16:23, 17:2
18:4, 19:5, 20:4
25:24, 25:25, 51:11
58:23, 61:17, 62:11
62:20, 63:12, 72:4
72:4, 79:8, 79:14
79:20, 82:17
103:22
**understanding**
85:20
**understood** 5:7
6:10, 21:11, 28:18
38:3, 48:12, 59:1
75:2, 76:22, 77:16
85:12, 85:13, 93:13
**unfair** 69:24
**Union** 37:10, 70:25
**UNITED** 1:1
**units** 33:4
**unlock** 86:7
**unlocked** 97:4
**unlocking** 97:1
**unnecessarily** 48:1
**use** 10:18, 10:21
10:24, 23:15, 31:16
31:19, 31:22, 32:5
33:3

**V**

**vague** 93:12
**valid** 44:12
**Valley** 31:9
**Vanderbilt** 14:18
**vehicle** 65:10
**venture** 25:17
**verify** 82:21, 83:6
**versed** 112:14
**versus** 4:20

**violent** 98:12
**virtue** 19:1
**visit** 7:2, 7:4, 7:5
7:9, 8:1, 9:2, 9:22
10:10, 16:25, 17:13
20:20, 22:19, 24:9
30:11, 33:18, 33:23
34:12, 35:14, 49:2
49:17, 50:22, 50:24
51:3
**visited** 7:16, 9:11
10:9, 10:14, 12:18
16:17, 17:11, 18:20
24:6, 27:18, 35:10
44:24, 50:17, 100:9
100:20, 100:24
101:2, 101:6
101:10, 101:14
101:18, 101:24
102:1, 102:5
102:13, 102:17
102:22, 103:4
103:14
**visiting** 7:20, 8:11
8:24, 11:23, 50:5
105:13
**visits** 9:25, 10:6
11:6, 11:13, 100:1
102:9
**volunteered** 65:6
**VS** 1:5

**W**

**Waffle** 46:14
50:18, 51:6, 62:2
**waffly** 81:6
**wait** 5:23
**waived** 116:25
117:4
**waiving** 106:22
**walked** 31:5, 31:6
31:14, 73:23
**want** 4:4, 18:8
25:17, 37:22, 43:5
43:7, 47:15, 48:15

62:12, 63:12, 69:22
77:13, 82:19, 83:3
93:5, 93:19, 95:23
98:3, 98:4, 101:22
105:23, 106:6
110:16, 115:20
**wanted** 53:13
75:23, 86:11, 86:13
94:3, 97:17, 98:5
107:5, 107:13
**watch** 55:7
**way** 16:25, 17:3
34:8, 39:18, 63:15
69:3, 69:16, 77:8
85:1, 94:14, 96:5
98:5
**week** 40:6, 62:3
114:8
**weeks** 6:18, 10:1
10:1, 10:3, 10:10
54:17, 54:21, 62:4
**welcome** 47:18
48:17, 48:21
**went** 15:7, 28:22
31:12, 32:20, 32:22
41:6, 42:2, 42:3
42:24, 56:19, 60:3
60:9, 60:15, 60:19
60:23, 74:13, 80:25
94:15, 96:2, 96:7
97:4, 99:1, 100:14
**West** 2:3
**wheel** 87:6
**whereabouts** 57:5
**WHEREOF**
117:12
**wife** 9:2, 21:4
35:24, 36:3, 36:8
36:17, 37:5, 41:3
41:20, 43:21, 44:2
44:13, 44:15, 45:6
45:7, 45:14, 52:8
63:1, 74:18, 74:20
88:8
**win** 111:21
**Wing** 98:24, 99:6

114:23
**Wink** 64:25
**wit** 116:12
**withdraw** 4:17
4:23, 21:22, 25:22
111:19
**witness** 4:1, 5:4
11:17, 34:6, 34:21
38:8, 45:9, 56:7
70:12, 74:17, 74:21
74:24, 79:9, 79:16
89:18, 90:14, 92:18
103:24, 104:5
104:14, 104:22
105:16, 108:5
111:2, 111:4
114:14, 115:4
116:23, 116:25
117:12
**wonderfully** 48:13
**word** 79:5, 91:11
**words** 82:16
**work** 17:15, 17:18
17:21, 17:24, 18:1
18:6, 18:14, 18:19
19:17, 19:19, 20:14
20:16, 20:19, 23:14
26:6, 26:7, 38:1
38:10, 38:19, 38:24
39:9, 39:13, 39:17
52:21, 56:2, 73:12
**working** 52:22
52:25, 59:11, 59:15
**Workshop** 88:4
**world** 58:11
**worst** 95:8
**wrong** 82:24

