## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## AT NASHVILLE

| | | |
|---|---|---|
| ABEDE DASILVA, | § | |
| | § | |
| *Plaintiff,* | § | Case No. 3:18-cv-00640 |
| | § | |
| v. | § | JURY DEMANDED |
| | § | |
| JEFFREY L. REINKING, | § | |
| | § | |
| *Defendant.* | § | |

## PLAINTIFF'S PROPOSED FIRST AMENDED COMPLAINT

## INTRODUCTION

1.      Akilah DaSilva was a beloved son, brother, and budding musician who was pursuing a promising career in computer engineering.  He loved his family, photography, writing poetry, and directing music videos.  *See* **Exhibit #1.**  On April 22, 2018, Travis Reinking gunned him down with an AR-15 style rifle that law enforcement had previously taken from him but which his father, Jeffrey Reinking, negligently returned to him despite Mr. Reinking's actual knowledge that his son was mentally unstable, had previously threatened one of his employees with a rifle, and posed a severe risk of harm to others.

2.      Due to Jeffrey Reinking gross negligence and criminally proscribed firearm transfer to his son, Akilah DaSilva was brutally and senselessly murdered.  Akilah's older brother, Abede DaSilva—who narrowly avoided being killed by Travis Reinking himself—held Akilah while he bled out, screaming in pain, and ultimately watched him die.

3.      This lawsuit seeks to hold Jeffrey Reinking accountable for the severe trauma that he caused Abede DaSilva through his tortious and criminal misconduct.

## I. PARTIES

4.      Plaintiff Abede DaSilva is a citizen of Davidson County, Tennessee, who was shot at and nearly murdered by Travis Reinking on April 22, 2018.  Abede DaSilva is the brother of Akilah DaSilva, who was murdered by Travis Reinking on April 22, 2018.

5.      Defendant Jeffrey Reinking is the father of Travis Reinking, who shot at the Plaintiff and brutally murdered the Plaintiff's brother with a Bushmaster XM-15 rifle that his father returned to him in Tazewell County, Illinois after Travis Reinking became a resident of Tennessee.  Jeffrey Reinking is a citizen of Tazewell County, Illinois.

## II. JURISDICTION, AUTHORITY AND VENUE

6.      This Court has jurisdiction over this diversity action pursuant to 28 U.S.C. § 1332.

7.      As a diversity action, this Court has authority to adjudicate the Plaintiff's claims under Tennessee common law and Tenn. Code Ann. § 29-11-107(b)(1).

8.      As the jurisdiction in which a substantial part of the events giving rise to the Plaintiff's claims occurred, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

## III. FACTUAL ALLEGATIONS

9.      On multiple occasions in 2016 and 2017, Defendant Jeffrey Reinking took possession of multiple firearms owned by his son, Travis Reinking.

10.      Each time that he took possession of Travis Reinking's firearms, Defendant Jeffrey Reinking ultimately returned them to Travis Reinking despite his actual knowledge that his son was mentally unstable, delusional, and a danger to others.

11.      In July 2017, Travis Reinking was arrested by the United States Secret

-2-

Service at the White House in Washington, D.C. The following month, after being contacted by the FBI, the Sheriff's Office in Tazewell County, Illinois, visited Travis Reinking at J&J Cranes, Inc.—a business owned by Defendant Jeffrey Reinking—for the purpose of dispossessing Travis Reinking of his firearms and his right to possess firearms.

12. In August 2017, the Tazewell County Sheriff's Office formally revoked Travis Reinking's Firearm Owners Identification (FOID) card. Under Illinois law, the effect of the revocation was to prevent Travis Reinking from lawfully possessing firearms anywhere in the State of Illinois.

13. In August 2017, and at all times thereafter, Jeffrey Reinking had actual knowledge that Travis Reinking's FOID card had been revoked by law enforcement and that his son could no longer legally possess firearms in the State of Illinois.

14. On or about August 24, 2017, Jeffrey Reinking asked the Tazewell County Sheriff's Office for permission to take possession of the firearms and ammunition that Travis Reinking had become legally obligated to surrender.

15. On or about August 24, 2017, Jeffrey Reinking did in fact take possession of the firearms and ammunition that Travis Reinking had become legally obligated to surrender. At the time that he took possession of the firearms, Jeffrey Reinking knew that Travis Reinking was "having problems."