**Y**

**yards** 32:22
**yeah** 11:25, 31:14
37:20, 45:15, 53:20
54:1, 74:21, 84:25
86:18, 87:22, 87:22
88:5, 88:6, 95:6

105:21, 108:8
115:4, 115:4, 115:5
**year** 15:8, 40:15
53:5
**Year's** 36:14
**years** 98:20
**yep** 5:4, 20:11
20:11, 47:2
**yesterday** 62:24
85:17
**Yogi** 30:2
**young** 21:4
**younger** 9:14

## 0

**084-004465** 1:17
116:6

## 1

**1** 12:15
**10** 62:8, 113:8
**10:00** 1:22
**101** 2:11
**10th** 117:13
**11** 73:19, 103:6
**114** 3:6
**13** 103:6
**1300** 1:19, 2:7
116:11
**14** 56:19
**14-minute** 56:10
**15** 103:6
**17** 17:12, 36:12
41:17, 83:21, 103:6
103:13
**18** 35:12, 40:15
40:17, 45:20
106:23, 106:24
**18th** 53:17, 54:10
55:16, 57:16, 59:14
59:23, 61:2, 61:6
**1985** 15:2

## 2

**20** 106:1
**2010** 12:24, 12:24
13:7, 13:12, 13:16
13:22, 15:13, 16:16
17:9, 104:9
**2017** 17:14, 17:18
17:23, 18:1, 18:5
18:10, 18:21, 19:12
20:21, 20:25, 21:7
21:15, 22:8, 22:14
22:21, 23:2, 24:2
24:6, 25:13, 27:19
28:6, 28:9, 28:15
28:25, 29:9, 29:21
30:5, 30:8, 30:12
30:18, 30:23, 31:3
32:19, 33:8, 33:12
33:16, 33:19, 33:23
34:4, 34:13, 34:16
34:25, 35:7, 35:9
36:14, 38:14, 38:21
49:13, 49:22, 50:2
50:5, 60:3, 60:16
60:20, 60:24, 61:12
61:23, 65:22, 84:1
84:6, 86:1, 87:23
88:23, 102:1, 102:2
102:6, 103:5, 103:7
103:15, 104:3
105:1, 105:12
**2018** 1:22, 6:21
6:24, 7:3, 7:6, 7:9
7:12, 7:16, 7:19
8:13, 8:17, 8:20
8:24, 9:6, 9:12
9:20, 10:12, 10:15
11:5, 11:8, 11:12
11:24, 12:2, 12:16
35:14, 35:22, 41:9
41:19, 42:1, 42:22
44:24, 45:17, 45:24
46:2, 46:8, 46:14
46:19, 49:3, 49:7
49:7, 49:16, 50:16

51:25, 52:1, 52:14
52:15, 52:23, 52:24
53:5, 53:18, 54:11
55:16, 56:9, 57:12
57:12, 57:16, 59:14
59:24, 61:3, 61:7
61:13, 62:6, 63:20
71:22, 99:1, 99:5
99:21, 100:5, 100:8
100:19, 100:25
101:4, 101:8
101:12, 101:16
101:20, 102:14
102:18, 102:24
103:8, 114:4, 115:2
116:10, 117:14
**22nd** 12:12, 56:9
62:6, 82:1, 100:17
114:3
**27380** 5:16
**28th** 49:13, 50:2

## 3

**3:18-CV-00640** 1:5
**30** 9:7, 49:7
**300** 41:4, 42:10
67:10
**37203** 2:4
**37228** 2:12
**3rd** 49:6

## 4

**40** 23:5
**408** 115:18, 115:22
**416** 1:19, 2:7
116:10
**45** 2:3
**49** 37:9
**4th** 1:21, 49:7
116:10

## 5

**5** 3:5

**5.56** 80:9, 80:11
**5/8-801** 43:24
**545** 2:11
**55** 25:16

## 6

**615** 53:16
**61550** 5:16
**61602** 2:8

## 7

**735** 43:24

## 8

**865** 53:16

## 9

**90's** 15:9

**Network Court Reporting & Video**
**866.256.1799**