16. As a condition of taking possession of Travis Reinking's firearms and ammunition, the Tazewell County Sheriff's Office asked Jeffrey Reinking to agree that he would not return the firearms to Travis Reinking.

17. Thereafter, Jeffrey Reinking did in fact agree that he would not return the firearms to Travis Reinking or allow him to access them.

18. As a result of this agreement, and only because of it, the Tazewell County

-3-

Sheriff's Office permitted Jeffrey Reinking to take possession of four of Travis Reinking's firearms, including a Bushmaster XM-15 semi-automatic rifle. Jeffrey Reinking understood from the Sheriff's Office that he could possess the weapons himself because he held a valid FOID card. However, he "was advised that he needed to keep the weapons secure and away from Travis. Jeffrey stated that he would comply."

19. After having his Illinois FOID card revoked, and after Jeffrey Reinking took possession of his firearms, Travis Reinking could not legally possess firearms anywhere in the State of Illinois, including inside Jeffrey Reinking's home.

20. After Travis Reinking's Illinois FOID card was revoked, Jeffrey Reinking knew that Travis Reinking could not legally possess firearms anywhere in the State of Illinois, including inside Jeffrey Reinking's home, and that it was illegal to facilitate Travis Reinking's possession of any firearm anywhere in the State of Illinois.

21. After taking possession of the four firearms that Travis Reinking had been legally obligated to surrender in or about August 2017, Jeffrey Reinking stored them in a locked gun safe at his home to which only he had the combination.

22. On November 12, 2017, Travis Reinking sent a text message to Defendant Jeffrey Reinking that stated: "Dad, I got a place out of town now, so I'm going to need to get my firearms back from you somehow."

23. Less than two hours later, Defendant Jeffrey Reinking responded: "Ok."

24. Thereafter, Defendant Jeffrey Reinking and his son Travis Reinking made arrangements to enable Travis Reinking to take possession of the four firearms that Jeffrey Reinking had stored in his locked gun safe after Travis Reinking's FOID card was revoked. Defendant Jeffrey Reinking and Travis Reinking agreed that Travis Reinking would drive to Defendant Jeffrey Reinking's home in Tazewell County, Illinois, where

-4-

Jeffrey Reinking would give them to him.

25.     Before Travis Reinking arrived at Defendant Jeffrey Reinking's home to receive the four firearms, Defendant Jeffrey Reinking went to his locked gun safe, entered the combination, and pulled the guns out of his safe.

26.     Travis Reinking then arrived at Defendant Jeffrey Reinking's home, and Defendant Jeffrey Reinking handed him a rifle or else placed the rifle on his table for Travis Reinking to take.

27.     The above-described firearm transfer took place entirely within the State of Illinois and after Travis Reinking's FOID card had been revoked.

28.     The rifle that Defendant Jeffrey Reinking handed Travis Reinking or else placed on his table for Travis Reinking to take possession of was the Bushmaster XM-15 rifle that Travis Reinking ultimately used to attempt to kill the Plaintiff, to murder the Plaintiff's brother, and to commit mass murder in Davidson County, Tennessee.

29.     At the time that Jeffrey Reinking pulled the firearms out of his locked gun safe to give to Travis Reinking, Defendant Jeffrey Reinking knew that Travis Reinking was a non-resident of the State of Illinois.

30.     At the time Jeffrey Reinking pulled the firearms out of his locked gun safe to give to Travis Reinking, Defendant Jeffrey Reinking knew that Travis Reinking intended to take possession of the firearms within the State of Illinois and then transport the firearms from the State of Illinois to Travis Reinking's residence out of state.

31.     At the time that Jeffrey Reinking pulled the firearms out of his locked gun safe to give to Travis Reinking, Defendant Jeffrey Reinking was aware that Travis Reinking had been involuntarily hospitalized, had exhibited serious mental health problems including delusions and hallucinations, and had previously threatened one of

-5-

his employees with a rifle.

32.     When Jeffrey Reinking pulled the firearms out of his locked gun safe to give to Travis Reinking in November of 2017, it was not the first time that Defendant Jeffrey Reinking had taken possession of his son's firearms, only to return them despite his actual knowledge that Travis Reinking was a dangerous and mentally unstable threat to himself and others.  Because Travis Reinking used the Bushmaster XM-15 rifle that his father returned to him to commit a deadly mass shooting on April 22, 2018 at the Antioch Waffle House located at 3571 Murfreesboro Pike in Nashville, Tennessee, however, it would ultimately be the last.

33.     Akilah DaSilva was one of the innocent people that Travis Reinking murdered at the Antioch Waffle House.

34.     The Plaintiff, Abede DaSilva—Akilah DaSilva's older brother—watched Akilah die of massive blood loss after narrowly avoiding death himself.

35.     Abede held his dying brother while he bled out and screamed in pain on the floor of the Antioch Waffle House, and he ultimately watched his brother die at Vanderbilt Hospital.

36.     Witnessing Akilah DaSilva's murder and narrowly avoiding death himself caused the Plaintiff to suffer serious and severe emotional injury that is supported by scientific proof.

37.     Losing his brother, best friend, work partner, and someone in whom he confided—and watching that person die in front of him—left a void in Abede's life that he will never be able to fill.  Abede misses his brother dearly, and a part of him is now gone forever.

38.     Travis Reinking shot at the Plaintiff and other Waffle House patrons and

-6-

murdered Akilah DaSilva using the Bushmaster XM-15 rifle that Defendant Jeffrey Reinking personally gave him in November 2017.

39.     The Bushmaster XM-15 rifle that Travis Reinking used to shoot at the Plaintiff and murder the Plaintiff's brother is a military-style weapon designed to inflict devastating and fatal damage. It fires ammunition at approximately 3,260 feet per second and can discharge up to 45 rounds per minute.

40.     One of the rounds that Travis Reinking fired at Akilah DaSilva hit him in the right shoulder.

41.     The force of the round inflicted a fatal wound that caused Akilah DaSilva to die from massive blood loss at Vanderbilt Hospital, a Level 1 Trauma Center. The Plaintiff was with Akilah DaSilva both when he was shot and when he died.

42.     At the time that Jeffrey Reinking returned the Bushmaster XM-15 rifle to Travis Reinking, Mr. Reinking knew or should have known that the Bushmaster XM-15 rifle was a deadly weapon that was designed to kill multiple people swiftly and with maximum efficiency and lethality.

43.     At the time that Jeffrey Reinking returned the Bushmaster XM-15 rifle to Travis Reinking, Mr. Reinking knew or should have known that AR-15 style rifles had been used to inflict massive fatal casualties during multiple recent mass shootings, including those that took place at Sandy Hook Elementary School in Newtown, Connecticut; the Pulse nightclub in Orlando, Florida; Stoneman Douglas High School in Parkland, Florida; and dozens of other locations.

44.     Jeffrey Reinking returned the Bushmaster XM-15 rifle to Travis Reinking in November 2017 despite actual knowledge that Travis Reinking was mentally unstable, had a history of mental instability, and was a danger to himself and others.

-7-

45. At the time that Defendant Jeffrey Reinking returned the Bushmaster XM-15 rifle to Travis Reinking in November 2017, Defendant Reinking knew that Travis Reinking did not reside in Illinois; he suspected that Travis Reinking planned to take and possess the rifle in the State of Tennessee; and he was aware that Travis Reinking posed a real and severe danger to all individuals with whom Travis Reinking came into contact.

46. Jeffrey Reinking transferred the rifle into Travis Reinking's possession within the State of Illinois with the knowledge and intent that the rifle be introduced into and possessed within a state other than Illinois by an individual whom he knew was dangerous and mentally unstable and resided out of state.

47. At the time that Jeffrey Reinking returned the Bushmaster XM-15 rifle to Travis Reinking, Jeffrey Reinking was aware that in July 2017, his son had been arrested by the United States Secret Service after he crossed into a restricted area near the White House and demanded an audience with President Trump.

48. After approaching the White House, Travis Reinking specifically stated that he wanted to speak to the President, proclaimed that he was a sovereign citizen, and insisted that he had "a right to inspect the grounds." Thereafter, Travis Reinking removed his tie, balled it into his fist, and walked past the White House's security barriers, proclaiming: "Do what you need to do. Arrest me if you have to."

49. At the time that Jeffrey Reinking returned the Bushmaster XM-15 rifle to Travis Reinking in November 2017, Jeffrey Reinking was aware that Illinois State Police had revoked Travis Reinking's FOID card. Nonetheless, and despite his actual knowledge that Travis Reinking Illinois FOID card had been revoked, Jeffrey Reinking returned the firearms to Travis Reinking and facilitated Travis Reinking's possession of the firearms within the State of Illinois.

-8-

50.     At the time that Jeffrey Reinking returned the Bushmaster XM-15 rifle to Travis Reinking in November 2017, Jeffrey Reinking was aware that in June of 2017, Travis Reinking had jumped into a Tremont Park District Pool wearing a pink woman's house coat and had begun swimming in his underwear. After Travis Reinking was told to get out of the pool, he started yelling at the lifeguards, tried to get the lifeguards to fight him, and then "showed his genitals saying he was a man."

51.     Following this incident, a Tazewell County law enforcement officer called Jeffrey Reinking and advised him that "he might want to lock the guns back up until Travis gets mental help." In response, Jeffrey Reinking stated he would do so. During this conversation, Jeffrey Reinking additionally volunteered that "awhile back he took 3 rifles and a hand gun away and locked them up when Travis was having problems. Jeff wanted to move out of state so he gave them back to him . . . ."

52.     At the time that Jeffrey Reinking returned the Bushmaster XM-15 rifle to Travis Reinking in November 2017, Jeffrey Reinking was similarly aware that on or about May 27, 2016, Travis Reinking was suicidal. Specifically, on or about May 27, 2016, Travis Reinking's family, including Jeffrey Reinking, advised police that "Travis made comments about killing himself earlier in the day."

53.     On or about May 27, 2016, Defendant Jeffrey Reinking communicated to police that Travis Reinking was armed, unstable, and a danger to himself.

54.     On or about May 27, 2016, Jeffrey Reinking knew that police wanted Travis Reinking to go to a hospital for a mental health evaluation, and that Travis Reinking became hostile afterward.

55.     On or about May 27, 2016, the Tazewell County Sheriff's Office responded to a CVS parking lot in Morton, Illinois, because Travis Reinking reported that Taylor

-9-

Swift was "stalking him and hacking his phone."

56.     On or about May 27, 2016, Travis Reinking additionally claimed that: "Taylor hacked his Netflix account and told him to meet her at the Dairy Queen in Morton. When Travis arrived, Taylor was across the street yelling at him before she took off running. Travis chased her in an attempt to get her to stop harassing him. Taylor climbed up the side of a building and Travis followed. However, when he reached the rooftop, Taylor was gone."

57.     None of the events that Travis Reinking was upset about had actually occurred. Travis Reinking's belief that Taylor Swift had hacked his Netflix account and was harassing him was attributable to the fact that he was suffering from delusions and hallucinations and has schizophrenia.

58.     On or about May 27, 2016, and at all times relevant thereafter, Jeffrey Reinking was aware of Travis Reinking's genuine belief that Taylor Swift had stalked and chased him. Jeffrey Reinking additionally knew that these beliefs were not grounded in reality.

59.     A police report regarding the incident on or about May 27, 2016, stated that "Travis is hostile towards police and does not recognize police authority."

60.     As a result of the incident in May 2016, police attempted to get Travis Reinking to go to a hospital to be evaluated, but he was uncooperative. Accordingly, "Travis was advised he did not have a choice and was going to go for evaluation."

61.     Thereafter, "Travis stated that he would go to Methodist [hospital] but it was against his will."

62.     Jeffrey Reinking was aware of the above-described incident. After Travis Reinking was involuntarily taken to Methodist against his will, Defendant Jeffrey

-10-

Reinking personally drove Travis' vehicle to his house so it did not sit in the CVS parking lot. At the time he did so, Defendant Jeffrey Reinking knew that Travis Reinking could not drive the car himself because he had been taken to a hospital against his will to undergo a mental health evaluation after suffering from delusions and hallucinations.

63.    Accordingly, at the time that Jeffrey Reinking returned the Bushmaster XM-15 rifle to Travis Reinking in November 2017, Jeffrey Reinking was aware that Defendant Jeffrey Reinking was suicidal, suffered from delusions and/or hallucinations, had baselessly believed that others—including Taylor Swift—had stalked, chased, and harassed him, and had been involuntarily hospitalized for his mental health issues against his will.

64.    Jeffrey Reinking had similarly been made aware of several additional incidents that did not involve police but also indicated that Travis Reinking was mentally unstable. For instance, at the time that Jeffrey Reinking returned the Bushmaster XM-15 rifle to Travis Reinking in November 2017, Jeffrey Reinking had been advised by his son's former employer that the employer was concerned about Travis Reinking's mental health.

65.    At the time that Jeffrey Reinking returned the Bushmaster XM-15 rifle to Travis Reinking in November 2017, Jeffrey Reinking had been made aware that in or about June 2017, Travis Reinking had threatened one of Jeffrey Reinking's employees and screamed profanity at him while wielding a rifle. The rifle was the Bushmaster XM-15.

66.    At the time that Jeffrey Reinking returned the Bushmaster XM-15 rifle to Travis Reinking in November 2017, Jeffrey Reinking was aware that his daughter—Travis Reinking's sister—had been advised by police to keep weapons away from Travis Reinking.

67.    At the time that Jeffrey Reinking returned the Bushmaster XM-15 rifle to

Travis Reinking in November 2017, Jeffrey Reinking knew or suspected that his son had moved to Tennessee.

68.     Defendant Jeffrey Reinking returned the Bushmaster XM-15 rifle to Travis Reinking in November 2017 despite his actual knowledge that Travis Reinking resided outside of the State of Illinois at the time the transfer took place.

69.     Defendant Jeffrey Reinking returned the Bushmaster XM-15 rifle to Travis Reinking in November 2017 despite having reasonable cause to believe that Travis Reinking did not reside in the State of Illinois—the jurisdiction where Defendant Jeffrey Reinking resided—at the time the transfer took place.

70.     On April 23, 2018, following an extended manhunt, Travis Reinking was arrested for murdering Akilah DaSilva and three other innocent victims at the Waffle House in Antioch with the Bushmaster XM-15 rifle that Defendant Jeffrey Reinking returned to Travis Reinking in November 2017.

71.     While shooting multiple innocent victims on April 23, 2018, Travis Reinking committed multiple torts, including, but not limited to, assaults against the Plaintiff and his brother, a fatal battery against the Plaintiff's brother, intentional and negligent infliction of emotional distress against the Plaintiff and his brother, and dozens of additional intentional torts against other patrons of the Waffle House.

72.     These torts could not and would not have occurred but for Jeffrey Reinking's overt acts to enable Travis Reinking to take possession of a Bushmaster XM-15 rifle in November 2017, and all of them resulted from Jeffrey Reinking's and Travis Reinking's conspiracy to unlawfully transfer and facilitate Travis Reinking's unlawful possession of firearms.

73.     Defendant Jeffrey Reinking intended to, overtly acted to, planned to, and

knowing Travis Reinking's intent to take possession of firearms that he could not lawfully receive, successfully acted in concert with Travis Reinking to unlawfully transfer firearms, including the Bushmaster XM-15, to his son in violation of both state and federal criminal law—all of which resulted in catastrophic injury to the Defendant and others.

74. In November 2017, it was not only foreseeable that Travis Reinking would use the firearms returned to him by Jeffrey Reinking to commit an act of violence against others, but that very likelihood had been communicated to Jeffrey Reinking, who both understood and acknowledged it.

75. In November 2017, Jeffrey Reinking nevertheless took express and deliberate actions to frustrate and undo the efforts of law enforcement to disarm his mentally deranged and dangerous son.

76. At all times relevant to this Complaint, Jeffrey Reinking had a legal duty not to entrust Travis Reinking with firearms. He also gratuitously accepted and acknowledged that duty by expressly agreeing to the same in exchange for receiving Travis Reinking's firearms from law enforcement.

77. At the time that Jeffrey Reinking returned the Bushmaster XM-15 rifle to Travis Reinking, Jeffrey Reinking knew or should have known that entrusting Travis Reinking with a Bushmaster XM-15 rifle created a severe and unreasonable risk of harm to others.

78. Given Travis Reinking's long history of mental illness, his erratic behavior, his mental instability, and law enforcement's concern that Travis Reinking was a threat to himself and others, the harm that Jeffrey Reinking caused would have been foreseeable to any reasonable person.

79. Travis Reinking could not have opened Jeffrey Reinking's locked gun safe

-13-

on his own, where the Bushmaster XM-15 was secured.

80.     In November 2017, Travis Reinking could not lawfully purchase firearms.

81.     In November 2017, Travis Reinking could not lawfully receive firearms from any person domiciled outside of Tennessee.

82.     In November 2017, Travis Reinking could not lawfully possess or take possession of any firearms within the State of Illinois.

83.     Jeffrey Reinking's overt acts to open his locked gun safe, remove the Bushmaster XM-15 from the safe, and hand Travis Reinking the rifle or else place the rifle on his table for Travis Reinking to take possession of resulted in, and proximately caused, the fatal battery of Akilah DaSilva and the assault of Abede DaSilva.

84.     But for Jeffrey Reinking's breach of his duties of care, Akilah DaSilva would be alive today, and the Plaintiff would not have had to watch him die.

85.     But for Jeffrey Reinking's breach of his duties of care, Travis Reinking would not have caused the Plaintiff to be assaulted and to experience imminent and traumatic fear that he himself was going to die.

86.     Defendant Jeffrey Reinking has admitted under oath that he has had significant contacts with the State of Tennessee since at least April of 2017, when he began visiting the state to explore business opportunities.  *See* **Exhibit #2**, p. 105.

87.     Defendant Jeffrey Reinking in fact has significant contacts with Tennessee, as he described in his December 4, 2018 deposition in this action.  *See generally* **Exhibit #2**.  Defendant Jeffrey Reinking's sworn testimony regarding his significant and extensive contacts with the State of Tennessee is expressly incorporated herein by reference.

## IV.  CAUSES OF ACTION

### 1.  Negligence—Count I

88.     The Plaintiff incorporates and realleges the foregoing allegations as if fully set forth herein.

89.     No reasonable person would have given Travis Reinking access to firearms in November 2017.

90.      At the time that Jeffrey Reinking returned the Bushmaster XM-15 rifle to Travis Reinking in November 2017, Jeffrey Reinking consciously disregarded a known risk to others by enabling Travis Reinking to take possession of firearms, including a Bushmaster XM-15 rifle.

91.     By returning the Bushmaster XM-15 rifle to Travis Reinking and facilitating his possession of it in November 2017 despite actual his knowledge that Travis Reinking was mentally unstable, Defendant Jeffrey Reinking acted unreasonably and failed to use ordinary or reasonable care under the circumstances.

### 2.  Negligence—Count II

92.     The Plaintiff incorporates and realleges the foregoing allegations as if fully set forth herein.

93.     By returning the Bushmaster XM-15 rifle to Travis Reinking and facilitating his possession of it in November 2017 despite his actual knowledge that Travis Reinking had been suicidal and experienced hallucinations and/or delusions that prompted Travis Reinking's involuntary hospitalization, Defendant Jeffrey Reinking acted unreasonably and failed to use ordinary or reasonable care under the circumstances.

### 3.  Negligence—Count III

94.     The Plaintiff incorporates and realleges the foregoing allegations as if fully set forth herein.

95.     By returning the Bushmaster XM-15 rifle to Travis Reinking and facilitating his possession of it in November 2017 despite having been made aware that Travis Reinking had previously threatened one of his employees with the same rifle that Travis Reinking ultimately used to commit mass murder, Defendant Jeffrey Reinking acted unreasonably and failed to use ordinary or reasonable care under the circumstances.

### 4.  Negligence—Count IV

96.     The Plaintiff incorporates and realleges the foregoing allegations as if fully set forth herein.

97.     By returning the Bushmaster XM-15 rifle to Travis Reinking despite his actual knowledge that that Travis Reinking posed a threat of physical harm to himself and others, Defendant Jeffrey Reinking acted unreasonably and failed to use ordinary or reasonable care under the circumstances.

### 5.  Negligent Entrustment

98.     The Plaintiff incorporates and realleges the foregoing allegations as if fully set forth herein.

99.     At all times relevant to this Complaint, Jeffrey Reinking had a legal duty not to entrust Travis Reinking with firearms.   He also gratuitously accepted and acknowledged that duty by expressly agreeing to the same in exchange for receiving Travis Reinking's firearms from law enforcement.

100.   At the time that Jeffrey Reinking returned the Bushmaster XM-15 rifle to Travis Reinking in November 2017, Jeffrey Reinking knew or should have known that entrusting Travis Reinking with a Bushmaster XM-15 rifle created a severe and unreasonable risk of harm to others.

101.   Given Travis Reinking's long history of mental illness and recent arrests arising out of his erratic behavior, mental instability, and law enforcement's concern that he was a threat to himself and others, the harm that Jeffrey Reinking caused would have been foreseeable to any reasonable person.

102.   The entrustment of firearms to Travis Reinking by Jeffrey Reinking directly resulted in and caused of the Plaintiff's injuries.

### 6.  Negligent Infliction of Emotional Distress

103.   The Plaintiff incorporates and realleges the foregoing allegations as if fully set forth herein.

104.   Jeffrey Reinking's breach of his duties of care proximately caused the Plaintiff to experience credible fear of imminent death and to witness his beloved brother's murder.

105.   Witnessing Akilah DaSilva's murder and narrowly avoiding death himself caused the Plaintiff to suffer serious and severe emotional injury that is supported by scientific proof.

### 7.  Negligence *Per Se* (Count I)

106.   The Plaintiff incorporates and realleges the foregoing allegations as if fully set forth herein.

107.   In November 2017, Defendant Jeffrey Reinking was not a licensed importer,

-17-

licensed manufacturer, licensed dealer, or licensed collector of firearms.

108.    In November 2017, Defendant Jeffrey Reinking had both actual knowledge and reasonable cause to believe that Travis Reinking did not reside in the State of Illinois.

109.    18 U.S.C. § 922(a)(5) provides that:

(a) It shall be unlawful

> (5) for any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) to transfer, sell, trade, give, transport, or deliver any firearm to any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) who the transferor knows or has reasonable cause to believe does not reside in (or if the person is a corporation or other business entity, does not maintain a place of business in) the State in which the transferor resides; except that this paragraph shall not apply to (A) the transfer, transportation, or delivery of a firearm made to carry out a bequest of a firearm to, or an acquisition by intestate succession of a firearm by, a person who is permitted to acquire or possess a firearm under the laws of the State of his residence, and (B) the loan or rental of a firearm to any person for temporary use for lawful sporting purposes[.]

110.    18 U.S.C. § 922(a)(5) is a penal statute that is designed to protect the public.

111.    18 U.S.C. § 922(a)(5) clearly defines the conduct that it prohibits.

112.    By returning the Bushmaster XM-15 rifle to Travis Reinking in November 2017 despite his actual knowledge that Jeffrey Reinking was not a resident of Illinois, Jeffrey Reinking violated 18 U.S.C. § 922(a)(5).

113.    The Plaintiff and his murdered brother belonged to the class of persons the statute was designed to protect.

114.    The Plaintiff's injury is of the type that the statute was designed to prevent.

## 8.  Negligence *Per Se* (Count II)

115.    The Plaintiff incorporates and realleges the foregoing allegations as if fully set forth herein.

-18-

116. 430 Ill. Comp. Stat. Ann. 65/0.01, *et seq.* generally prohibits anyone from acquiring or possessing any firearm within the State of Illinois without a valid FOID card. *See* 430 Ill. Comp. Stat. Ann. 65/2(a).

117. 430 Ill. Comp. Stat. Ann. 65/3(a) further provides that:

[N]o person may knowingly transfer, or cause to be transferred, any firearm, firearm ammunition, stun gun, or taser to any person within [the State of Illinois] unless the transferee with whom he deals displays either: (1) a currently valid Firearm Owner's Identification Card which has previously been issued in his or her name by the Department of State Police under the provisions of this Act; or (2) a currently valid license to carry a concealed firearm which has previously been issued in his or her name by the Department of State Police under the Firearm Concealed Carry Act.

118. In November 2017, Travis Reinking's Illinois FOID card had been revoked.

119. In November 2017, Travis Reinking could not lawfully possess firearms in the State of Illinois.

120. In November 2017, Jeffrey Reinking knew that Travis Reinking's Illinois FOID card had been revoked.

121. In November 2017, Jeffrey Reinking knew that Travis Reinking could not lawfully possess firearms in the State of Illinois.

122. In November 2017, Jeffrey Reinking nonetheless opened a gun safe to which only he had the combination, removed four firearms from it, and either handed them to Travis Reinking or left them on a table for Travis Reinking to take—all within the State of Illinois—even though Travis Reinking neither had nor displayed a valid FOID card or a valid license to carry a concealed firearm.

123. 430 Ill. Comp. Stat. Ann. 65/3(a) and 65/2(a) are penal statutes that are designed to protect the public. *See* 430 Ill. Comp. Stat. Ann. 65/14.

124. 430 Ill. Comp. Stat. Ann. 65/3(a) and 65/2(a) clearly define the conduct that

-19-

they prohibit.

125.    The Plaintiff and his brother belonged to the class of persons that 430 Ill. Comp. Stat. Ann. 65/3(a) and 65/2(a) were designed to protect.

126.    The Plaintiff's injury is of the type that 430 Ill. Comp. Stat. Ann. 65/3(a) and 65/2(a) were designed to prevent.

## 9.  Civil Conspiracy

127.    The Plaintiff incorporates and realleges the foregoing allegations as if fully set forth herein.

128.    By returning Travis Reinking the Bushmaster XM-15 rifle despite actual knowledge that Travis Reinking resided out of state and also could not possess firearms anywhere in the State of Illinois as a result of his FOID card having been revoked, Jeffrey Reinking conspired with Travis Reinking to violate 18 U.S.C. § 922(a)(5) and 430 Ill. Comp. Stat. Ann. 65/0.01, *et seq.*

129.    In November 2017, Jeffrey Reinking knew that Travis Reinking unlawfully intended to take possession of firearms within the State of Illinois.

130.    In November 2017, Jeffrey Reinking intended to facilitate and did in fact unlawfully facilitate Travis Reinking's possession of firearms within the State of Illinois.

131.    In November 2017, Jeffrey Reinking knew that Travis Reinking intended to take possession of firearms within the State of Illinois and transport them outside of the State of Illinois because Travis Reinking resided out of state.

132.    In November 2017, Jeffrey Reinking did in fact unlawfully facilitate the unlawful transfer of firearms to Travis Reinking despite knowing and having reasonable cause to believe that Travis Reinking resided out of state.

133. At the time that Jeffrey Reinking conspired with Travis Reinking to unlawfully transfer him firearms in violation of 18 U.S.C. § 922(a)(5) and 430 Ill. Comp. Stat. Ann. 65/0.01, *et seq*., both Jeffrey Reinking and Travis Reinking had the intent and knowledge of the other's intent to accomplish by concert an unlawful purpose, or to accomplish by concert a lawful purpose by unlawful means.

134. Akilah DaSilva's death; the Plaintiff's near-death; and the Plaintiff's traumatic experience of seeing his brother murdered all resulted from Jeffrey Reinking's and Travis Reinking's conspiracy to violate to violate 18 U.S.C. § 922(a)(5) and 430 Ill. Comp. Stat. Ann. 65/0.01, *et seq*.

135. As a consequence, Jeffrey Reinking is jointly and severally liable for the unlawful acts of Travis Reinking pursuant to Tenn. Code Ann. § 29-11-107(b)(1).

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully requests:

1. That the Defendant be required to appear and answer this Complaint within the time required by law;

2. All compensatory, consequential and incidental damages to which the Plaintiff is entitled in an amount not less than $5,000,000.00;

3. Punitive damages in an amount not less than $15,000,000.00;

4. That the Plaintiff be awarded the discretionary costs of trying this action;

5. That pre-judgment and post-judgment interest be awarded to the Plaintiff;

6. That all costs be taxed against the Defendant;

7. That a jury of 12 be empaneled to try this cause; and

8. All such further relief as this Court deems just and proper.

Respectfully submitted,

By:   /s/Daniel A. Horwitz_____
      Daniel A. Horwitz, BPR #032176
      1803 Broadway, Suite #531
      Nashville, TN  37203
      daniel.a.horwitz@gmail.com
      (615) 739-2888

      *Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of December, 2018, a copy of the foregoing was sent via CM/ECF to the following parties:

Parks T. Chastain
Cory R. Miller
BREWER, KRAUSE, BROOKS & CHASTAIN, PLLC
545 Mainstream Drive, Suite 101
Nashville, TN 37228
pchastain@bkblaw.com
cmiller@bkblaw.com

Joel E. Brown
416 Main Street, Suite 1300
Peoria, IL 61602
jb@joelebrown.com

*Attorneys for Defendant Jeffrey L. Reinking*

By:      /s Daniel A. Horwitz_____